# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF TEXAS

## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

MAR 3 0 2026

Nathan Ochsner, Clerk of Court

**ROBERT W. VAN KIRK,** Plaintiff (*Pro Se*),

v.

**OFFICER M. HERNANDEZ (Badge No. 8324),** in his Individual Capacity; **OFFICER JOHN DOE,** in his Individual Capacity; **THE CITY OF HOUSTON, HARRIS COUNTY HOSPITAL DISTRICT d/b/a HARRIS HEALTH SYSTEM / BEN TAUB HOSPITAL; VALERIA M. CONTRERAS, M.D.,** in her Individual Capacity; and **JASMINE BALBIR SINGH ANEJA, R.N.,** in her Individual Capacity, Defendants.

---

# VERIFIED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983 & ADA Title II)

**JURY TRIAL DEMANDED**

I, Robert W. Van Kirk, proceeding *pro se*, bring this civil rights action for damages and injunctive relief against Officer M. Hernandez, Officer John Doe, the City of Houston ("Defendant City"), and Harris County Hospital District, operating as Harris Health System / Ben Taub Hospital ("Defendant Harris Health"). I allege severe, documented violations of my First, Fourth, and Fourteenth Amendment rights under 42 U.S.C. § 1983, alongside systemic violations of Title II of the Americans with Disabilities Act.

## I. INTRODUCTION

1.     This civil rights action arises from a documented abuse of state power: a Houston Police Department ("HPD") patrol officer, with no clinical training or diagnostic

authority, weaponized a crime victim's truthfully disclosed medical diagnoses of ADHD and Depression as the probable cause to justify an eleven-day involuntary psychiatric detention. Officer M. Hernandez abandoned the criminal investigation he was obligated to conduct and instead initiated a psychiatric detention based on my disclosed diagnoses. I made no threats. I committed no violent acts. I reported a cybercrime that HPD had already opened as an active investigation three days earlier (Case No. 1198816-24). Officer Hernandez omitted that fact from his sworn affidavit. Instead, my clinical diagnoses were cited on the face of a sworn Emergency Detention Order ("EDO") not as clinical context, but as the substantive justification for stripping me of my liberty.

2. That unconstitutional seizure produced a compounding, institutional harm that continues to this day. HPD's Records Management System ("RMS") now permanently affixes a psychiatric detention flag to my identity, a persistent alert that surfaces as the first result when any officer queries my name, priming the responding officer's judgment before a single word has been exchanged. By merely reporting a crime to HPD, I was branded with a permanent flag that structurally guarantees any future request for emergency police assistance will be met with institutional prejudice and the imminent threat of a repeat unconstitutional seizure.

3. To obscure this constitutional failure, the City of Houston currently maintains mutually exclusive official positions regarding the exact same set of facts, weaponizing whichever posture is most convenient to evade accountability:

4. **First,** to justify stripping me of my liberty on August 26, 2024, HPD Officer M. Hernandez swore under penalty of perjury that my reports of being hacked were the paranoid delusions of a deteriorating mind. But I was not fabricating a story—I was describing an ongoing crime that HPD itself had already opened as an "active criminal investigation" three days earlier. Hernandez omitted that fact from his sworn affidavit.

5. **Second**, when I requested records about the incident under the Texas Public Information Act, HPD denied access to the Houston Emergency Center's network telephony records — the records captured while I was receiving spoofed calls impersonating 911 emergency services — and denied access to the Computer Aided Dispatch records, citing the § 552.108 exemption for an "active, ongoing criminal investigation." The same crime HPD called a delusion to lock me up is simultaneously real enough to shield public records.

6. **Third**, despite classifying this case as an active criminal investigation, HPD is actively trying to shed its own evidence. When I attempted to surrender a compromised device for forensic examination, HPD's Cybercrimes Division refused to accept it, stating that the division did not have the capacity to investigate phone malware and suggesting I bring it to my phone carrier instead. When I subsequently surrendered the specific device from which $74,370.88 in Bitcoin was stolen, accompanied by forensic reports and a filesystem extraction, HPD accepted the evidence into custody on March 16, 2026 — then called me back within 48 hours demanding I pick it up, now asserting that HPD is simply "not taking phones as evidence," as documented in **Exhibit 12**.

7. **Fourth**, and most revealing: this "active, ongoing criminal investigation" has never had a single investigator assigned to it. On August 22, 2025, Detective Jacorey D. Chaney of HPD's Cybercrimes Division confirmed in writing that no detective had been assigned (**Exhibit 11**). As recently as March 16, 2026, the department confirmed that Incident No. 1198816-24 remains unassigned. Nineteen months after HPD accepted my initial evidence, no detective has reviewed it, no suspect has been identified, and no investigative report has been generated.

8. As a matter of law and logic, a single set of facts cannot simultaneously be a psychiatric delusion justifying confinement, an active, ongoing criminal investigation shielding public records under Tex. Gov't Code § 552.108 (without any assigned

investigators), and an investigation whose evidence the police actively attempt to return.

## II. JURISDICTION AND VENUE

9.      This civil action is brought under 42 U.S.C. § 1983 for violations of my constitutional rights, and under 42 U.S.C. § 12132 for violations of the Americans with Disabilities Act.

10.     This Court has subject matter jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

11.     Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) because the Defendants are located within this District, and the events giving rise to the claims occurred in Houston, Harris County, Texas.

12.     **For the Court's jurisdictional assessment:** Plaintiff was not arrested for, charged with, or convicted of any crime arising from the August 26, 2024 encounter. No criminal proceedings of any kind are pending against him. He is the victim and reporting party of the underlying cybercrimes investigation (Case No. 1198816-24).

## III. PARTIES

13.     I, Robert W. Van Kirk, am a resident of Houston, Harris County, Texas.

14.     Officer M. Hernandez (Badge No. 8324) is, and was at all relevant times, a police officer employed by the Houston Police Department, acting under color of state law. He is sued in his individual capacity.

15.     Officer John Doe is the second Houston Police Department officer who responded to the scene on August 26, 2024. This officer arrived while I was accurately reporting a cybercrime with a corroborating witness present, and he participated in the execution of the Emergency Detention Order. He is sued in his individual capacity. I am currently

unable to identify this officer by name because HPD has denied my requests for CAD/dispatch records and Houston Emergency Center records under the pretext of an "active criminal investigation" (§552.108), and has unlawfully failed to respond at all to my request for body-worn camera footage (statutory default under §552.301). I will identify this officer through discovery and move to amend this complaint accordingly.

16.     The City of Houston is a municipality organized under the laws of the State of Texas. It operates the Houston Police Department and is legally responsible for its officers' training, its widespread departmental customs, and its compliance with the Americans with Disabilities Act.

17.     Defendant Harris County Hospital District ("Harris Health") is a governmental entity organized under Texas Health & Safety Code § 281.001 et seq., operating Ben Taub Hospital at 1504 Taub Loop, Houston, Texas 77030. Harris Health acts under color of state law through the physicians, nurses, and social workers it employs. Individual defendants Dr. Valeria M. Contreras, MD, and Intake Nurse Jasmine Balbir Singh Aneja, MSN, PMH-BC, RN, are employees of Harris Health and are sued in their individual capacities.

## IV. STATEMENT OF FACTS

### A. The City's Own Records Prove the Underlying Crimes Were Real

18.     Before recounting the details of my unconstitutional seizure, one fact must be established: the Houston Police Department's own records confirm that the crimes I reported to Officer Hernandez on August 26, 2024, were real and documented.

19.     On the evening of August 22, 2024, I called HPD to report that my family's computers and phones had been compromised by unauthorized remote access. Officers responded to my residence in the early morning hours of August 23, 2024, interviewed me extensively, and took detailed notes. Later that same morning, I personally delivered

the compromised electronic devices to HPD's Cybercrimes Division at downtown headquarters. HPD accepted the physical evidence, generated Incident No. 1198816-24 ("Tampering w/ Electronic"), and secured my devices in their evidence locker, where they remain today.

20. When I subsequently filed Texas Public Information Act (TPIA) requests for records related to my encounter with Officer Hernandez, HPD's responses revealed that the Department's own records infrastructure has embedded the psychiatric detention into my identity profile, and that HPD maintains irreconcilable official positions regarding the same events:

(a) Request No. P121427-082425, filed August 24, 2025, seeking CAD/dispatch records for the August 26, 2024 encounter at Sonic Drive-In, 7470 Bellfort Street. HPD responded August 27, 2025: **Denied** under §552.108, citing EDO incident no. (121581524) — not the cybercrimes case no. (1198816-24). A true and correct copy of HPD's denial is attached as **Exhibit 7**.

(b) Request No. P121428-082425, filed August 24, 2025, seeking body-worn camera footage from Officer Hernandez. **No response** — statutory default under §552.301. A true and correct copy of this ongoing refusal is attached as **Exhibit 9**.

(c) Request No. R259343-082425, filed August 24, 2025, seeking 911 call records and contractor-held location data. HPD responded September 1, 2025: **Denied** under §552.108. A true and correct copy of HPD's denial is attached as **Exhibit 8**.

(d) Request No. P122802-090825, filed September 8, 2025, seeking whether HPD issued §2703(f) carrier preservation letters. **No response** — statutory default under §552.301. A true and correct copy of this ongoing refusal is attached as **Exhibit 10**.

21. The denial of P121427 is particularly revealing. HPD denied my CAD/dispatch records request under § 552.108 — the exemption for active criminal investigations — but cited Incident No. 121581524, which is Officer Hernandez's Emergency Detention Order. An EDO is a civil psychiatric hold, not a criminal investigation; no charges

were ever filed. Section 552.108 does not apply. Then, when I separately requested 911 telephony data (R259343), HPD again invoked § 552.108, but this time cited case number 1198816-24 — the cybercrimes case. HPD used the EDO number to deny one set of records and the cybercrimes number to deny the other, applying whichever incident number was most useful to justify each withholding.

22. The telephony data HPD withheld under this exemption includes ANI (Automatic Number Identification), ALI (Automatic Location Identification), Call Detail Records, SIP headers, ESInet border traffic logs, and any dispatcher call notes or narrative — the raw network metadata and operator records generated by my 911 calls on August 26, 2024.

23. HEC retains 911 voice recordings for only six months; CAD dispatch records are retained for one year. My 911 calls were placed on August 26, 2024. I filed my TPIA request on August 24, 2025 — a full year later. Unless HPD or HEC independently preserved the recordings, the audio evidence has been permanently destroyed by routine purge.

## B. The Underlying Cybercrimes Case

24. I am a software developer with a degree in Physics. I founded and operated Kaboomracks, a cryptocurrency mining and colocation services business that generated in excess of $71 million in cumulative gross receipts. In August 2024, my former business partners diluted my ownership from approximately 39% to less than 4% through board actions, while the CFO simultaneously misrepresented the company's financial position to me. Upon information and belief, the combined entities generated in excess of $200 million in cumulative revenue. These facts establish that individuals with financial interests directly adverse to mine had a concrete motive to surveil my communications and compromise my devices.

25. During that same August 2024 period, I discovered direct evidence of unauthorized remote access to my personal laptop and my father's desktop PC, including commercially licensed surveillance software that had been installed without my knowledge or consent.

26. On August 22, 2024, my Samsung Galaxy S22 Ultra spontaneously powered itself on from a fully shut-down state and then refused to shut down, demanding a PIN — an event directly witnessed by my mother, Carolyn Van Kirk, and by my friend Nikandro Pacheco. Both witnesses have provided written statements to HPD, each declared under penalty of perjury, corroborating this event.

27. On August 23, 2024, HPD officers responded to my home and generated Incident No. 1198816-24 ("Tampering w/ Electronic"). A true and correct photograph of the HPD incident card issued to me that morning is attached as **Exhibit 4**. I then surrendered the compromised device along with other affected electronics, including computers and phones, to HPD's Cybercrimes Division at downtown headquarters, where my devices were secured in their evidence locker. Therefore, when I approached Officer Hernandez three days later, the physical evidence proving my claims was already secured inside an HPD facility, assigned to an active criminal case.

## C. The Attack Escalates to a New Device

28. On August 26, 2024, I purchased a brand-new Samsung Galaxy S24 with a new phone number from a Verizon store, deliberately avoiding linking any prior accounts. I made several calls during the drive home without issue. My mother was driving; the phone was connected to her vehicle's speakers and navigation display, so she could hear and see every call. As we approached my home, the device began receiving bursts of three MMS messages, each containing a broken image, and spoofed inbound calls. The phone began ringing with incoming calls that disconnected immediately the moment I answered — no voice, no hold tone, just a dead line. The caller ID on each spoofed

callback displayed my own most recently dialed number. My mother witnessed the entire sequence through the vehicle's Bluetooth caller-ID display.

29. My mother pulled into a Sonic Drive-In at 7470 Bellfort Street. I called 911 to report the attack. After the call ended, the same pattern repeated: the phone rang with an incoming call displaying "911" as the caller ID. When I answered, the line disconnected instantly — the same swift, automated hangup as every spoofed callback before it, with no human voice on the other end.

## D. The Encounter with Officer Hernandez

30. Observing HPD Officer M. Hernandez stationed at a nearby intersection, I voluntarily approached him to report the active attack. My mother was present and was interviewed by an officer on the scene.

31. During the field interview, I reported the events described above, in addition to the same categories of cybercrimes I had reported to HPD three days earlier, and offered to show Officer Hernandez the device. I was a citizen in the middle of an existing criminal case seeking police assistance with an ongoing crime. At no point was I violent, threatening, or expressing any intent to harm myself or others.

32. Rather than documenting a crime report, Officer Hernandez abruptly abandoned any inquiry into the perpetrators. Instead, he shifted his interrogation entirely to my private medical history, demanding to know my psychiatric diagnoses and my medication compliance. In response to a direct question from a law enforcement officer, I truthfully disclosed my clinical diagnoses of ADHD and Depression.

33. When Officer Hernandez began suggesting psychiatric detention, I asked him directly whether he was referring to an involuntary psychiatric hospitalization. Upon confirmation, I explicitly and unambiguously instructed Officer Hernandez to "cease and desist" from the detention, stating that I did not consent. As the founder and operator of a technology business, I was well-acquainted with the legal significance

9

and proper use of a cease and desist demand; this was not an impulsive outburst but a deliberate, informed invocation of my rights by an individual who had issued such demands in the ordinary course of business.

34.     Despite my unequivocal objection and the presence of a corroborating witness — my mother — Officer Hernandez proceeded to draft a sworn EDO. A true and correct copy of the sworn Emergency Detention Order obtained from Harris Health is attached hereto as **Exhibit 1**, and the authenticated version filed with the Probate Court is attached as **Exhibit 2**. The complete narrative he submitted under oath to justify stripping a citizen of his liberty is reproduced here verbatim:

"THE CONSUMER BELIEFS HE IS UNDER CYBER ATTACK, SOMEOME HAS TOLEN HIS IDENTITY. SOMEONE HAS HACKED HIS PHONE. CONSUMER HAS NOT SLEPT IN DAYS, CONSUMER CALLED 911 AND BELIEFS THAT 911 CALL TAKER IS NOT REAL, CONSUMER BELIEFS HE IS BEING WIRED TAPPED FOR A CIVIL SITUATION. CONSUMER STATED THAT HE IS DIOGNOSED WITH DEPRESSION, ANXIETY, AND ADHD AND DID NOT TAKE HIS MEDICATION TODAY."
"BASED ON THE CONSUMER'S STATEMENT, IT IS MY BELIEF THAT HE IS PARANOID DO TO HIS STATEMENTS AND SHOWING SIGNS OF MENTALL CAPACITY DETERIORATION."
Charges: "NO CHARGES"
Witnesses (Section 5): "None"

35.     That is the entirety of the sworn basis for my eleven-day psychiatric detention. The first thing the affidavit does is erase me. It erases my coherent description of ongoing crimes in a case already under active investigation by HPD's own Cybercrimes Division, delivered by a citizen accompanied by a corroborating eyewitness, and reduces it to "THE CONSUMER" who "BELIEFS." The EDO does not describe a single act of violence, a single threat, or a single instance of harm to self or others — the statutory predicate required by Texas Health & Safety Code § 573.001 to authorize emergency detention. What it documents instead is a citizen's truthfully disclosed

10

psychiatric diagnoses and an honest answer about whether he took his medication that morning. The next thing it does is erase my mother — the corroborating witness who was present, interviewed on scene, and who had personally witnessed the same criminal activity as it occurred to both of us — by listing "None" in the Witnesses field. And by omitting the active cybercrimes case entirely, the affidavit erases his own fellow officers — the HPD investigators who had opened Incident No. 1198816-24 three days earlier and were actively working it. It contains no description of any criminal conduct I reported, no mention of the telephony attack I was reporting — the impersonation of 911 Emergency Services — a federal crime under 47 U.S.C. § 227(e) (the Truth in Caller ID Act) occurring within 1.5 miles of William P. Hobby Airport — the caller-ID spoofing, the spoofed callbacks — and no acknowledgment that the crimes I described to Hernandez were the same crimes I had already reported to HPD and that HPD was already investigating under Incident No. 1198816-24. Officer Hernandez reduced an articulate crime report to a series of "beliefs," transmuting each factual statement into a psychiatric symptom, and weaponized my truthfully disclosed, ADA-protected diagnoses of ADHD and Depression as the foundational basis for confinement. And when he escorted me into the triage bay at Ben Taub Hospital, the triage nurse documented his words verbatim at 19:53: "HPD officer Hernandez 8324 States — 'Patient states took caffeine pills. States is willing to go to a locked unit.'" A true and correct copy of this triage record is attached as **Exhibit 5**.

36.    The EDO's final clinical data point — the one that apparently sealed its author's psychiatric assessment — is that I "DID NOT TAKE HIS MEDICATION TODAY." Officer Hernandez did not know what medication I take. He did not know the dosage. He did not know whether it was prescribed daily or as-needed. He did not know whether a single missed dose of an ADHD or Depression medication produces any clinically observable effect at all — because it does not: every medication I was prescribed is a long-acting formulation specifically designed to maintain therapeutic

levels in the body well beyond a single missed dose, and no prescribing guideline for any of the medications I was taking lists "psychiatric emergency" as a consequence of missing a single morning dose. A qualified mental health diagnostician evaluating whether a person poses an imminent risk of serious harm applies the DSM-5 criteria, a structured clinical interview, and the legal standard of Texas Health & Safety Code § 573.001. Officer Hernandez applied none of these. He asked a citizen whether he had taken his pills that day, received an honest answer, and wrote it into a sworn affidavit as though it explained everything that followed.

37. **I told Officer Hernandez to "cease and desist." He walked into Ben Taub and told staff I was "willing to go to a locked unit."** That is not a miscommunication. A citizen has the legal right to withhold consent to psychiatric detention, even when an officer proceeds under an EDO. Officer Hernandez did not merely ignore that right — he inverted that right. After I explicitly objected to the detention, Officer Hernandez transported me to the hospital and stated to the intake nurse that I was "willing to go to a locked unit," causing the medical record to reflect affirmative consent where he knew an express refusal existed.

38. To summarize Officer Hernandez's conduct: a citizen in the middle of an existing cybercrimes case approached a police officer for help, accompanied by a corroborating witness — his mother — who had experienced the same criminal activity. The officer abandoned any inquiry into the crime and instead began interrogating the citizen about his private psychiatric history — his diagnoses, his medications, whether he had taken them that day. The citizen answered truthfully. The officer then independently discovered the citizen's open HPD cybercrimes case in his own system — and did not add it to the EDO, did not amend his sworn narrative, and did not reconsider. He told the officer to cease and desist from psychiatric detention. The officer detained him anyway, produced a sworn document that erased every substantive detail of his crime report, listed his corroborating witness as "None," weaponized the citizen's own

truthfully disclosed psychiatric diagnoses as justification for confinement, and then walked into a hospital and told staff the citizen was "willing to go to a locked unit." The body-worn camera footage of this encounter — which Plaintiff will seek through discovery — will demonstrate the full extent of the disparity between the coherent, detailed crime report I delivered and the conduct Officer Hernandez chose.

39. A second officer ("Officer John Doe") was present on the scene. Officer Doe was aware of the open HPD cybercrimes case and was in possession of an EDO that failed to articulate any threat or act of harm to self or others — yet did not intervene to prevent the involuntary psychiatric transport.

40. HPD maintains a dedicated Mental Health Division (MHMD) whose officers are specially trained to review, respond to, and supervise Emergency Detention Orders in the field. Upon information and belief, the MHMD was notified of my EDO and had active access to HPD's Records Management System. Had any MHMD officer or supervisor queried my name in RMS, they would have immediately seen the open cybercrimes case (Incident No. 1198816-24) opened just three days earlier. Whether the MHMD reviewed this EDO, what its review concluded, and whether supervisory action was deliberately withheld are facts exclusively within the City's possession and will be sought through discovery.

41. While the EDO process was underway, Officer Hernandez turned to me and asked: "Why didn't you tell me you had an open case with Cybercrimes?"

42. Upon confirming that cybercrimes I just described were the subject of an active HPD investigation, a reasonable officer would have halted the psychiatric detention and contacted the investigating division. Officer Hernandez did not. He executed the detention, knowingly omitting the corroborating eyewitness and the active cybercrimes case from the sworn EDO.

## E. The Execution and Transport

43.    Officer Hernandez placed me in handcuffs for transport. I had made no threats, committed no act of violence, and offered no physical resistance. The EDO itself does not allege any threatening conduct. There was no legal or safety basis for restraining a cooperative, non-violent citizen during a civil mental health transport.

44.    The sworn EDO did not document a single threat, act of violence, or instance of self-harm. Four independent clinicians: Dr. Cedrick Lubin, DO Chinelo Obinero, Dr. Joy M. Mackey, and RN Jessica L. Hamblin, separately evaluated me within hours and charted identically: "No SI/HI." The statutory predicate Officer Hernandez swore to was clinically non-existent.

## F. The Involuntary Psychiatric Detention and Institutional Collapse

45.    I was involuntarily admitted to the Psychiatric Emergency Center at Ben Taub Hospital. The admitting physician specifically remarked to Officer Hernandez, or the officer accompanying him, on the absence of any documented threat to self or others on the face of the EDO.

46.    The sworn EDO — the sole legal instrument authorizing my detention — was never scanned into Harris Health's electronic medical records system. The document that justified stripping a citizen of his liberty was physically absent from the clinical file. Every clinician who evaluated me, every physician who continued my hold, and every nurse who charted my behavior did so without the legal basis for my presence in their facility anywhere in the record. Nobody knew why I was there.

47.    The hospital's own intake records confirm I was lucid, coherent, and oriented. Upon intake, I stated: "The police brought me here because I told them some[one] hacked into my phone and computers... the cops made a mistake." Staff formally assessed me

14

as "Alert," "Oriented," and "Attentive," and explicitly declined to check the clinical boxes for "Delusional" or "Confused."

48. From the moment of my arrival I continuously requested access to an attorney. I made this request to every nurse who assessed me and every physician who interviewed me — at least a dozen times over the course of multiple hours. At 21:15, Intake Nurse Jasmine Balbir Singh Aneja documented that I "Wants to call his lawyer." This is the only instance in the entire medical record where any staff member charted my request for counsel.

49. Rather than questioning the facially deficient EDO — which documented no criminal conduct, no threat, no witness, and no coherent basis for detention — Ben Taub's clinical staff uncritically adopted Officer Hernandez's tainted narrative. From my first interactions with staff, I could tell they had been poisoned by information I had never provided: clinicians asked me leading questions about taking pills to stay awake because I was paranoid, questions that tracked Hernandez's fabricated triage statement — not anything I had said. Because the sworn EDO was not even contemporaneously scanned into the medical record, staff were left to rely entirely on Officer Hernandez's unsworn verbal statements at triage, where he delivered the truly damaging fabrications — the manufactured consent, the caffeine-paranoia narrative — without the constraint of an oath. The staff had been told I was "willing to go to a locked unit" — the same fabrication I had explicitly contradicted with a cease and desist demand. At approximately 21:00 on August 26, ED physician Dr. Mackey speculatively notated "substance use?" in my clinical record — hours before any toxicology results were available — echoing Hernandez's fabricated claim that I was taking caffeine pills "to stay awake all night" driven by paranoia. This introduced the false diagnostic variable "R/o Stimulant induced [psychosis]" that would anchor my clinical assessment from its first moment. The toxicology panel that returned later that night found only amphetamines, consistent with lawfully prescribed medications from my providers in

Arizona — which the hospital never bothered to verify. No clinician amended Dr. Mackey's notation after the disconfirming lab results returned. The false narrative Officer Hernandez introduced at triage was thereby converted into clinical fact, permanently anchoring my assessment to a "rule-out" diagnosis that no institutional protocol ever subjected to objective verification.

50. Throughout this period, I was unable to verify the identity or credentials of a single individual providing my care. In a facility authorized to forcibly inject patients with antipsychotic medication and strip them of their liberty, the only identification visible on treating staff were black-and-white paper printouts that lacked full names — just names written in marker. No photograph. The printouts identified staff under "Harris Health" — the parent hospital system — not "Ben Taub," the facility where I was being held. When I pointed out this discrepancy, staff documented my factually accurate observation as my Chief Complaint: "Where does it say Ben Taub" — framing a correct question about inadequate identification as evidence of disorientation. When I requested to see photo identification, no staff member produced one. I could not confirm whether the individuals who would later physically restrain me and inject me against my will were licensed providers, nor could I identify them by full name for purposes of contacting an attorney or filing a complaint.

51. For a substantial period during my detention, I was held in a common hallway observation area within the PEC. The area was staffed by what appeared to be graduate students, residents, or clinical trainees engaged in a supervised training exercise. Multiple trainees were stationed in the hallway, deliberately avoiding eye contact or interaction with patients. A supervising clinician oversaw the group. Throughout this period, I continued to request access to an attorney — audibly and repeatedly. Not a single trainee, and not the individual supervising them, responded to my request, facilitated attorney contact, or documented my demand for counsel. When an entire supervised training cohort uniformly ignores a patient's repeated demands for an

16

attorney, and the supervisor charged with teaching them does the same, the failure is not individual — it is institutional. These trainees were being trained, and what they were being trained to do was ignore requests for counsel.

52. During the observation period, I repeatedly asked the attending physicians to contact HPD's Cybercrimes Division — a specific law enforcement unit within the same police department that had just detained me — to verify my status as a crime victim in an open investigation. I used the words "HPD Cybercrimes." The medical record transcribes my statement as: "I'm confused why no one has called cyber security yet" — substituting a vague, generic term for the name of a real law enforcement division, subtly reframing a concrete, verifiable request into something that sounds confused. Staff documented the statement and took no action. A single phone call to HPD would have confirmed Case No. 1198816-24 and could have ended the detention entirely.

53. Six hours and thirty-three minutes after my first documented request for counsel, I was permitted access to the ward telephone. I made three calls — each of which I had an absolute right to make under the Fourteenth Amendment and Texas Health & Safety Code § 576.006 (guaranteeing involuntary patients the right to communicate by sealed, uncensored mail and by telephone). I dialed 811. The call did not connect. I dialed 911. The call did not connect. I called my father. His phone rang but never went to voicemail, preventing me from leaving a message to relay my need for counsel. All three call attempts failed. Because I had been seized from a public parking lot without warning, I did not have my attorney's number memorized. No physician order restricting my telephone access existed at any point during my admission. Rather than investigating why three consecutive calls from the ward phone failed to connect, Nurse Aneja charted my accurate observation at 03:48 AM — that outbound calls were blocked, including emergency services — as a psychiatric delusion: "Patient does not believe that the phone on the wall is real."

17

54. At 03:47 AM, after I abandoned the non-functional phone, Dr. Contreras ordered the administration of a "B52" chemical restraint: Haloperidol 5 mg, Lorazepam 2 mg, and Diphenhydramine 50 mg by forced intramuscular injection. To justify this intervention, she checked the box for "Harm to others." Her written narrative stated only that I was "acutely paranoid, believes staff has kidnapped him and threatening to elope." RN Hamblin acknowledged the medication order at 03:50 AM.

55. I walked to my room voluntarily and was not aggressive. At 03:58 AM, I was physically tackled by multiple staff members and injected against my will. RN Hamblin recorded at the moment of injection that I "did walk into his room" and was "not aggressive." No physician order authorizing the physical restraint existed at the time force was applied. The restraint monitoring record, completed by RN Hamblin, identifies the "Condition impacting the need for restraint still present" as: "Refusing Emergent Psychotropic Medication." My medical record explicitly documents that I was "unwilling to consent for psychotropic medication at this time." No court order authorizing involuntary medication existed.

56. The physical restraint was applied at 03:58 AM, discontinued at 03:59 AM, and Dr. Contreras did not sign the physician order authorizing it until 04:07 AM, nine minutes after the restraint had already been applied and discontinued. The medication order was prospective; the restraint order was retroactive. Staff physically held me down and injected me without any physician authorization for the use of force.

57. The chemical injection profoundly violated my bodily autonomy. Lorazepam is clinically known to cause anterograde amnesia; consequently, I am unable to independently recall what was done to me during the hours following the injection.

58. The following morning, August 27, 2024, my mother called Dr. Contreras. Dr. Contreras's clinical addendum transcribes my mother independently confirming the cyber-attack, the compromised family devices, and the acquisition of our new phones. This was now the second independent prompt to verify my account: I had already

18

asked the attending physicians to contact HPD's Cybercrimes Division to confirm my open case (¶52) — a request they documented as "cyber security" and ignored. The EDO that authorized my detention was facially deficient — it documented no criminal conduct, no threat, no witness, and no coherent basis for detention. That deficiency alone should have placed the examining physicians on heightened notice to independently verify the basis for my commitment rather than uncritically parroting the arresting officer's narrative. Instead, when my mother's call provided direct collateral validation of the exact facts Officer Hernandez had labeled delusions, Dr. Contreras treated corroboration as contamination. A single phone call to HPD would have confirmed Case No. 1198816-24 and revealed that Hernandez had omitted the existence of an open criminal investigation from the sworn EDO. Dr. Contreras made no such call. She did not revise the diagnosis or release me. Minutes later, she entered: *"mom bringing CPAP. ?folie a deux."* — proposing that my mother had adopted my reported account as a shared delusion rather than corroborated the objective truth.

59. On August 28, 2024, examining physician Dr. Eileen K. Starbranch certified that I was "likely to cause serious harm to others." Her justification: "poor sleep. Says his identity has been stolen" and "Agitation. Pacing."

60. I was detained for a total of eleven days and eventually transferred in Precinct 1 Constable custody to Houston Behavioral Healthcare Hospital (HBHH). I was finally released on September 6, 2024, only after the Probate Court dismissed the cause. Throughout the entirety of my detention — across two facilities and eleven days — no clinician at either institution ever documented suicidal ideation, homicidal ideation, or hallucinations. Four independent clinicians charted "No SI/HI" on the night of my admission to Ben Taub (¶42). HBHH's own psychiatric evaluation, conducted on August 28, states twice: "Denies suicidal and homicidal ideation. He denies hallucinations." Daily progress notes continued to document the same throughout the

stay. The statutory predicate for my involuntary detention — an "imminent, substantial risk of serious harm" — was clinically nonexistent from the first hour to the last.

## G. Post-Detention Records Review, Documentary Fabrication, and Institutional Obstruction

61. In February 2025, during Plaintiff's review of the Harris Health System Epic EHR export file obtained through a patient records request, Plaintiff identified critical anomalies in the detention paperwork that prompted a comparative forensic analysis against authenticated court records. The discoveries described in ¶¶60–62 below arose from that post-discharge review and document the fabrication and alteration of the very instruments used to authorize and justify Plaintiff's eleven-day confinement.

62. **Post-Hoc EDO Insertion.** The Application for Emergency Detention maintained in Harris Health's Epic EHR (**Exhibit 1**) bears a hard-coded digital scanner timestamp of **02/18/2025** — approximately six months after the August 26, 2024 detention and September 6, 2024 discharge. This timestamp establishes that the EDO was not contemporaneously present in Plaintiff's clinical record when Ben Taub detained him. The document was scanned and inserted into the EHR months after Plaintiff's release.

63. **Two Physically Distinct "Sworn" Affidavits.** Plaintiff obtained the authenticated copy of the EDO filed with the Harris County Probate Court in Cause No. 360232 (**Exhibit 2**). A direct, lossless native-vector comparison of the signature blocks (**Exhibit 3**) reveals that the Harris Health EHR version and the Probate Court version are not the same physical document. The two instruments exhibit different signature geometry in Officer Hernandez's handwriting, different checkbox markings in the body of the form, and clinical identification stickers that are oriented differently across the two versions. By definition, only one of these instruments can be the document Officer Hernandez actually executed before a magistrate. Accordingly, at least one of these

instruments is not the affidavit Hernandez swore to before any magistrate and is a fabricated physical instrument purporting to be that sworn application.

64. **Documented Refusal of Consent.** During the same review, Plaintiff examined page 82 of the Harris Health EHR export, which contains the intake consent signature page (**Exhibit 6**). Consistent with my contemporaneous cease-and-desist demand to Officer Hernandez and my refusal to consent to the detention, I expressly refused to sign these documents. The physical document itself bears the notation "Patient Refused to Sign" written in staff handwriting. This notation provides absolute documentary proof that Harris Health intake staff knew my admission was entirely coercive and non-consensual—directly contradicting Officer Hernandez's fabricated oral statement that I was "willing to go to a locked unit." Yet despite this documented refusal on August 26, 2024, the exculpatory intake documents proving my non-consent were suppressed from the active digital record and were not scanned into the Epic EHR until the retroactive "cleanup" on February 18, 2025.

65. **Regulatory Context.** The conduct described in ¶¶59–62 constitutes severe violations of the record-integrity standards governing Harris Health's operations. 26 Tex. Admin. Code § 301.329 requires that medical record systems ensure the "availability, integrity, utility, authenticity, and confidentiality" of information in the record. A six-month-late insertion of a non-contemporaneous EDO image, a second physically distinct version of the same sworn affidavit, and the delayed scanning of the patient's explicit refusal to sign intake documents are not minor clerical irregularities; they are systematic breaches of the documentary safeguards designed to prevent the indefinite, off-the-books detention of a citizen.

66. Upon information and belief, one or more employees of HPD and/or Harris Health created and inserted the non-contemporaneous EDO image into Plaintiff's medical record after the fact in order to retroactively manufacture jurisdictional authority for Plaintiff's prior confinement. The identity of the individual(s) responsible, the specific

date of fabrication or substitution, and the chain of custody by which the second physical EDO was produced and transmitted remain within the exclusive knowledge and control of Defendants and are the proper subject of discovery.

67.     On September 3, 2025, I submitted a detailed supplemental records request to Harris Health, formally requesting: (a) the complete EHR access and audit log; (b) an Accounting of Disclosures under 45 C.F.R. § 164.528; (c) all detention and legal predicate documents; and (d) the complete inpatient clinical record from HBHH. Simultaneously, I submitted a written Preservation Rider expressly requesting that Harris Health preserve all EHR data and metadata, all detention paperwork, all security camera footage, and all badge and door access logs.

68.     On September 15, 2025, Privacy Officer Catherine Walther, JD, CHC, CHRC, issued a formal written response denying three independent categories of request. She denied the Accounting of Disclosures by asserting the TPO exemption — despite disclosures to the Probate Court and Precinct 1 Constable being judicial and governmental disclosures expressly required to be accounted for under § 164.528. She denied the EHR audit log without citing legal authority. She failed entirely to address the HBHH records. The response was copied to two additional Harris Health administrators, confirming a reviewed institutional decision.

## H. Consequential Harm

69.     On July 20, 2025, $74,370.88 in cryptocurrency (0.63415691 BTC) was stolen from an Exodus wallet on my mother's compromised device while my parents slept. My mother is retired. I personally conducted a retroactive forensic analysis of the family's mobile devices. That analysis confirmed that all devices had been recompromised at the kernel level. Tombstone crash logs document a hardware encryption key compromise on my mother's device on September 9, 2024, related exploitation attempts on September 8, and a separate attack on my father's device on September 15 — all within days of my

release and consistent with attackers who had established persistence while I was detained. A close friend's device, belonging to Nikandro Pacheco, showed the same indicators of kernel-level compromise. The quality of this independent forensic work is not speculation: during the same investigation, I discovered a separate, unrelated, severe Remote Code Execution vulnerability in Android's Radio Interface Layer. Google's Android Security Team independently validated the vulnerability and compensated me through its Vulnerability Reward Program in December 2025.

## I. HPD's Ongoing Failure to Investigate

70. More than nineteen months after I surrendered my initial physical evidence, HPD has produced no investigative report, made no arrests, assigned no detective to Incident No. 1198816-24, and taken no investigative action.

71. **Actionable Forensic Evidence Ignored.** This paralysis is particularly egregious because the physical evidence contains directly actionable, verifiable leads. As detailed in my formal August 2025 supplemental statement to HPD Cybercrimes, forensic analysis of my father's compromised PC revealed that TeamViewer remote-access software had been illicitly bound to an unauthorized enterprise management console. A Recuva forensic scan of the device (**Exhibit 13**) demonstrates that the attackers were actively overwriting TeamViewer log files—a recognized anti-forensics technique designed to scrub session metadata. A critical configuration file, `session.json` (**Exhibit 14**), survived the scrubbing only because I had hard-unplugged the PC mid-session, suspecting it could contain forensic evidence since it had been abruptly pulled offline before the intrusion was even fully discovered, thereby physically arresting the log rotation process. This surviving artifact contains a unique TeamViewer Session ID timestamped 2024-08-14T13:19:40.341Z (August 14, 2024, at 1:19 PM UTC), specifically identifying the use of an enterprise deployment of TeamViewer Windows version 15.55.3. This establishes that the unauthorized remote access session was

initiated twelve days before Officer Hernandez dismissed my crime report as a psychiatric delusion. A routine administrative subpoena to TeamViewer GmbH for this Session ID would positively identify the perpetrator's originating IP address, as well as the remote user's account information, including the credit card used to purchase the enterprise license. HPD possesses this evidence, possesses this Session ID, yet has steadfastly refused to execute the subpoena or advance the investigation.

72.    **Contradictory Stonewalling.** In direct contradiction to this institutional inaction, HPD Cyber Crimes Detective J. Chaney emailed me on August 22, 2025 (**Exhibit 11**)—more than six months ago—claiming he had issued urgent preservation requests for TeamViewer data logs on Case No. 1198816-24. Yet HPD continues to systematically ignore formal public information requests seeking the transmission records of those very preservation letters (**Exhibit 10**), providing absolutely no response in violation of statutory deadlines. HPD's Cyber Crimes Division claims to be urgently pursuing evidence, while its Open Records division refuses to confirm the preservation requests were ever actually sent.

73.    Each of the evidence refusals and reversals described in the Introduction (¶6) is documented. I objected in writing to HPD's demand that I retrieve my mother's device without completing forensics, copying the Harris County District Attorney's Victim Services Division.

## J. The Permanent Deprivation of Rights

74.    As a direct consequence of Officer Hernandez's fabricated EDO, my involuntary psychiatric commitment was formalized into a permanent public record in Harris County Probate Court (Cause No. 360232). That application was subsequently dismissed by the court on September 9, 2024, without any formal commitment order ever being entered.

75. The existence of the probate proceeding record has damaged my ability to clear background checks for cybersecurity employment and government security clearances. Upon information and belief, the proceedings may have been transmitted to the FBI's National Instant Criminal Background Check System (NICS), potentially subjecting me to a firearms prohibition under 18 U.S.C. § 922(g)(4). Because my probate case was dismissed before any commitment order was entered, any such NICS submission would be erroneous.

76. The practical consequence of the RMS psychiatric flag is a structural barrier to police services: any officer who queries my name is immediately confronted with an involuntary psychiatric commitment record before I have said a single word. Because the cyber-attacks against my family are ongoing and the perpetrators remain at large, I face a continuous, structural need for emergency police assistance that is now in direct tension with a municipal data infrastructure that primes responding officers to view me as a delusional subject rather than a crime victim with an active, open case.

## V. CAUSES OF ACTION

### Count I: Fourth Amendment — Unreasonable Seizure (42 U.S.C. § 1983)

**(Unreasonable Seizure, *Franks* Violation, and Failure to Intervene — against Officers Hernandez and John Doe)**

77. I incorporate by reference the factual allegations set forth in Paragraphs 18 through 41 as they specifically relate to Officers Hernandez's and John Doe's conduct during the August 26, 2024 encounter, and Paragraphs 64 through 74 as they relate to the ongoing consequences of the unlawful seizure.

25

## A. The Sworn EDO — Deliberate Fabrications and Material Omissions

78. Officer Hernandez's sworn EDO affirmatively misrepresented the presence of witnesses and omitted four critical facts known to him at the time of execution:

(a) The EDO falsely claimed there were "None" for witnesses, when my mother, Carolyn Van Kirk, was physically present, actively corroborated my account, and was interviewed on body-worn camera.

(b) The EDO omitted my active, verified HPD cybercrimes case (No. 1198816-24), which Hernandez personally confirmed on the scene.

(c) The EDO failed to articulate any fact establishing an "imminent, substantial risk of serious harm." By relying solely on my reported speech ("BELIEFS"), self-disclosed diagnoses, and the officer's subjective conclusion of "paranoia," the document omitted the complete lack of any threats, violence, self-harm, weapons, severe emotional distress, or inability to care for myself.

(d) The EDO deliberately reframed my citizen-initiated crime report—concerning actively spoofed incoming calls on a newly purchased phone with a corroborating witness—into the spontaneous exhibition of delusional beliefs, omitting the fact that I had voluntarily approached the officer to report a specific, witnessed telecommunications crime.

79. By personally confirming the active cybercrimes case, interviewing my mother, and observing the absence of any distress or danger, Officer Hernandez knew these statements were false or omitted them with reckless disregard for the truth.

80. If these truths were included and the falsehoods removed, the resulting facts would not establish an imminent risk of serious harm sufficient to justify emergency detention under Texas Health & Safety Code § 573.001(a). The EDO was thus incapable of supporting probable cause for my seizure. Indeed, HPD's own records division later confirmed the falsity of Hernandez's sworn narrative when it denied Plaintiff's open

records requests under an exemption reserved exclusively for an *active criminal investigation*—for the very crimes that Officer Hernandez swore were delusions.

## B. Post-Hoc Fabrication of the Emergency Detention Instrument and Absence of Valid Legal Process

81.    Independent of the content falsities and omissions addressed above, the physical instrument maintained by Harris Health to justify Plaintiff's seizure is itself a post-hoc fabrication. As set forth in Section G (¶¶59–62), the EDO image in Harris Health's Epic EHR (**Exhibit 1**) bears a hard-coded scanner timestamp of **02/18/2025** — approximately six months after Plaintiff's August 26, 2024 detention and September 6, 2024 discharge. This document was not contemporaneously present in Plaintiff's clinical record when Ben Taub detained him; it was inserted months later.

82.    Moreover, the Harris Health EHR version and the authenticated Probate Court version (**Exhibit 2**) are not the same physical document. A lossless native-vector comparison of their signature blocks (**Exhibit 3**) reveals different signature geometry in Officer Hernandez's handwriting, different checkbox markings, and clinical identification stickers that are oriented differently across the two versions. Only one of these instruments can be the document Officer Hernandez actually executed before a magistrate. Accordingly, at least one is a fabricated physical instrument purporting to be the sworn application that authorized Plaintiff's seizure.

83.    This physical fabrication presents a distinct Fourth Amendment problem: the document in Harris Health's possession is not a facially valid affidavit at all — it is a non-contemporaneous, post-hoc reproduction that cannot serve as the "legal process" insulating the seizure. An officer who secures a seizure through false or materially incomplete sworn statements is directly liable even when a magistrate later signs off.

84.    Thus, Count I presents two independent dimensions of Fourth Amendment liability: first, Officer Hernandez's sworn narrative was deliberately false and fundamentally unsupported by probable cause (Section A above); and second, the physical instrument maintained by Harris Health to justify the seizure is itself a post-hoc fabrication that cannot constitute valid legal process (this Section B). Either dimension independently renders the seizure unconstitutional.

## C. Oral Misrepresentations to Hospital Staff — Taint Exception to the Independent Intermediary Doctrine

85.    Separately from the sworn EDO, Officer Hernandez made two material oral misrepresentations to Ben Taub hospital staff upon delivery (Exhibit 5). First, he told hospital staff I "took caffeine pills" in a context implying paranoid stimulant compulsion, rather than a voluntary disclosure of routine over-the-counter use. Second, he told the triage nurse I was "willing to go to a locked unit," manufacturing consent moments after I had expressly commanded him to "cease and desist" and refused consent.

86.    These oral misrepresentations tainted Ben Taub's subsequent clinical evaluations through documented Diagnostic Anchoring. Hospital flowsheets definitively prove that at 20:00 on August 26, 2024—exactly 62 seconds after the Triage Nurse completed her initial intake at 19:58:58, and while Plaintiff was actively being searched and changing clothes—a separate Crisis Intervention nurse recorded a comprehensive psychiatric narrative attributing Plaintiff's ingestion of caffeine pills to "paranoia," stating he took them "because he did not feel safe to go to sleep." Because the mathematical timeline proves this nurse could not have conducted a contemporaneous psychiatric interview in 62 seconds, this psychological motivation was extracted directly from Officer Hernandez's fabricated EDO and unverified oral report, and immediately laundered

28

into the chart as an objective clinical finding. Subsequent providers blindly relied on this police-manufactured clinical baseline, converting Plaintiff's legitimate exercise of rights and accurate crime reports into psychiatric symptoms. Because Hernandez manufactured this clinical baseline, the hospital's intake decisions cannot be considered independent of his unconstitutional seizure.

## D. Failure to Intervene and Qualified Immunity

87.   Officer Doe witnessed a calm citizen accurately reporting a verified crime with a corroborating witness present, observed no facts that would constitute an imminent risk of serious harm, and failed to intervene to prevent the involuntary detention despite a clear opportunity to do so. Officer Doe was physically present on the scene when Officer Hernandez executed the EDO, and was in a position to observe that Hernandez listed "None" for witnesses while Plaintiff's mother stood within speaking distance. Officer Doe was present when Plaintiff issued his cease-and-desist demand refusing consent to psychiatric detention — and was therefore on actual notice that any subsequent representation of Plaintiff's "willingness" to go to a locked unit was fabricated. Officer Doe accompanied or followed the transport to Ben Taub and was present in the triage area when Officer Hernandez delivered the manufactured consent narrative to the admitting nurse. Despite witnessing these fabrications in real time, Officer Doe had a reasonable opportunity to intervene — by correcting Hernandez's false statements, by noting the presence of the corroborating witness, or by contacting dispatch to verify the open cybercrimes case — and chose not to act. In the alternative, Officer Doe is directly liable for knowingly contributing to the false material information used to secure the unlawful seizure, regardless of whether he signed the EDO.

88.   Defendants Hernandez and Doe are not entitled to qualified immunity. The constitutional violations alleged herein were clearly established at the time of the

conduct: citizens have a clearly established right to be free from seizure based on a deliberately fabricated affidavit. Because the statutory exigency here was fabricated rather than genuine, no Fourth Amendment exception saves this seizure. No reasonable officer could believe that personally confirming a citizen's active criminal case, then swearing under oath that the same citizen's reports are delusions, erasing a corroborating eyewitness from the record, reframing a citizen-initiated crime report as the exhibition of delusional beliefs, and then orally fabricating the citizen's consent to hospital staff, could be lawful.

## Count II: First Amendment — Retaliatory Seizure (42 U.S.C. § 1983)

**(Retaliation for Protected Speech — against Officer Hernandez)**

89.    I incorporate by reference the factual allegations set forth in Paragraphs 27 through 35 as they specifically relate to Officer Hernandez's retaliatory conduct — including my cease-and-desist demand and his fabrication of consent — during the August 26, 2024 encounter.

90.    I engaged in core First Amendment protected speech in two distinct and independently protected ways: First, I exercised my right to petition the government for redress of grievances by reporting an active cybercrime to a law enforcement officer — a citizen-initiated request for police investigation that constitutes quintessential petitioning activity under the First Amendment's Petition Clause. Second, I verbally and formally commanded Officer Hernandez to "cease and desist" from the unlawful detention and expressly refused consent to psychiatric hospitalization — a direct, on-scene challenge to police action. The First Amendment protects both the right to report crimes to law enforcement and the right to verbally oppose or challenge police conduct without thereby risking arrest or seizure. Officer Hernandez retaliated against both forms of protected speech: he abandoned the criminal investigation I had petitioned him to

30

conduct, reframed my crime report as psychiatric symptomatology, and then seized me for involuntary commitment.

91. After I invoked my rights and refused consent, Officer Hernandez completed the Emergency Detention Order, placed me in handcuffs, transported me to Ben Taub Hospital, and then delivered the exact opposite narrative to the admitting nurse — that I was "willing to go to a locked unit" (Exhibit 5). He thereby erased my recorded invocation of rights from the institutional record and replaced it with a fabricated statement of cooperation.

92. These actions would deter a person of ordinary firmness from exercising the same protected speech in the future: a citizen who tells an officer to "cease and desist" is immediately subjected to an involuntary psychiatric seizure lacking probable cause, and the officer then manufactures a false narrative of consent to ensure that the invocation of rights cannot be proved or challenged from within the hospital. The fabrication of consent occurred only after, and because, I asserted my rights, and was aimed at punishing and neutralizing that protected speech.

93. The seizure lacked probable cause for the reasons set out in Count I. Even if Defendants later contend there was arguable probable cause, the deliberate creation of a false consent narrative immediately following my cease-and-desist demand constitutes objective evidence of retaliatory motive.

94. At the time of these events, it was clearly established that (a) citizens have a right to verbally challenge and refuse police action without being subjected to retaliatory seizure, and (b) officers may not initiate or prolong a seizure in retaliation for protected speech, particularly where there is no probable cause. Using an involuntary detention, and fabricating a contrary consent narrative, in response to a cease-and-desist invocation violates the First Amendment.

31

## Count III: Fourteenth Amendment — Due Process (42 U.S.C. § 1983)

**(Arbitrary Confinement and Fabricated Evidence — against Officer Hernandez, the City of Houston, and Harris County Hospital District)**

95.    I incorporate by reference the factual allegations set forth in Paragraphs 27 through 41 as they specifically relate to Officer Hernandez's fabrication of the EDO and the initial seizure, Paragraphs 42 through 59 as they relate to the downstream deprivation of liberty and bodily integrity caused by that fabrication, and Paragraphs 59 through 65 as they relate to the post-hoc documentary fabrication and suppressed consent refusals discovered during Plaintiff's February 2025 forensic review.

### A. Arbitrary Deprivation of Liberty and Bodily Integrity (Civil Commitment Cascade)

96.    Officer Hernandez's deliberately fabricated EDO — which omitted the exculpatory witness, fabricated paranoid stimulant compulsion, and officially branded my factual crime reports as delusional threats — tainted every subsequent clinical evaluation, the forced chemical restraint, and the Probate Court proceedings. The crime reports that Hernandez branded as delusions are the same crimes that HPD's own records division now shields under Texas Government Code § 552.108 as an active criminal investigation. I was physically tackled, physically restrained without a contemporaneous physician order, and forcibly injected with antipsychotic drugs precisely because Officer Hernandez's fabrication instructed the hospital that I was a delusional threat. The eleven-day loss of liberty and the forced chemical sedation were the direct, foreseeable, and proximately caused consequences of Officer Hernandez's initial fabrication, and deprived me of my Fourteenth Amendment liberty interest in freedom from unjustified confinement and my right to bodily integrity without due process of law.

97. Deliberately branding accurate crime reports as delusional and omitting exculpatory facts in order to trigger and sustain an involuntary psychiatric confinement shocks the conscience and constitutes the type of arbitrary state action that violates substantive due process, not a reasonable mistake. The conduct alleged here fails to meet the heightened procedural and evidentiary safeguards required to constitutionally authorize civil commitment.

## B. Manufactured Evidence and Use of Fabricated Records to Secure and Defend Civil Commitment

98. Independent of the arbitrary-confinement theory above, Defendants' manufacturing of evidence and knowing use of fabricated records to obtain, sustain, and defend a deprivation of liberty violates the Due Process Clause as a distinct constitutional injury.

99. **Officer Hernandez** is individually liable for procuring Plaintiff's eleven-day civil commitment through manufactured evidence: the deliberately fabricated EDO narrative (false "No Witnesses," omitted cybercrimes case, omitted statutory predicate, reframed crime report); the oral fabrications to hospital staff (manufactured consent, distorted caffeine disclosure); and any role he had in creating or transmitting the physically inconsistent EDO instruments to the Probate Court and/or Harris Health.

100. **The City of Houston** is liable under *Monell* for the HPD-side manufactured evidence: the tainted EDO process described in Count V, Custom 2 (rubber-stamp EDOs and fabricated affidavits), and any subsequent HPD involvement in the creation, transmission, or "paper clean-up" of the inconsistent EDO instruments, including communications with Harris Health around the February 18, 2025 scan date.

101. **Harris County Hospital District (Harris Health)** is liable under *Monell* for the post-hoc record laundering detailed in Section G (¶¶59–62): the insertion into Plaintiff's

33

Epic EHR of a non-contemporaneous EDO image bearing a 02/18/2025 scanner timestamp — a document physically distinct from the Probate Court's authenticated copy — and the six-month suppression of the Patient Bill of Rights intake forms proving Plaintiff had expressly refused to sign them. These acts manufactured a false timeline of jurisdictional authority and hid the contemporaneous proof of Plaintiff's involuntary status, which was then used to defend Plaintiff's prior confinement in post-hoc administrative and legal responses. The identity of the specific Harris Health employees who performed the scanning and record manipulation on February 18, 2025, remains within Defendants' exclusive knowledge and control and is the proper subject of discovery.

102. To be clear, Plaintiff does not assert any Texas common-law false-imprisonment claim for the probate "custody period." Plaintiff alleges that the underlying EDO and subsequent record entries were physically fabricated and post-hoc inserted, so there was never constitutionally valid "legal process" capable of insulating the deprivation of liberty.

## Count IV: Americans with Disabilities Act, Title II (42 U.S.C. § 12132)

**(Discriminatory Provision of Police Services — against the City of Houston)**

103. I incorporate by reference the factual allegations set forth in Paragraphs 27 through 41 as they specifically relate to the City of Houston's denial of police services to Plaintiff based on his disclosed disabilities, and Paragraphs 64 through 74 as they relate to the City's ongoing refusal to investigate Plaintiff's reported cybercrimes.

104. I am a qualified individual with a disability within the meaning of Title II of the ADA: I have clinically diagnosed ADHD and Depression, which substantially limit one or more major life activities, including concentrating, thinking, and sleeping.

105. The City of Houston, through HPD, provides public-safety and law-enforcement services, including responding to 911 calls, taking crime reports, and conducting

34

criminal investigations. I called 911 and then voluntarily approached Officer Hernandez to obtain those services — a lawful HPD response and investigation into an ongoing telecommunications crime. Instead of providing those services, Hernandez refused to investigate, initiated an Emergency Detention Order, and had me taken into involuntary psychiatric custody.

106. Officer Hernandez knew of my disabilities because I truthfully disclosed my ADHD and Depression in response to his direct questions. On the face of the sworn EDO, he explicitly cited my ADHD and Depression, and my decision not to take medication yet that day, as the primary basis for dismissing my crime report and seizing me, even though I had made no threats, possessed no weapons, and engaged in no violence. In other words, Hernandez treated my disclosed mental-health diagnoses as a substitute for the statutory "imminent, substantial risk of serious harm" required for an EDO, and as a reason not to provide me the same investigative services HPD affords to non-disabled crime victims.

107. The August 26, 2024 encounter involved no exigent, life-threatening circumstances: there were no weapons, no ongoing violence, and no risk to bystanders. The scene was secure, and nothing prevented Hernandez from providing ADA-compliant police services — verifying the already-open HPD cybercrimes case, taking my report, and forwarding evidence to the investigating division — instead of initiating a psychiatric detention based on my diagnoses.

108. By denying me the benefit of a lawful police investigation and subjecting me instead to involuntary psychiatric commitment because of my disclosed ADHD and Depression, the City of Houston, through its officer, violated Title II of the ADA. HPD General Orders 200-19 (ADA) and 500-12 (Mental Health Incidents) underscore that officers must provide equal police services to individuals with disabilities and use the least coercive measures in mental-health incidents; Hernandez's conduct departed from those policies by weaponizing my disability status rather than accommodating it.

35

109. The disability-based denial of police services and diversion into involuntary psychiatric custody described in this Count were not isolated errors by a single officer, but the predictable product of the City's longstanding customs and failures described in Count V, including HPD's practice of treating disclosed mental-health diagnoses as a substitute for the statutory EDO danger criteria, its failure to train officers on ADA-compliant responses to crime victims with disabilities, and its pattern of freezing or abandoning the underlying criminal cases of those subjected to EDOs. These policies and customs were the moving force behind the discrimination I suffered in the provision of police services and the violations of Title II of the ADA alleged here.

## Count V: Municipal Liability (*Monell*) (42 U.S.C. § 1983)

**(Widespread Custom, Failure to Train, and Ratification — against the City of Houston)**

110. I incorporate by reference the factual allegations set forth in Paragraphs 18 through 41 as they specifically relate to the City of Houston's customs and policies regarding EDO practices, and Paragraphs 64 through 74 as they relate to HPD's post-EDO case freeze, RMS psychiatric flagging, and evidence refusal patterns.

111. The City of Houston is liable under 42 U.S.C. § 1983 because, acting through its final policymakers for HPD — including the Chief of Police for day-to-day law-enforcement operations and the City Council for formal general orders, training standards, and budget allocations — it has long maintained persistent, widespread customs that were the moving force behind the violations of my constitutional rights. These customs are so common and well-settled as to constitute official HPD policy rather than isolated or sporadic acts by individual officers, and include:

(a)    **Custom 1: Disability-as-Probable-Cause / Denial of Police Services.** HPD maintains a custom of treating a citizen's disclosure of a managed mental-health diagnosis (such as ADHD or depression) as a substitute for the particularized finding of "imminent, substantial risk of serious harm" required for an EDO — abandoning the investigation

36

of reported crimes and instead seizing the reporting party on the basis of disability-related stigma.

(b) **Custom 2: Rubber-Stamp EDOs and Fabricated Affidavits.** HPD maintains a systemic practice of submitting sworn EDO applications that omit exculpatory witness statements and rely solely on officers' subjective interpretations of citizens' speech, driven by an institutional failure to train officers on the statutory requirement for an "imminent, substantial risk of serious harm" and on the constitutional obligations under *Franks*.

(c) **Custom 3: Post-EDO Case Freeze, RMS Psychiatric Flagging, and Evidence Refusal.** After an HPD-initiated EDO, HPD freezes or abandons the victim's underlying criminal case while representing it as "active" for TPIA purposes, and simultaneously refuses critical evidence, using a permanent RMS psychiatric flag to treat the victim as delusional rather than credible in all subsequent encounters.

112. The City had actual and constructive notice of these customs and of the obvious need for different or additional training, supervision, and RMS safeguards. That notice came from, among other sources: (a) the Goines scandal and ensuing federal civil-rights litigation exposing HPD's pattern of securing seizures via fabricated and materially incomplete affidavits, resulting in at least 162 overturned convictions; and (b) the known gap in HPD's CIT curriculum, which trains officers to treat diagnoses as "indicators" of mental illness but does not train that those diagnoses are ADA-protected statuses that cannot substitute for statutory EDO danger criteria. Despite this notice, the City failed to revise its policies, retrain its officers, or correct its RMS design, and instead allowed these customs to persist. That conscious failure to act in the face of known risks constitutes deliberate indifference. In the alternative, HPD command-level officials, after receiving full notice of the facts of my case through my complaints and open-records requests, chose to leave the defective EDO, RMS

psychiatric flag, case freeze, and evidence-refusal posture in place, thereby ratifying the underlying customs.

113. The City's customs were the direct cause and "moving force" behind the violations of my constitutional rights. Custom 1 — treating a disability disclosure as a substitute for probable cause — was the moving force behind Officer Hernandez's decision to abandon the cybercrimes investigation, unlawfully seize me, and initiate an EDO instead of providing police services. Custom 2 — rubber-stamp EDOs and fabricated affidavits — was the moving force behind the sworn EDO's material falsehoods and omissions, including the erasure of a corroborating eyewitness and an active HPD cybercrimes case, which enabled the initial unlawful seizure and set in motion the ensuing eleven-day confinement. Custom 3 — post-EDO case freeze, RMS psychiatric flagging, and evidence refusal — was the moving force behind the ongoing denial of police services, HPD's refusal to investigate the documented cybercrimes or accept critical devices as evidence, and the structural risk of future harm created by permanently branding me as a psychiatric detainee in HPD's systems. But for these institutional customs, the constitutional deprivations alleged in Counts I–IV would not have occurred.

114. In the alternative, even if the Court were to conclude that Plaintiff's experience constitutes a single incident insufficient to establish a widespread pattern, the constitutional consequences of equipping patrol officers with the unilateral power to involuntarily commit citizens via sworn EDO — without training them that ADA-protected diagnoses cannot serve as a substitute for the statutory danger criteria, that corroborating witnesses and open criminal cases must be documented, and that *Franks* requires probable-cause affidavits to be truthful — are so highly predictable and patently obvious that the City's failure to provide such training falls within the single-incident exception for deliberate indifference recognized in *Connick v. Thompson*, 563 U.S. 51, 63–64 (2011), and *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).

Upon information and belief, the constitutional violations alleged herein have occurred to other similarly situated citizens who disclosed mental-health diagnoses during HPD encounters and were subjected to EDOs lacking statutory predicates.

115. Accordingly, Plaintiff has plausibly alleged (a) a municipal policymaker; (b) persistent, widespread customs that fairly represent official HPD policy; (c) the City's deliberate indifference to the known or obvious risk that these customs would result in constitutional violations; and (d) that these customs were the direct and proximate "moving force" behind the Fourth, First, and Fourteenth Amendment injuries described in Counts I–III and the ADA violations described in Count IV. Plaintiff's *Monell* allegations are based on the facts currently available to him; the full scope of the City's unconstitutional customs, the identities of all responsible final policymakers, and the extent of their knowledge are matters within the City's exclusive control. Plaintiff therefore expressly reserves the right to amend and supplement this Count after obtaining HPD body-worn camera footage, CAD/RMS records, and other discovery bearing on HPD's training, supervision, and RMS practices.

## Count VI: Unlawful Chemical Restraint and Violation of Bodily Integrity (42 U.S.C. § 1983)

**(Against Dr. Valeria M. Contreras, MD, in her Individual Capacity)**

116. I incorporate by reference the factual allegations set forth in Paragraphs 42 through 59 as they specifically relate to Dr. Contreras's conduct — including the forced B-52 injection, the retroactive restraint order, and the dismissal of collateral corroboration — during Plaintiff's involuntary confinement at Ben Taub Hospital.

117. **Plaintiff brings this claim exclusively as a federal constitutional deprivation of substantive due process and bodily integrity under 42 U.S.C. § 1983. Plaintiff expressly disclaims any state-law tort, medical malpractice, or health care liability**

39

**claim governed by Chapter 74 of the Texas Civil Practice and Remedies Code.** This Count challenges the non-consensual administration of powerful psychotropic drugs by a state actor in the absence of any emergency or valid court order.

118. On August 27, 2024, at 03:47 AM, Dr. Contreras ordered a forced intramuscular "B52" injection — Haloperidol 5 mg, Lorazepam 2 mg, Diphenhydramine 50 mg — over my explicit refusal. The medical record contemporaneously documents that I was "unwilling to consent for psychotropic medication at this time." No court order authorizing involuntary medication existed under Texas Health & Safety Code § 576.025 or § 574.106. The following facts establish that Dr. Contreras's decision to forcibly medicate me was not a good-faith exercise of medical judgment, but a substantial departure from accepted professional standards:

(a) The comprehensive toxicology panel, available for over three hours before the injection, was negative for all controlled substances except those lawfully prescribed by my physicians. Dr. Contreras did not act on this disconfirming data.

(b) Contemporaneous nursing notes at the moment of injection documented that I "did walk into his room" and was "not aggressive." There was no acute safety emergency or evidence that I posed an imminent danger to myself or others.

(c) The sole working diagnosis at the time was a "rule-out" — an unconfirmed hypothesis, not a clinical conclusion. A "rule-out" diagnosis is, by definition, a request for further investigation, not a basis for the most invasive intervention available.

(d) No court order authorizing involuntary medication existed under Texas Health & Safety Code § 576.025, and no effort was made to obtain one before forcibly administering antipsychotic medication over my objection.

(e) The physical restraint was applied at 03:58 AM and discontinued at 03:59 AM. Dr. Contreras did not sign the physician order authorizing it until 04:07 AM — nine minutes after the restraint had already been applied and discontinued. The restraint order was retroactive, documenting an already-completed use of force rather than prospectively authorizing it.

(f) The restraint-monitoring record identified the justification as "Refusing Emergent Psychotropic Medication" — my exercise of a statutory right to refuse treatment, not any contemporaneous safety threat.

(g) The following morning, Dr. Contreras received direct collateral corroboration from my mother independently confirming the cyber-attack, the compromised family devices, and our new phone acquisitions. Rather than revising the diagnosis in light of this corroboration, Dr. Contreras entered "? folie a deux," treating my mother's agreement as further evidence of shared delusion rather than as exculpatory evidence.

119. Taken together, these facts demonstrate not mere negligence or a reasonable difference of medical opinion. By forcibly medicating a calm, non-aggressive civil detainee solely on a "rule-out" diagnosis, using my protected medication refusal itself as the documented rationale for restraint, and executing retroactive paperwork to authorize an already-completed physical hold, Dr. Contreras's conduct constituted a substantial departure from accepted professional judgment and an arbitrary invasion of bodily integrity. Furthermore, I could not verify the identity or credentials of the individuals who physically restrained and injected me; the only identification visible on treating staff were names written in marker on paper printouts — no photographs, no full names, no verifiable credentials.

120. By ordering and causing the forced "B52" injection under these circumstances, Dr. Contreras, acting under color of state law, deprived me of my Fourteenth Amendment liberty interest in freedom from unjustified physical restraint and my right to bodily integrity without due process of law. No reasonable clinician, apprised of the negative toxicology, the absence of aggression or imminent danger, the lack of any court order, and the purely "rule-out" diagnosis, could have believed that this level of force and chemical restraint was medically or legally appropriate.

41

## Count VII: Denial of Communication Rights and the Iatrogenic Feedback Loop (42 U.S.C. § 1983)

**(Against Nurse Jasmine Balbir Singh Aneja, MSN, PMH-BC, RN, in her Individual Capacity)**

121. I incorporate by reference the factual allegations set forth in Paragraphs 44, 45 through 48, and 50 as they specifically relate to Nurse Aneja's conduct — including the denial of attorney access, the pathologizing of Plaintiff's accurate telephone complaint, and the resulting iatrogenic feedback loop that triggered the forced injection.

122. I requested access to my attorney continuously from the moment of my arrival. The single documented instance at 21:15 — "Wants to call his lawyer" — represents the minimum verifiable floor of at least a dozen requests. No physician order restricting my telephone access or attorney communication existed at any point. Six hours and thirty-three minutes after my first documented request for counsel, I was permitted access to the ward telephone. The phone was non-functional: at minimum, my call to 911 was blocked, and the nurse documented that I reported the call to my father "did not go to voicemail." When I accurately reported these failures, Nurse Aneja documented my observation at 03:48 AM as a psychiatric delusion: "Patient does not believe that the phone on the wall is real."

123. This documentation had direct, measurable clinical consequences. The documented "delusion" elevated my Behavioral Activity Rating Score (BARS), which triggered the emergent medication order, which triggered the forced injection described in Count VI, which generated the "Kicked nurse" notation during the injection, which Dr. Contreras then used in the Probate Court certification as evidence of danger to others. Harris Health's own infrastructure created the symptom, documented my rational response as pathology, and used that pathology to justify continued restraint — a self-sustaining iatrogenic feedback loop.

124. By documenting Plaintiff's accurate complaints about a non-functional ward telephone as delusional, pathologizing his repeated requests for counsel, and thereby helping to trigger the forced chemical restraint, Defendant Aneja, acting under color of state law, violated Plaintiff's Fourteenth Amendment rights to bodily integrity and access to the courts. This claim is brought solely under 42 U.S.C. § 1983 and does not assert any state-law health care liability or malpractice claim.

## Count VIII: Municipal Liability — Harris Health (*Monell*) (42 U.S.C. § 1983)

**(Widespread Custom, Failure to Train, and Ratification — against Harris County Hospital District)**

125. I incorporate by reference the factual allegations set forth in Paragraphs 42 through 59 as they specifically relate to Harris Health's institutional customs at Ben Taub Hospital — including the uncritical adoption of law-enforcement narratives, the restraint-as-coercion practice, and the systemic failure to provide functional communication access and verifiable staff identification.

126. Harris Health is liable under 42 U.S.C. § 1983 because, acting through its final policymakers for Ben Taub Hospital — including its Board of Trustees and senior executive leadership responsible for patient-care policies and compliance — it has long maintained persistent, widespread customs that were the moving force behind the violations of my constitutional rights. These customs are so common and well-settled as to constitute official policy rather than isolated or sporadic acts by individual clinicians, and include:

(a) **Custom H1: Restraint-as-Coercion for Non-Dangerous Non-Compliance.** Harris Health maintains a custom of using B-52 injections and physical holds on non-aggressive, non-dangerous patients as a coercive response to medication refusal, rather

43

than as a last-resort safety measure. In my case, contemporaneous documentation recorded that I "did walk into his room" and was "not aggressive" at the moment of injection; the physician restraint order was entered retroactively, after the hold had already been applied and discontinued; and the restraint-monitoring record listed "Refusing Emergent Psychotropic Medication" — the exercise of a statutory right to refuse — as the justification for the hold.

(b)     **Custom H2: Institutional Failure to Verify Staff Identity and Pathologizing of Rational Suspicion.** To understand the reasonableness of my conduct inside Ben Taub, the court must hold the full context in view: I had been targeted by sophisticated cyberattacks — spoofed callbacks, corrupt SMS bursts, 911 caller-ID impersonation — crimes that HPD's own records division has since confirmed are real by denying records from that day under § 552.108, the exemption reserved exclusively for active criminal investigations. I was then seized by an officer who omitted every exculpatory fact from a sworn affidavit, erased a corroborating witness, and fabricated my consent to a locked psychiatric unit. In that context, the failure of medical staff to wear photo identification badges as required by Texas Health & Safety Code § 241.009 was itself a direct cause of iatrogenic harm. I could not verify the identity or credentials of the individuals who would control my liberty, my medication, and my body. The only identification visible were names written in marker on paper printouts bearing the name "Harris Health" — not "Ben Taub" — in violation of the statutory requirement that hospital employees wear identification badges. When I pointed out this discrepancy, staff documented my factually accurate observation as my Chief Complaint: "Where does it say Ben Taub." The institution's statutory noncompliance created the very suspicion it then charted as evidence of disorientation — a second iatrogenic feedback loop. Simultaneously, Harris Health maintained a custom of documenting civil detainees' requests for counsel without facilitating attorney contact: six hours and thirty-three minutes after my first documented request, I was permitted

access to a ward telephone that was non-functional — at minimum, my call to 911 was blocked. When I accurately reported the malfunction, staff charted my observation as a psychiatric delusion: "Patient does not believe that the phone on the wall is real." The failure to produce credentials in compliance with state law, the failure to provide functional communication access, and the pathologizing of accurate complaints about both failures constitute a single, self-reinforcing institutional custom that manufactured clinical justifications for continued detention.

(c)    **Custom H3: Uncritical Incorporation of Law-Enforcement Narratives at Intake.** Harris Health maintained a custom of accepting police narratives as the clinical baseline during intake without any institutional checkpoint for independent verification. The chart itself is the evidence of this custom: Officer Hernandez's characterization was adopted wholesale as the presenting complaint; the panel was negative for all tested substances except amphetamines, consistent with my out-of-state Arizona prescriptions which they never verified, yet this objective data did not prompt clinicians to disconfirm the police narrative; a family member's direct corroboration of the reported cybercrimes was recharacterized as shared delusion ("folie à deux") rather than treated as disconfirming evidence; and the patient's accurate report of a malfunctioning telephone was documented as a psychiatric symptom. This custom created a clinical environment where unverified police narratives superseded objective medical data, causing Officer Hernandez's initial statements to dictate every subsequent clinical decision and proximately causing the eleven-day detention.

(d)    **Custom H4: Retroactive Record-Laundering.** Harris Health maintains a longstanding practice of "cleaning up" missing or defective civil-commitment paperwork by altering the documentary record after the fact. In Plaintiff's case, that practice manifested as scanning a non-contemporaneous "Sworn Application for Emergency Detention" and the exculpatory "Patient Refused to Sign" intake forms into his Epic chart six months after discharge, bearing a 02/18/2025 scanner timestamp.

45

Suppressing the patient's documented refusal of consent from the active digital record for a half-year operates in direct violation of 26 Tex. Admin. Code § 301.329's requirement that medical record systems ensure the "availability, integrity, utility, authenticity, and confidentiality" of information in the record. Upon information and belief, this was not an isolated aberration, but a routine method by which Harris Health staff handle off-the-books psychiatric paperwork: by hiding the proof of non-consent and manufacturing the appearance of contemporaneous legal authority months later, rather than accurately providing the intake authorizations to the treating clinicians in real time.

(e)     Even if Plaintiff's experience were the only proven instance, the deliberate retroactive insertion of an EDO image and the withholding of the patient's "Refused to Sign" intake forms from the medical record of an involuntarily confined patient for six months is so egregious, and so directly tied to centralized policies for medical-records management, that it independently reflects institutional deliberate indifference to record integrity in the civil-commitment context. The risk that such conduct would result in unlawful deprivations of liberty is obvious, and no further pattern is necessary to establish that Harris Health's policies and customs were the moving force behind Plaintiff's injuries.

**Constitutional Significance of Record Integrity in Civil Commitment.** A hospital's practice of retroactively "laundering" EDO paperwork and suppressing the proof of a patient's consent refusal from the active medical record is not a clerical irregularity; it is an institutional policy choice that predictably results in unlawful deprivations of liberty.

127.    Harris Health was on actual and constructive notice of these customs and of the obvious need for different or additional training, supervision, and systems safeguards. That notice came from, among other sources, a September 2019 CMS survey finding "Immediate Jeopardy" deficiencies in Patient Rights at Ben Taub, which resulted in a federal investigation and loss of CMS "deemed status," as well as prior federal

46

litigation placing Harris Health on notice of systemic psychiatric evaluation and restraint failures. Despite this clear notice, Harris Health acted with deliberate indifference by failing to adequately train staff on the strict limits governing restraints of non-dangerous patients, to remedy deficient communication systems that obstruct attorney access, or to implement policies preventing the punitive use of restraints and the pathologizing of patients' rights assertions. In the alternative, Privacy Officer Catherine Walther's deliberate misapplication of HIPAA exemptions to deny the EHR audit log and Accounting of Disclosures in response to my detailed written request and Preservation Rider — a reviewed institutional decision copied to additional administrators — constitutes ratification of the underlying customs and an effort to conceal their operation.

128. Harris Health's failure to produce the EHR audit log and security video after receiving the written Preservation Rider on September 3, 2025, raises a substantial inference that these records, if produced, would be unfavorable to Defendant. Harris Health remains under a continuing obligation to preserve these materials, and any subsequent destruction or loss subjects Defendant to adverse inference sanctions under the federal spoliation doctrine.

129. Harris Health's customs were the direct cause and "moving force" behind the violations of my constitutional rights. Custom H1 (restraint-as-coercion for medication refusal) was the moving force behind the forced B-52 injection and the retroactive physical restraint — the battery on my person and the violation of my bodily integrity. Custom H2 (failure to verify staff identity, denial of attorney access, and pathologizing of rights demands) was the moving force behind the iatrogenic feedback loops that converted my rational complaints — about unverifiable staff credentials and a non-functional telephone — into "symptoms" used to justify further restraint. Custom H3 (uncritical incorporation of law-enforcement narratives at intake) was the moving force behind the perpetuation of the unlawful detention on a tainted clinical baseline that no

institutional checkpoint ever corrected. Custom H4 (retroactive record-laundering and manufactured consent narratives) was the moving force behind the manufactured paper trail of jurisdictional authority and medical consent used to justify and defend Plaintiff's prior confinement, and constitutes the post-hoc documentary fabrication alleged in Count III, Section B. But for these institutional customs, the constitutional deprivations alleged in Counts III, VI, and VII would not have occurred.

130. Accordingly, Plaintiff has plausibly alleged (a) a municipal policymaker for Harris Health; (b) persistent, widespread customs that fairly represent official policy at Ben Taub; (c) Harris Health's deliberate indifference to the known or obvious risk that these customs would result in violations of patients' Fourteenth Amendment rights to liberty, bodily integrity, and access to counsel; and (d) that these customs were the direct and proximate "moving force" behind the injuries described in this Complaint. The full scope of Harris Health's unconstitutional customs, the identities of all responsible final policymakers, and the extent of their knowledge are matters within Harris Health's exclusive control; Plaintiff therefore expressly reserves the right to amend and supplement this Count after obtaining discovery concerning Ben Taub's restraint, communication, and intake-policy practices, and the EHR audit and security-video records that Harris Health has failed to produce.

## VI. PRAYER FOR RELIEF

WHEREFORE, I respectfully request that this Court enter judgment in my favor and against Defendants, and award the following relief:

(a) Compensatory damages for the loss of eleven days of freedom, the denial of access to counsel, the physical pain and battery of the forced injection and physical restraint, and the resulting severe emotional and psychological harm;

(b) Compensatory damages for the harm to my reputation, background-check record, cybersecurity employment prospects, and potential erroneous NICS entry caused by

48

the initiation of the probate proceeding (Cause No. 360232), which was dismissed without any commitment order;

**(c)** Compensatory damages for medical and counseling expenses;

**(d)** Consequential and special economic damages proximately caused by the eleven-day incapacitation, including but not limited to accrued leave expended during detention, the full insurance billing for the inpatient stay, and the severe devaluation and dilution of Plaintiff's equity position in a multi-million-dollar technology enterprise that occurred while Plaintiff was unlawfully stripped of his liberty and isolated from communication. Officer Hernandez's unconstitutional seizure constituted an affirmative act that placed Plaintiff in a position of danger substantially worse than that which existed absent state intervention: Hernandez was explicitly on notice of the active, ongoing cyberattack at the time of seizure — having personally confirmed the open HPD Cybercrimes case (No. 1198816-24) on scene — and nevertheless stripped Plaintiff of his electronic devices, physically incapacitated him, and isolated him from all communication for eleven days, thereby affirmatively providing the criminal perpetrators an unobstructed window to destroy evidence, cover their tracks, establish hardened kernel-level persistence on family devices, and ultimately steal $74,370.88 in cryptocurrency from Plaintiff's mother's compromised device. Because Hernandez knew of and confirmed the active attack before executing the seizure, the resulting financial losses were a directly foreseeable consequence of the unconstitutional detention and fall within the state-created danger exception to the general rule against liability for third-party criminal acts. The City of Houston's subsequent ratification of the fabricated "delusion" narrative further compounded these damages by causing the systemic failure of the investigating division to issue 18 U.S.C. § 2703(f) preservation letters to telecommunications carriers, irreparably spoliating critical network evidence and severely prejudicing Plaintiff's ability to civilly prosecute the perpetrators for the full scope of their criminal harassment;

(e)    Punitive damages against Officer Hernandez individually for the knowing fabrication of a sworn affidavit, the deliberate omission of both a corroborating eyewitness and Plaintiff's active HPD Cybercrimes investigation, and the retaliatory manufacture of false consent—a 180-degree inversion of Plaintiff's explicit invocation of his statutory right to refuse voluntary transport under Texas Health & Safety Code § 573.001;

(f)    Punitive damages against Dr. Contreras individually for ordering forced medication on a rule-out diagnosis over an explicit refusal, entering a retroactive restraint order, and continuing the involuntary hold by failing to contact the Houston Police Department Cybercrimes division to verify an active investigation—even after receiving outside corroboration from Plaintiff's mother—while relying on a facially deficient Emergency Detention Order;

(g)    Declaratory relief pursuant to 28 U.S.C. § 2201, including:

(i) A declaration that Defendants violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments and Title II of the ADA;
(ii) A declaration that Officer Hernandez knowingly omitted exculpatory evidence to facilitate an unlawful seizure, and/or subsequently falsified a replacement Emergency Detention Order to retroactively justify the unconstitutional detention; and
(iii) A declaration that the Houston Police Department has failed to conduct a meaningful investigation into Incident No. 1198816-24 as a direct result of institutional efforts to ratify Officer Hernandez's fabricated narrative;

(h)    Injunctive relief directing the City of Houston to revise its CIT training curriculum and implement protocols regarding ADA-protected disclosures and coordination with investigating divisions during EDO encounters;

(i)    Injunctive relief directing Harris Health to: (1) implement policies and training ensuring that civil detainees' requests for legal counsel are treated as a legal right requiring affirmative facilitation within a reasonable time, not as a clinical observation to be charted and ignored; (2) audit and reconfigure hospital PBX telephone systems to

50

ensure that any telephone access provided to a patient pursuant to their statutory right to invoke counsel or contact the government retains the unblocked ability to dial 911 or otherwise contact law enforcement to report abuse and verify active criminal cases, effectively prohibiting the hospital from satisfying legal communication requests via strictly blocked, functionally nominal "courtesy" lines; (3) prohibit the use of physical or chemical restraints to coerce or punish non-dangerous patients who are exercising their statutory right to refuse medication; and (4) enforce strict compliance with Texas Occupations Code § 104.008 by requiring all direct-care psychiatric staff to wear conspicuous photo identification badges that state the specific facility name ("Ben Taub Hospital") and the provider's licensure status, and mandating that if staff last names are obscured pursuant to a hospital violence-prevention policy, the facility must proactively provide patients written notice in the Patient Bill of Rights explaining that this specific obscuration is permitted under Texas law, thereby preventing unnecessary escalation while ensuring patients retain the legally mandated ability to verify credentials and report abuses;

**(j)**    Injunctive relief directing the expungement of all records resulting from this unconstitutional seizure, including removing the psychiatric detention flag from HPD's RMS and any erroneous NICS entry;

**(k)**    Post-judgment interest pursuant to 28 U.S.C. § 1961, and pre-judgment interest as allowed by federal common law;

**(l)**    Costs of suit, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 if counsel is retained;

**(m)**    Such other relief as this Court deems just and proper.

---

**Reservation of Rights.** Plaintiff's allegations regarding municipal liability are based on facts and records currently available to him. The full scope of Defendants' unconstitutional customs,

the identities of all responsible final policymakers, and the extent of their knowledge and deliberate indifference are matters exclusively within Defendants' possession and control. Plaintiff reserves the right to supplement and refine these allegations following discovery, and respectfully prays for leave to amend this Complaint should discovery reveal additional evidence supporting his claims for municipal liability.

## DEMAND FOR JURY TRIAL

I hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

*Robert W. Van Kirk* ROBERT W. VAN KIRK

Plaintiff, *Pro Se*

7366 Brace St.

Houston, TX 77061

(832) 428-2882

robertwaynevankirk@gmail.com

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my personal knowledge, information, and belief.

Executed on this 30th day of March, 2026.

*Robert W. Van Kirk* **ROBERT W. VAN KIRK**, Declarant

53