United States Courts
Southern District of Texas
F I L E D

MAY 1 4 2026

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT W. VAN KIRK, | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:26-cv-02517 |
| *v.* | § | |
| | § | Honorable George C. Hanks, Jr. |
| Officer Hernandez, et al., | § | |
| *Defendants.* | § | |

## VERIFIED AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983 & ADA TITLE II)

### JURY TRIAL DEMANDED

I, Robert W. Van Kirk, proceeding *pro se*, bring this civil rights action for damages and injunctive relief against Officer M. Hernandez, et al. Plaintiff alleges that Defendants, acting under color of state law, violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments and Title II of the Americans with Disabilities Act.

## I. INTRODUCTION

1.    On August 26, 2024, Plaintiff Robert W. Van Kirk voluntarily approached HPD Officer M. Hernandez to report an ongoing cyberattack in an already-open HPD Cybercrimes matter, with his mother present as an eyewitness. Plaintiff's mother remained in her vehicle within feet of the encounter, with her window down, and heard and observed the officer's questioning. When Hernandez later interviewed her separately, she told him she had witnessed the spoofed-call events Plaintiff was reporting. Three days earlier, HPD had opened Incident No. 1198816-24, classified as "Tampering w/ Electronic," after officers documented Plaintiff's report of unauthorized remote-access software, compromised

devices, and related electronic intrusions. Plaintiff had already surrendered multiple devices to HPD's Cybercrimes Division for forensic review. The specific August 26 report concerned a brand-new phone, purchased less than two hours earlier, receiving spoofed calls from the most recently dialed number, including callbacks displaying "911" after Plaintiff called 911.

2.     During the August 26 encounter, Officer Hernandez located Plaintiff's open Cybercrimes case in HPD's own system. Hernandez turned to Plaintiff and asked: "Why didn't you tell me you had an open case with Cybercrimes?" After locating that case, he proceeded with an Emergency Detention Order (the "EDO"). Upon information and belief, Cybercrimes was never contacted by Hernandez or any participating member of HPD involved in Plaintiff's detention.

3.     Plaintiff made no threats, committed no violent acts, possessed no weapon, and expressed no intent to harm himself or others. The EDO identifies no inability by Plaintiff to function independently. In response to Hernandez's direct questioning, Plaintiff disclosed diagnoses of ADHD and Depression and stated that he had taken caffeine supplements that day, as he had done daily for years in lieu of coffee. The EDO later claimed Plaintiff had not slept in days; Plaintiff does not recall making that statement.

4.     The EDO identified no overt act, threat, attempt, weapon, violent conduct, suicidal ideation, homicidal ideation, or grave disability. Its stated basis was Plaintiff's statements: Hernandez wrote that his belief was "based on consumer's statement," then characterized Plaintiff's report as "mental capacity deterioration." The form listed no witness, although Plaintiff's mother had remained within feet of the questioning and was separately interviewed by Hernandez. The form identified the content of Plaintiff's speech and

disclosed diagnoses; it did not identify independently observed conduct or behavior showing an imminent risk of serious harm.

5.      Afterward, the City took the following public-records positions. For Houston Emergency Center telephony and network data generated while Plaintiff was calling 911 and receiving spoofed callbacks displaying "911," HPD invoked the Texas Public Information Act exemption for an "active, ongoing criminal investigation." HPD also denied CAD data for the Emergency Detention Order under the same criminal-investigation exemption while citing the civil EDO incident number. Separately, HPD failed to produce body-worn camera footage within the statutory deadline. Plaintiff was never arrested for, charged with, or convicted of any crime arising from the encounter; he was the reporting victim. The investigation HPD invokes has no assigned detective, no investigative report, and no documented forensic submission. When Plaintiff later surrendered the device from which $74,370.88 in Bitcoin was stolen, HPD accepted it on March 16, 2026, then called him back within 48 hours, demanding that he retrieve it because HPD was "not taking phones as evidence" (Ex. 12).

6.      HPD's official position: Plaintiff's statements reporting a cybercrime were cited as justification for an emergency detention; the HEC telephony data Plaintiff requested, captured while Plaintiff was calling 911 to report receiving inbound spoofed callbacks, was withheld under the exemption for an "active, ongoing investigation," citing Plaintiff's Cybercrimes case number; and the CAD records for the same encounter were withheld under the same exemption, citing the incident number of the Emergency Detention Order.

7.      As recently as March 2026, the Cybercrimes case had not been assigned to a detective. Upon information and belief, no investigative report has been generated, no

evidence has been submitted for forensic evaluation, and no suspects have been identified in Incident No. 1198816-24.

**8.**    The City provides police reporting, digital-evidence retention, and forensic referral as municipal services. Plaintiff alleges below that, after his disclosed ADHD and Depression diagnoses were recorded in the EDO, the surrendered devices remained outside forensic review, the later theft device was not retained, and the same Cybercrimes matter was used to withhold records while no detective was assigned to investigate it.

## II. JURISDICTION AND VENUE

**9.**    This civil action is brought under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights, and under 42 U.S.C. § 12132 for violations of the Americans with Disabilities Act.

**10.**    This Court has subject matter jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

**11.**    Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) because the Defendants are located within this District, and the events giving rise to the claims occurred in Houston, Harris County, Texas.

**12.**    Plaintiff was not arrested for, charged with, or convicted of any crime arising from the August 26, 2024 encounter. No criminal proceedings are pending against him. He is the victim and reporting party in HPD Incident No. 1198816-24.

## III. PARTIES

**13.**    Plaintiff Robert W. Van Kirk is a resident of Houston, Harris County, Texas.

**14.** Officer M. Hernandez (Badge No. 8324) is, and was at all relevant times, a police officer employed by the Houston Police Department, acting under color of state law. He is sued in his individual capacity.

**15.** Officers John Doe 1–N are additional Houston Police Department officers who responded to the scene on August 26, 2024. According to Plaintiff's mother, Carolyn Van Kirk, who was present throughout the encounter, multiple additional officers arrived, were present during the execution of the Emergency Detention Order, and failed to intervene. They are sued in their individual capacities. Plaintiff is currently unable to identify these officers by name because HPD has denied his requests for CAD/dispatch records and body-worn camera footage.

**16.** The City of Houston is a municipality organized under the laws of the State of Texas. It operates the Houston Police Department and is legally responsible for its officers' training, its widespread departmental customs, and its compliance with the Americans with Disabilities Act.

**17.** Defendant Harris County Hospital District ("Harris Health") is a governmental entity organized under Texas Health & Safety Code § 281.001 et seq., operating Ben Taub Hospital at 1504 Taub Loop, Houston, Texas 77030. Harris Health is a political subdivision acting under color of state law and is subject to suit under 42 U.S.C. § 1983. Defendants Contreras, Aneja, and Jones acted under color of state law as employees, agents, or contractors of Harris Health carrying out the State's involuntary commitment statutes, and are sued in their individual capacities.

## IV. STATEMENT OF FACTS

**A. The Underlying Cybercrimes Case: Board Meeting Surveillance, Unauthorized Remote Access Software, and Spontaneous Device Activation Witnessed Under Penalty of Perjury**

**18.** Plaintiff is a software developer with a degree in Physics. Plaintiff founded and operated Kaboomracks, a cryptocurrency mining and colocation services business that generated over $71 million in gross receipts. Upon information and belief, the combined entities generated over $200 million in cumulative revenue. During a contentious overnight board meeting on August 18–19, 2024, Plaintiff's former business partners diluted Plaintiff's ownership from approximately 39% to less than 4% through board actions, while the CFO simultaneously misrepresented the company's financial position to Plaintiff.

**19.** Recovered Telegram messages, which have been provided to HPD as evidence, show that in late July 2024, Plaintiff had questioned a board member and shareholder about an anomalous approximately $1,500 TeamViewer enterprise purchase on his company credit card; he dismissed the inquiry.

**20.** During that same board meeting, the audio recording and transcript of which have been provided to HPD as evidence, the CFO stated:

> "I can see you all the time when you get distracted. You have a mirror behind you.
> We can see when you're not paying attention and your screen is going crazy."

This was followed immediately by a second board member:

> "We can see your screen in the reflection of the mirror behind you, *too*. All the porn
> you're looking at."

Because Google Meet's background-obscuring feature was enabled, the screen was not physically visible in the mirror. Within hours of the meeting's conclusion, Plaintiff

discovered that his laptop's webcam indicator light remained on. In light of the above comments, Plaintiff found this highly suspicious, and upon investigation, he found commercially licensed enterprise TeamViewer software that had been installed on his personal laptop and his father's desktop PC without his knowledge or consent.

21.    On August 22, 2024, Plaintiff's Samsung Galaxy S22 Ultra spontaneously powered itself on from a fully shut-down state and then refused to shut down, demanding a PIN — an event directly witnessed by Plaintiff's mother and a friend. Both witnesses provided sworn statements to HPD under penalty of perjury corroborating this anomaly.

22.    On August 23, 2024, HPD officers responded to Plaintiff's home and documented his coherent account of the corporate board meeting, severe ownership dilution, and the subsequent discovery of unauthorized enterprise remote-access software on his devices. Finding the account credible, officers generated Incident No. 1198816-24 ("Tampering w/ Electronic") (Ex. 4). Plaintiff then surrendered the compromised computers and phones to HPD's Cybercrimes Division at downtown headquarters, where they were secured in an evidence locker. Consequently, when Plaintiff encountered Officer Hernandez three days later, HPD's own Records Management System (the "RMS") already contained an objective, documented context for Plaintiff's reports—an active investigation of a technology shareholder suffering targeted electronic intrusions following an adversarial corporate action.

## B. The Attack Escalates to a Brand-New Device Within Two Hours of Purchase — Witnessed by Plaintiff's Mother Through Vehicle Bluetooth Display

23.    On August 26, 2024, Plaintiff purchased a brand-new Samsung Galaxy S24 from a Verizon store with a newly opened Verizon account and a new phone number, deliberately avoiding linking any prior accounts. Plaintiff made several ordinary calls during the drive

home without issue. Plaintiff's mother was driving; the phone was connected to her vehicle's speakers and navigation display, allowing her to hear the calls and see the caller ID. The device then began receiving bursts of three MMS messages, each containing a broken image, followed by spoofed inbound calls. Each call disconnected immediately when Plaintiff answered — no voice, no hold tone, no carrier message.

24.    Each spoofed callback displayed the exact number Plaintiff had most recently dialed. The calls paused while Plaintiff was connected to a legitimate call and resumed within seconds after he hung up. When the calls stopped, they left no trace in the device's call history. The device was brand-new, the Verizon account was newly opened, the number was new, no prior accounts had been linked, and the phone had existed on the carrier's network for less than two hours.

25.    The pattern began only as Plaintiff neared his home. Based on this timing, the repeated use of Plaintiff's most recently dialed numbers, and the absence of call-history entries, Plaintiff felt unsafe to return home without first seeking law enforcement assistance.

26.    Plaintiff's mother pulled off the road, and Plaintiff called 911 to report the attack. After the 911 call ended, the same pattern repeated: the phone rang with an incoming call displaying "911" as the caller ID. When Plaintiff answered, the line disconnected immediately, with no human voice on the other end.

## C. The Encounter with Officer Hernandez: A Crime Victim Voluntarily Approaches Police and the Officer Abandons the Criminal Inquiry to Interrogate the Victim's Psychiatric History

27.    Observing HPD Officer M. Hernandez stationed at a nearby intersection, Plaintiff walked across the street on foot to voluntarily report the active attack. Plaintiff's mother followed in her vehicle and was later interviewed by Hernandez on the scene.

**28.**     During the field interview, Plaintiff reported the events described above (¶¶22–27), in addition to the same cybercrimes Plaintiff had reported to HPD three days earlier (¶22). Plaintiff maintained a cooperative demeanor, explaining his technical hypotheses for the attack and offering to show Officer Hernandez the device. When Plaintiff utilized cybersecurity terminology unfamiliar to the officer, Plaintiff clarified the definitions, such as defining a "zero-day exploit" as "a vulnerability without a patch." Plaintiff was a citizen in the middle of an existing criminal case seeking police assistance with an ongoing crime. At no point was Plaintiff violent, threatening, or expressing any intent to harm himself or others.

**29.**     Officer Hernandez abruptly stopped inquiring about the perpetrators and did not document a crime report. Instead, he questioned Plaintiff about his private medical history, sleep, safety, medication adherence, and any OTC supplement usage.

**30.**     Plaintiff answered truthfully. When asked if he felt unsafe, Plaintiff answered "yes." Plaintiff acknowledged missing a daily medication dose. Plaintiff acknowledged poor sleep, citing the all-night corporate board meeting six days prior and the discovery that his family's devices were under surveillance. When asked about supplements, Plaintiff stated he had taken caffeine supplements, which he had used instead of morning coffee for years.

**31.**     When Hernandez began asking about psychiatric diagnoses, Plaintiff's mother, within sight and hearing of the exchange, looked at Plaintiff and gestured for him not to answer. Plaintiff answered anyway. Believing that routine, widely managed diagnoses could not legally justify a deprivation of liberty, Plaintiff truthfully disclosed his diagnoses of ADHD and Depression. Officer Hernandez immediately cited these disclosed diagnoses as the primary basis for psychiatric detention.

32.    HPD routinely investigates reports of property crimes, telecommunications fraud, and cybercrimes from non-disabled complainants without subjecting the victims to an interrogation regarding their private medical history, sleep habits, or psychiatric diagnoses. Instead of proceeding with the investigation of the reported cybercrime, Officer Hernandez shifted his inquiry to Plaintiff's private medical history. Non-disabled complainants reporting similar property or telecommunications crimes are not routinely subjected to psychiatric questioning prior to filing a police report.

## D. Plaintiff Invokes Complete Refusal of Consent Prior to Hernandez Discovering the Active Investigation

33.    During the encounter, Officer Hernandez made unclear statements regarding Plaintiff's medical care. Plaintiff pointedly asked whether Hernandez meant an emergency psychiatric detention. After Hernandez confirmed, Plaintiff explicitly and unambiguously refused voluntary transport, stated that he did not consent to any such seizure, and verbally commanded the officer to "cease and desist." It was only after Plaintiff explicitly verbalized his refusal to be transported that Hernandez initiated the Emergency Detention Order process.

34.    Drawing on his business background, this refusal was a calculated, deliberate invocation of Plaintiff's legal and constitutional rights to be free from unreasonable seizure.

35.    Following Plaintiff's explicit refusal of consent, Officer Hernandez ordered Plaintiff to stand by a wall. Plaintiff complied with this order without argument as Hernandez initiated the emergency detention process.

36.    While the encounter was underway, and after Hernandez had begun the detention process, Hernandez turned to Plaintiff and asked: "Why didn't you tell me you had an open

case with Cybercrimes?" Hernandez had located Incident No. 1198816-24 in HPD's system, confirming that Plaintiff's prior cybercrime report was an active HPD investigation.

**37.**    Officer Hernandez did not contact the Cybercrimes Division. He proceeded with the detention.

**38.**    Multiple additional officers (John Doe 1–N) responded before transport. They observed Plaintiff's demeanor, heard his refusal of consent, and saw Plaintiff's mother corroborate the cyberattack. Upon information and belief, they also knew of the existence of Incident No. 1198816-24. Based on the recollection of Plaintiff's mother, upon information and belief, at least one John Doe officer expressed disagreement or questioned the necessity of the detention prior to transport. Despite possessing actual knowledge of these facts and expressing apparent disagreement on the scene, no officer intervened to halt the detention before Plaintiff was transported.

**39.**    Plaintiff voluntarily approached Officer Hernandez in a public setting to report a crime. Plaintiff possessed no weapons, made no threats, and complied with Hernandez's instructions. Before executing the Emergency Detention Order, Hernandez questioned Plaintiff about psychiatric diagnoses, interviewed Plaintiff's mother, waited for additional officers to arrive, and searched HPD's RMS, where he confirmed the active Cybercrimes case. The detention occurred after those steps were completed.

### E. The Affidavit: The Omission of Exculpatory Evidence and the Total Absence of Any Documented Threat, Act of Violence, or Indication of Self-Harm

**40.**    Despite Plaintiff's unequivocal objection, the presence of a corroborating witness, and the confirmed existence of an active cybercrimes case, Officer Hernandez proceeded to draft a sworn EDO (Exhibits 1–2). The relevant portions of the Notification of Emergency Detention form are reproduced below verbatim:

**Item 2.** I have reason to believe and do believe that the above-named person evidences a substantial risk of serious harm to himself/herself or others based upon the following: "THE CONSUMER BELIEFS HE IS UNDER CYBER ATTACK, SOMEOME HAS TOLEN HIS IDENTITY, SOMEONE HAS HACKED HIS PHONE, CONSUMER HAS NOT SLEPT IN DAYS, CONSUMER CALLED 911 AND BELIEFS THAT 911 CALL TAKER IS NOT REAL, CONSUMER BELIEFS HE IS BEING WIRED TAPPED FOR A CIVIL SITUATION, CONSUMER STATED THAT HE IS DIOGNOSED WITH DEPRESSION, ANXIETY, AND ADHD AND DID NOT TAKE HIS MEDICATION TODAY."

**Item 3.** I have reason to believe and do believe that the above risk of harm is imminent unless the above-named person is immediately restrained.

**Item 4.** My beliefs are based upon the following recent behavior, overt acts, attempts, statements, or threats observed by me or reliably reported to me:

"BASED ON THE CONSUMER'S STATEMENT, IT IS MY BELIEF THAT HE IS PARANOID DO TO HIS STATEMENTS AND SHOWING SIGNS OF MENTALL CAPACITY DETERIORATION."

"NO CHARGES"

**Item 5.** The names, addresses, and relationship to the above-named person of those persons who reported or observed recent behavior, acts, attempts, statements, or threats of the above-named person are (if applicable): "**None**"

**Item 6.** Was the person restrained in any way? — Checked: "**Yes**"

41.    The quoted text constitutes the entirety of the factual narrative Officer Hernandez submitted to execute the EDO, which resulted in an eleven-day involuntary psychiatric confinement. However, the document omitted four material facts known to Hernandez at the scene:

42.    **A. The Omitted Witness:** The EDO omitted Plaintiff's mother. Item 5 required Hernandez to identify persons who "reported or observed recent behavior, acts, attempts, statements, or threats." Hernandez's stated basis for detention was "based on consumer's statement." Plaintiff's mother observed Plaintiff's statements and behavior during the encounter, including the diagnosis questioning and Plaintiff's refusal of consent. Hernandez

then interviewed her separately on scene, where she corroborated the spoofed-call events Plaintiff was reporting. Item 5 states: "None."

43.    **B. The Active Police Investigation:** Officer Hernandez personally confirmed the existence of an active HPD cybercrimes investigation — Incident No. 1198816-24 — while on the scene with Plaintiff (¶35). He confronted Plaintiff about it: "Why didn't you tell me you had an open case with Cybercrimes?" He then drafted the sworn EDO. The EDO contains no reference to Incident No. 1198816-24. It does not mention the existence of any active HPD investigation. It does not acknowledge that the crimes Plaintiff described to Hernandez at the scene — the same crimes Hernandez characterized as evidence of "MENTAL CAPACITY DETERIORATION" — were the exact same crimes that HPD's own Cybercrimes Division had opened an active case on three days earlier.

44.    **C. The Federal Telecommunications Crime:** The EDO does not describe the specific crime Plaintiff was reporting. Plaintiff was reporting the impersonation of 911 Emergency Services — a federal crime under 47 U.S.C. § 227(e) (the Truth in Caller ID Act) occurring within 1.5 miles of William P. Hobby Airport. The EDO instead characterizes this report as: "CONSUMER BELIEFS HE IS UNDER CYBER ATTACK" and "BELIEFS THAT 911 CALL TAKER IS NOT REAL." The sworn instrument omitted the specific details of the reported telecommunications fraud — including the spoofed callbacks and the physical presence of a corroborating witness — and instead documented Plaintiff's statements as a belief that the "911 CALL TAKER IS NOT REAL."

45.    **D. The Harm Predicate:** The EDO omitted any threatening conduct, violent behavior, indication of self-harm, severe emotional distress, or inability to function independently. Item 4 required "recent behavior, overt acts, attempts, statements, or threats observed by me." Hernandez supplied only the conclusion that Plaintiff showed "mental

capacity deterioration," and identified no specific behavior, act, threat, or observable sign supporting that conclusion. His stated basis remained Plaintiff's speech: "based on consumer's statement." Hernandez repeated the same deterioration narrative during the Ben Taub intake handoff, telling Triage RN Rodriguez that Plaintiff was "getting worse." In the same intake sequence, Rodriguez documented Plaintiff as "ambulatory with steady gait," "In No Acute Distress (NAD)," and with "respirations unlabored". At 20:00, RN Aneja scored Plaintiff BARS 4 — quiet and awake — with "ability to follow commands: Yes" and "compliant." The EDO's deterioration conclusion was contradicted by the first clinical observations recorded after transport.

46.     The sworn affidavit states: "CONSUMER CALLED 911 AND BELIEFS THAT 911 CALL TAKER IS NOT REAL." The document omits Plaintiff's report of successive inbound calls displaying "911" that disconnected upon answering. The EDO also states that Plaintiff "BELIEFS HE IS BEING WIRED TAPPED FOR A CIVIL SITUATION." It does not identify the documented civil/business context already reflected in HPD Incident No. 1198816-24: the board dispute, ownership dilution, unauthorized enterprise remote-access software, and compromised devices.

47.     The EDO Hernandez later wrote states that Plaintiff "HAS NOT SLEPT IN DAYS". Although Plaintiff recalls acknowledging poor sleep, Plaintiff does not recall stating that he had not slept in days.

48.     Texas Health and Safety Code § 573.001 mandates that a warrantless apprehension requires a belief of a substantial risk of serious harm and "not sufficient time to obtain a warrant." The sworn EDO invokes this emergency standard by asserting that Plaintiff "did not take his medication today" as its final clinical data point.

**49.**      Hernandez had no knowledge of Plaintiff's psychiatric history which was only known by his psychiatrist. Hernandez did not know Plaintiff's specific medication, its dosage, its half-life, or whether a single missed dose carries any clinical significance.

**50.**      Upon information and belief, HPD's Crisis Intervention Response Team ("CIRT") was involved in the encounter and authorized the detention. Upon information and belief, both Hernandez and CIRT were aware of Incident No. 1198816-24 before the EDO was executed. Neither Hernandez nor CIRT contacted HPD's Cybercrimes Division before the detention proceeded. On April 27, 2026, Plaintiff submitted an expedited HIPAA Right of Access request to the Harris Center for Mental Health and IDD seeking CIRT tele-triage call notes, dispatch logs, and any CSPMP query audit records referencing Plaintiff on August 26, 2024. The Harris Center requested an authorization release form, which Plaintiff completed and returned on April 28, 2026. As of the date of this filing, record production remains pending within the Harris Center's HIPAA 30-day window. Upon information and belief, those records will establish what clinical basis — if any — CIRT communicated to Officer Hernandez.

**51.**      Officer Hernandez placed Plaintiff in handcuffs for transport. Plaintiff had made no threats, committed no act of violence, and offered no physical resistance. Plaintiff had not made any statements or committed any acts indicating self-harm. The EDO itself does not allege any threatening conduct.

---

### F. Suicide Watch Began Before Any Psychiatric Evaluation and Before the EDO Was Executed

---

**52.**      Upon arrival at the Psychiatric Emergency Center at Ben Taub Hospital, the admitting physician reviewed the physical paper copy of the sworn EDO and specifically

remarked to the officers on the absence of any documented threat to self or others on its face.

53.    The hospital's own admission record documents Plaintiff's arrival at 19:53 and the EDO execution at 20:03. Before the EDO was executed, and before any psychiatric evaluation appears in the record, staff searched Plaintiff, required him to change into green scrubs, *confiscated his personal property (cell phones, wallet, etc.)*, initiated suicide precautions, and placed him under continuous 1:1 supervision.

54.    **19:53 – Triage Intake and Officer Handoff:** Triage RN Natividad Rodriguez opened the intake record at 19:53 and signed it at 19:58 (Exhibit 5). During that five-minute interval, Rodriguez verified Plaintiff's name, date of birth, and allergies and completed standardized Epic intake checklists, including Travel Screening, Pre-Arrival Notification, and Prehospital Treatment. These were administrative intake steps, not psychiatric evaluations. The narrative entered during the same officer-handoff interval begins: *HPD officer Hernandez 8324 states "patient is getting worse." Patient HX of depression, ADHD. Patient states took caffeine pills. States is willing to go to a locked unit.*

55.    Rodriguez's note opens a quotation for Hernandez's statement but does not close it, leaving the attribution of some phrases ambiguous on the face of the record. Plaintiff did not tell Hernandez or Rodriguez that he was willing to go to a locked unit; he had already refused psychiatric detention in the field. To the extent Defendants contend otherwise, body-worn camera footage and intake records will resolve the attribution and wording.

56.    **20:00 – Suicide Precautions Initiated:** RN Balbir Singh Aneja initiated the "Safety and Intervention Checklist for Suicide Risk," applying maximum-restriction suicide precautions as a blanket administrative default. Plaintiff was subjected to arm's-length observation at all times and supervised daily hygiene, including toileting.

**57.    20:01 – Physician Confinement Order:** Dr. Stephen A. Harding placed an electronic physician's order for "Nursing - Continuous 1:1 Supervision"—a maximum-restriction confinement order.

**58.    20:03 – EDO Executed.** Two minutes after Dr. Harding ordered constant physician supervision, three minutes after RN Aneja initiated the severe suicide protocol, and ten minutes after RN Rodriguez confiscated and inventoried Plaintiff's personal property, Officer Hernandez executed the sworn paper EDO.

**59.    20:11 – Formal Admission:** Plaintiff was formally admitted and roomed in BT POD F 18. The hospital's admission record confirms Means of Arrival: "Police." The formal admission occurred eight minutes after the EDO was executed and nineteen minutes after staff had already seized Plaintiff's property and initiated maximum-restriction confinement.

**60.**    Harris Health's Patient Bill of Rights, presented at intake, guarantees "the right to appropriate treatment in the least restrictive appropriate setting available" that "is not more restrictive of your physical or social liberties than is necessary" (Exhibit 6). By 20:01, before the EDO was executed and before any psychiatric evaluation appears in the record, staff had searched Plaintiff, required green scrubs, confiscated his property, initiated suicide precautions, and ordered continuous 1:1 supervision.

**61.**    As quoted in ¶53, the 19:53 triage note recorded the officer handoff notation: "States is willing to go to a locked unit." The sworn Emergency Detention Order, executed by Officer Hernandez at 20:03, contains no mention of Plaintiff being "willing to go to a locked unit."

**62.**    At 02:45, RN Hamblin charted a symptom narrative: *"Per report pt has been taking caffeine pills to stay up d/t paranoia"*. Given that Plaintiff arrived via police transport, this "report" is an attribution to Officer Hernandez.

63. At the 20:00 intake evaluation, RN Aneja charted: "Per the patient he has been taking caffeine pills because he did not feel safe to go to sleep."

64. The sworn Emergency Detention Order contains no mention of Plaintiff taking caffeine pills at night to avoid going to sleep.

65. Plaintiff had already refused psychiatric detention in the field by telling Hernandez to "cease and desist." The physical Patient Bill of Rights form (Exhibit 6) presented at intake corroborates this refusal, bearing the explicit notation: "Patient Refused to Sign" alongside a primary staff witness signature timestamped at 20:26.

66. *The physical form presents a witness signature, certifying that rights were explained at 20:20. This signature belongs to RN Luke Dean.*

67. The Epic audit trail establishes that RN Dean first accessed Plaintiff's chart at 22:01 —one hour and thirty-five minutes after 20:26. Plaintiff has no memory of a second staff member being present when the document was initially presented, nor does Plaintiff recall it ever being presented to him again at a later time.

68. At 21:15, RN Aneja formally charted an attorney demand in her clinical note: "Wants to call his lawyer" (Exhibit 18).

69. In the same chart entry, she documented that Plaintiff was actively reviewing the Patient Bill of Rights. Under the section titled "Emergency Detention – Special Rights for People Brought to the Hospital Against Their Will," the document explicitly mandates: "You have the right to call a lawyer. The people talking to you must help you call a lawyer if you ask." It further stipulates: *"In no case may your right to contact or be contacted by an attorney... be limited."*

70. The same Patient Bill of Rights form, under that same heading, also states: "You have the right to be told: where you are." The four-page form does not state the name of the

hospital or its address. Furthermore, none of the intake paperwork presented to Plaintiff identified the facility as Ben Taub Hospital or provided its physical location.

71.    Staff had already confiscated Plaintiff's three personal cell phones upon intake, removing his ordinary means of contacting counsel. Despite charting the explicit attorney demand and the hospital policy requiring them to facilitate it, RN Aneja did not fulfill the request.

72.    The triage notes preserved Plaintiff's own explanation: *"Pt states he shouldn't be here; he had called the police b/c he states he identity was stolen; being hacked"*. In the formal intake record, staff recorded objective markers including "Oriented X4," "Attentive," "Cooperative," and "Within Functional Limits," while simultaneously checking the "Delusions" label.

## G. "I'm Confused Why No One Has Called Cyber Security Yet"

73.    Deprived of his personal cell phones and denied access to legal counsel, Plaintiff repeatedly asked staff to contact the Houston Police Department's Cybercrimes Division to verify his active case. At 03:34 AM on August 27, LMSW Monique Jones entered the following behavioral health assessment into the clinical record (Exhibit 22):

> "SW arrived at bedside patient states, 'I'm confused why no one has called cyber security yet' Patient reports that he is being hacked on all of his electronic devices to have his identity stolen. Patient states that he was working with some business partners and they were working with some investors that may have an interest in taking his identity. Patient has rapid speech with constant roaming eyes throughout the entire assessment. Patient appears to be paranoid, SW will complete an affidavit for acute involuntary hospitalization."

74.    LMSW Monique Jones did not contact the Houston Police Department. She did not attempt to verify the reported identity theft or business dispute. Based on the assessment

quoted above (¶73), Jones executed the sworn probate affidavit used to support Plaintiff's continued involuntary detention.

## H. Clinical Chronology of Null Results

75.    The following clinical assessments were documented in Plaintiff's electronic health record between intake and the forced injection:

| Time | Clinician | Assessment | Finding | Record |
|------|-----------|------------|---------|--------|
| 19:53 (Aug 26) | RN Natividad Rodriguez | Triage Exam | "In NAD" (no acute distress); "ambulatory with steady gait"; "respirations unlabored" | |
| 20:00 | RN Jasmine Aneja | BARS / Psych Eval | "BARS 4" (quiet and awake); "ability to follow commands: Yes"; "compliant" | |
| 20:03 | Officer Hernandez | EDO executed | No suicidal or homicidal threat, act, or ideation alleged on its face | EDO (Exhibits 1–2) |
| 21:35 | Dr. Cedrick Lubin | Physician evaluation | "No SI/HI" | |
| 23:14 | Dr. Joy M. Mackey | Physician evaluation | "No SI/HI" | |
| 23:15 | DO Chinelo Obinero | Physician evaluation | "No SI/HI" | |
| 01:41– 01:42 (Aug 27) | Dr. Mackey | Medical clearance — CMP | Normal values ($K^+$ 4.3, Glucose 90, Anion Gap 10, $CO_2$ 27, Temp 97.9°F); illicit substances: "No"; "Labs reassuring will medically clear" | (Exhibit 23) |

| Time | Clinician | Assessment | Finding | Record |
|---|---|---|---|---|
| 02:37 | RN Hamblin | Nursing Intake | Objective Checkboxes: "Oriented X4", "Cooperative", "Attentive", "Within Functional Limits" | |
| 02:45 | RN Jessica L. Hamblin | Charge RN evaluation | "No SI/HI" | |
| 02:54 | RN Hamblin | C-SSRS (scored instrument) | **"No Risk"** | |
| 02:54 | RN Hamblin | Homicide Screening | **"No"** | |

76.     Texas Health & Safety Code § 576.023 provides that a facility shall release a person apprehended under an EDO if an examining physician determines the person does not meet the criteria for involuntary detention. Between 19:53 and 02:54, the chart recorded no suicidal ideation, no homicidal ideation, no intoxication, no abnormal orientation, no inability to follow commands, and no scored suicide risk.

77.     The homicide findings were separately documented at three points: RN Rodriguez recorded "No HI" at triage; Dr. Lubin recorded "No HI" at physician sign-out; and RN Hamblin completed the homicide screening at 02:54 AM, documenting Plaintiff's denials: "Do you feel like hurting others?: No. Did you feel like hurting others within last 7 days?: No".

78.     At 02:20 AM, RN Aneja documented Plaintiff's statement: "He wants to leave". Thirty-four minutes later, the C-SSRS returned "No Risk" and the homicide screening returned "No." Plaintiff remained detained.

79.     By approximately 03:48 AM, Plaintiff remained without his personal phones, had not been allowed to contact counsel, and had received no verification from HPD Cybercrimes. Staff in the locked psychiatric area wore paper identification tags without

photographs or Harris Health ID numbers. Names and departments appeared handwritten in marker. The tags identified the parent system, "Harris Health," not Ben Taub Hospital. Plaintiff saw no interior signage identifying the specific facility or building he was in.

80.    Plaintiff was then permitted access to the hospital's wall phone and attempted three outbound calls:

81.    **Call 1 — 811:** Plaintiff dialed 811, seeking directory assistance or a police non-emergency number. The call did not connect.

82.    **Call 2 — 911:** Plaintiff dialed 911 to reach law enforcement independently and verify his active Cybercrimes case after staff had not contacted HPD Cybercrimes in response to his requests. The call did not connect. Texas Health & Safety Code § 771A.001 requires hospital multi-line telephone systems to allow direct 9-1-1 access without prefix or restriction.

83.    **Call 3 — Plaintiff's Father:** Plaintiff dialed his father's telephone number to obtain or facilitate access to attorney contact information stored on confiscated personal devices. At approximately 03:48 AM, voicemail access was necessary because a live answer was unlikely. The call rang and terminated before reaching voicemail or any carrier intercept message. Even an unconfigured Verizon line ordinarily generates an automated announcement rather than silently terminating; the abrupt termination was consistent with hospital MLTS ring-timeout settings that can end outbound calls before the recipient's carrier voicemail answers.

84.    Three calls. Two were blocked, one was abruptly terminated without reaching voicemail.

85.    After the calls failed, Plaintiff asked staff for basic identity and location verification. He asked staff to show that they possessed photo identification, not to surrender it for

inspection; staff did not do so. He also asked staff to load a hospital website or otherwise verify that the facility was Ben Taub.

## I. Statutory Rights, the Simultaneous Minute, and Elopement

**86.** At 03:47:39 AM, Dr. Contreras placed a medication order for Haloperidol, Lorazepam, and Diphenhydramine—a combination colloquially known as a "B52."

**87.** At 03:47 AM, the automated dispensing cabinet logged the medication as available.

**88.** In this note, RN Aneja checked a behavior code for "Patient attempting to leave" (PTALEDOWC).

**89.** In the free-text narrative of the same entry, RN Aneja documented: "Patient is insisting on leaving" and "Although he is not aggressive. Emergent medications ordered. Patient did walk into his room but required physical hold to medicate him.".

**90.** At 18:19 (6:19 PM), the inter-facility transfer certification formally certified "No" in the checkbox for elopement attempts.

**91.** RN Hamblin charted at 03:30 AM that Plaintiff was "threatening to elope". Dr. Contreras used the same phrase in her Restraints Face-to-Face Provider Note at 04:13 AM: "threatening to elope despite being on police packet".

**92.** Neither RN Hamblin nor Dr. Contreras documented that Plaintiff physically attempted to leave the unit. Neither clinician recorded the specific words Plaintiff allegedly used to "threaten" elopement.

**93.** LMSW Jones later swore under oath to the Probate Court that Plaintiff was actively "attempting to elope from the locked unit" (B31 Affidavit).

## K. Objective Clinical Findings: Aggression

94.    Regarding aggression, RN Aneja's 03:48 AM note scored Plaintiff at BARS 6. Under the standardized clinical rubric for the Behavioral Activity Rating Scale, a score of 6 is defined as: "Extremely or continuously active, not requiring restraint."

95.    In the accompanying narrative, RN Aneja documented: "Although he is not aggressive."

96.    At 03:58 AM, the official restraint monitoring log identified the sole condition necessitating physical restraint as: "Refusing Emergent Psychoactive Medication."

97.    No staff member documented any physical aggression prior to or during the initiation of the physical hold. No staff member filed a Safety Event Report regarding a kick.

98.    Dr. Contreras later swore to the Probate Court that Plaintiff "kicked nurse" and was "aggressive due to severe paranoia" (F25 Certificate).

## L. The Unverifiable Environment and the DSM-5-TR

99.    At 03:48 AM, staff holding Plaintiff in the locked unit wore black-and-white paper printouts as identification. The printouts lacked a photograph. The printouts did not identify the hospital. They displayed incomplete names handwritten in marker.

100.    Plaintiff possessed no means to verify that the individuals detaining him were licensed medical providers.

101.    Plaintiff requested that staff produce valid photo identification. Staff did not do so. Plaintiff then requested that staff merely show him they were in possession of valid photo identification, without needing to hand it to him or let him read it. No staff member did so.

102.    Plaintiff requested they load the hospital's website to verify the physical location was Ben Taub. Staff did not load the website.

**103.** Plaintiff attempted to dial 911; the facility's telephone blocked the call. Plaintiff attempted to dial his father; the call terminated abruptly without reaching an automated carrier intercept.

**104.** The DSM-5 defines a delusion as "fixed beliefs that are not amenable to change in light of conflicting evidence."

**105.** Staff charted Plaintiff's requests for verifiable facility documentation and staff photo identification as his psychiatric "Chief Complaint."

**106.** At 03:48 AM, RN Aneja checked the clinical protocol box for "Therapeutic communication" as an intervention. In the free-text narrative of the same entry, she recorded: "Unable to reason with the patient" and "Patient is not redirectable at this time." The clinical chart contains no record of any words staff spoke to Plaintiff, nor any words Plaintiff said in response.

**107.** Plaintiff walked away from the silent staff and returned to his room.

## M. The Forced Injection: 03:58 AM

**108.** Staff members Plaintiff could not identify followed him into his room.

**109.** An individual that Plaintiff could not verify as a licensed nurse approached holding a syringe filled with the B52 cocktail ordered at 03:47:39 AM.

**110.** At no point did any staff member identify the medication, explain its risks, or attempt to obtain consent.

**111.** Plaintiff explicitly stated he was unwilling to consent to psychotropic medication, stating he was "being killed and injected with poison and being kidnapped."

**112.** Staff charted Plaintiff's reaction to the silent, unexplained approach of unverified personnel holding a syringe as clinical paranoia.

113.    At 03:58 AM, multiple unidentifiable Staff members forced Plaintiff onto a bed and initiated a physical hold.

114.    No physician's order for physical restraint existed at the time of the hold.

115.    Three staff members physically immobilized Plaintiff's extremities.

116.    In resisting the restraint, Plaintiff's leg broke free momentarily, resulting in contact between the side of his leg and the thigh area of one of the staff members. The movement had to overcome the active resistance of the restraint grip and lacked any leverage.

117.    With his body pinned to the bed, the nurse injected the syringe into Plaintiff's left lateral thigh, injecting the B52 cocktail.

118.    Dr. Contreras's initial 04:13 AM note confirms this timeline, describing the physical contact as occurring during "medication administration."

119.    42 CFR § 482.13(e) requires a physician's order before the application of physical restraint. At 04:07 AM, nine minutes after the physical hold began, Dr. Contreras entered the authorizing "Personal Restraint" order retroactively.

120.    Because Lorazepam is clinically known to cause anterograde amnesia, Plaintiff has no independent recollection of the subsequent events. The remaining factual record relies entirely on the charting entered by the personnel who applied the physical and chemical restraints.

## N. The Subsequent Clinical Diagnosis and Post-Restraint Documentation

121.    At 04:13 AM, federal regulations required RN Hamblin to conduct a post-restraint debriefing—a face-to-face evaluation requiring the patient's active, conscious participation. RN Hamblin checked the compliance box: "Debriefing occurred."

122.    At that exact minute, the clinical flowsheet recorded a positive CAM-ICU Feature 3 assessment: "Altered Level of Consciousness." By 04:30 AM, thirty-two minutes after the

injection, the clinical reassessment documented Plaintiff as "lying in bed with both eyes closed" with "respirations even and unlabored" — pharmacologically incapacitated and incapable of the face-to-face participation the debriefing protocol requires. Harris Health certified a successful, interactive patient debriefing while concurrently documenting in the clinical flowsheet that Plaintiff was experiencing an altered level of consciousness due to the administered chemical restraint.

123.    Medical records indicate the administration of the chemical restraint occurred prior to the documentation of any psychiatric diagnosis.

124.    At 03:58 AM, no psychiatric diagnosis existed anywhere in Plaintiff's medical record. The B52 was injected.

125.    At 01:41 AM — more than two hours earlier — Dr. Mackey had documented: "Labs reassuring will medically clear". At 01:42 AM, she completed the formal medical stability checklist, marking illicit substances: "No" (¶73).

126.    At 04:19 AM — twenty-two minutes after the injection — Dr. Contreras authored Plaintiff's first psychiatric evaluation. She entered: "Unspecified psychotic d/o, R/O [Rule Out] Stimulant induced."

127.    By that evening, when Dr. Contreras submitted her sworn F25 Certificate to the Probate Court, the "R/O" qualifier had been removed. "Kicked nurse who was administering emergency medication" — her own 04:13 AM language — had become: Item 9: "kicked nurse." Item 10: "aggressive due to severe paranoia, kicked a nurse." Item 11: "active psychosis leading to aggressive behavior."

128.    Not one of the four people physically present during the injection — RN Aneja, R. Bendy PT, Jose Rios RN, or A. Adelowo RN — documented any act of kicking, striking, or physical aggression.

**129.**    At 04:19 AM, Dr. Contreras assigned Plaintiff a Global Assessment of Functioning (GAF) score of 25—a severe clinical metric denoting an "inability to function in almost all areas."

**130.**    At triage, staff recorded Plaintiff as "ambulatory" and in "no acute distress" (¶43). The attending physician documented him as "oriented to person, place, and time" (¶70). Sitter logs recorded him "Talking with peers" and "Talking with staff" continuously throughout the night (¶152).

**131.**    A GAF of 25 requires profound, observable impairment. The clinical flowsheet instead documents a coherent, oriented, and cooperative patient whose only observed functional impairment was the pharmacological effect of the recently administered chemical restraint.

## O. "Folie à Deux"

**132.**    Plaintiff had repeatedly asked staff to call the Department of Cybercrimes at the HPD to verify his status as a victim in an active cybercrimes investigation. LMSW Jones documented his explicit request: "I'm confused why no one has called cyber security yet." He provided her the context: a dispute involving "business partners" who had "an interest in taking his identity." He attempted to call authorities himself; the ward telephone blocked the call. HPD Cybercrimes Case No. 1198816-24 had been open since August 26. A single phone call would have confirmed an active investigation matching the patient's account. No one called.

**133.**    Plaintiff's mother called Dr. Contreras the following morning. In her addendum (Exhibit 21), Contreras documented the call: Plaintiff's mother "had been notified by police." She confirmed that Plaintiff "has been stressed out recently because of an issue that started at his job," that "he was kicked off the board of the company," and that "since [then]

pt and his parents have been dealing with a cyber attack." She confirmed that "she and her husband have also had issues with their phones and internet at their home and they got new phones just recently because of this." She provided new phone numbers.

134. The mother's account independently verified the exact business and cybercrime context Plaintiff had provided to Jones. The documentation contains ellipses throughout, indicating Contreras summarized or truncated the mother's account.

135. Despite receiving independent factual corroboration from a secondary witness, Dr. Contreras did not adjust the psychiatric diagnosis or verify the police report. Instead, fifteen minutes later, Contreras reduced the entire call to a single flowsheet entry: "mom bringing CPAP, ?folie à deux" (Exhibit 19). She entered "?folie à deux" into the clinical chart, suggesting applying the psychiatric classification for a "shared delusion" to the corroborating witness.

## P. Sworn Probate Court Submissions: Material Fabrications and Omissions

136. On August 27, 2024, Defendants submitted an Application for Temporary Mental Health Services (B29), an Affidavit of Applicant (B31) sworn by Monique Jones, LMSW (Exhibit 15), and a Certificate of Medical Examination (F25) sworn by Dr. Valeria Contreras (Exhibit 16) to the Harris County Probate Court (Cause No. 360232).

137. Texas Health & Safety Code § 574.011 requires such certificates to contain "specific factual descriptions of the patient's recent overt behavior" demonstrating a likelihood of serious harm.

## Q. The B31 Affidavit (Monique Jones, LMSW)

138. In the B31 Affidavit, LMSW Jones swore under penalty of perjury to the following narrative:

Obs. 1. That on or about the 27th day of August, 2024. I saw the proposed patient do the following: "**Patient was brought in by police for emergency psychiatric treatment by police. Patient appears to be delusional and believes that he is being cyber hacked for his identity. Patient appears to be paranoid with rapid speech and constant wandering eyes. Patient attempted to elope from the psychiatric unit.**"

Obs. 2. That on or about the 27 day of August, 2024. I heard the proposed patient say as follows: "**Patient stated during this writer's assessment, 'Someone is using my electronic devices to steal my identity and you are not doing anything.' 'This is not a real hospital this has been put together, by the people trying to take my identity.'**"

Obs. 3. That I have had the opportunity to watch the proposed patient recently, and I have seen him/her act as follows: "**Patient was witnessed to be a danger to himself, attempting to elope from the locked unit. Patient believes that persons on the other end of the phone are impersonating 911 operators and his parents.**"

**139.** In her 03:34 AM internal assessment (¶71) (Exhibit 22), LMSW Jones explicitly recorded Plaintiff's request to contact "cyber security" (HPD Cybercrimes) regarding his compromised devices and business dispute. LMSW Jones transcribed Plaintiff's report of cyber-intrusion and corporate disputes.

**140.** She made no attempt to independently verify these reports. Neither LMSW Jones nor any member of the Harris Health clinical staff made a single phone call to the Houston Police Department. LMSW Jones cited these reports to the Probate Court as evidence that Plaintiff "appears to be delusional." Concurrently, HPD opened Incident No. 1198816-24 as an investigation into those exact reports.

**141.** Jones simultaneously swore Plaintiff "attempted to elope." Every contemporaneous clinical and operational record generated by her own facility contradicts this sworn assertion:

- Every attending physician who evaluated Plaintiff documented only a verbal desire to leave the hospital, never a physical attempt to elope.

- The facility's own contemporaneous inter-facility transfer certification (Exhibit 20), authored at 18:19 (6:19 PM), formally certified "No" in the checkbox for elopement attempts.

- The sole clinical basis for physical elopement in the entire chart was a behavior code checkbox (PTALEDOWC) selected by RN Aneja at 03:48 AM—a checkbox that was immediately refuted by her own simultaneous free-text narrative, which documented only a verbalization: "*Patient is insisting on leaving.*"

**142.**    In her sworn affidavit (Exhibit 15), LMSW Jones certified under penalty of perjury that Plaintiff believed "persons on the other end of the phone are impersonating 911 operators and his parents."

**143.**    The electronic health record contains no prior documentation of this delusion. The nursing staff observing the phone call documented only that Plaintiff's outgoing calls were failing to connect, and that Plaintiff was accurately reporting the routing failure.

**144.**    The 03:48 AM clinical assessment (Exhibit 17) objectively establishes that the calls did not connect: "*Patient was allowed to make a phone call... attempted to call 811, then 911 and then his father and says it doesn't go to voicemail.*"

**145.**    Thus, while LMSW Jones swore to the Probate Court that Plaintiff was hallucinating impersonators, the clinical record at 03:48 AM objectively establishes only that Plaintiff attempted to dial 911 and his father, and accurately reported that the calls did not connect.

## R. The F25 Certificate of Medical Examination (Dr. Valeria Contreras)

**146.**    Concurrently, Dr. Contreras certified the following narrative to the Probate Court on the F25 Certificate (Exhibit 16):

Item 7. The treatment, if any, given by me or administered at my direction to Patient is as follows: "**Hospitalization, Antipsychotic medication**"

Item 8. My diagnosis of the physical and mental condition of Patient based upon reasonable medical probability is — Psychiatric or Substance Use Diagnosis: "**Unspecified psychotic disorder**" — Personality Disorder and Intellectual Diagnosis: "**Deferred**" — Medical Diagnosis: "**None**"

Item 9. Furthermore, the detailed factual basis of such opinion is as follows: "**He is extremely paranoid, believes hospital staff has kidnapped him, required emergency medication, kicked nurse.**"

Item 10. I am of the opinion that the Patient presents a substantial risk of serious harm to self or others if not immediately restrained; the detailed basis for such is as follows: "**He is aggressive due to severe paranoia, kicked a nurse and believes hospital has kidnapped him.**"

Item 11. Emergency detention is the least restrictive means; the facts forming the basis for my opinion as to Patient's imminent risk of harm unless immediately restrained are: "**He exhibits poor insight and judgment due to active psychosis leading to aggressive behavior.**"

**147.**    Dr. Contreras swore Plaintiff "kicked a nurse" (Exhibit 16). As established (¶116), the incidental contact occurred exclusively as a physical reflex while three staff members were forcibly pinning Plaintiff to a bed over his refusal, and a leg temporarily broke free from their grasp.

**148.**    Neither RN Aneja (the designated restraint observer), nor the three nursing staff members who executed the physical hold, ever documented that a kick occurred or that any staff member was injured. Dr. Contreras swore to an act of physical aggression that the involved staff members themselves did not record. Upon information and belief, no Safety Event Report was filed.

**149.**    In the F25 Certificate submitted to the Probate Court (Exhibit 16), Dr. Contreras certified under penalty of perjury that Plaintiff was "aggressive due to severe paranoia" and exhibited "active psychosis leading to aggressive behavior."

150. At the exact moment Dr. Contreras claims this aggression occurred—and exactly 21 seconds after she ordered the chemical restraint—RN Aneja (the designated CIT nurse observing the event) formally scored Plaintiff at BARS 6 ("not requiring restraint") (Exhibit 17). In the accompanying free-text narrative, RN Aneja explicitly charted: "Although he is not aggressive," and "Patient did walk into his room."

151. Plaintiff was not aggressive. Plaintiff voluntarily walked into his room.

152. Furthermore, 28 separate sitter notes made in the seven hours prior to the emergency medication order (21:00 to 03:45 AM) uniformly logged "No" behavioral change, continuously documenting Plaintiff peacefully "Sitting," "Talking with peers," and "Talking with staff" in the open unit.

153. At 04:19 AM, Dr. Contreras recorded Plaintiff's diagnosis in the internal clinical chart as: "Unspecified psychotic d/o, R/O [Rule Out] Stimulant induced" (¶126) (Exhibit 21).

154. On the F25 Certificate submitted to the Probate Court under penalty of perjury (Exhibit 16), Dr. Contreras certified Plaintiff's diagnosis as: "Unspecified psychotic disorder."

## S. Omitted Exculpatory Clinical Data

155. Defendants submitted the police intake narrative and the PTALEDOWC code to the magistrate. Defendants did not submit the concurrent "No Risk" C-SSRS finding, the normal metabolic labs, or the nursing note documenting Plaintiff as "not aggressive."

## T. Transfer to HBHH

156. Plaintiff's initial arrival at Ben Taub triage was logged at 19:53 on August 26, 2024. His formal transfer out of the facility to Houston Behavioral Healthcare Hospital was

logged at 19:58 exactly one day later — 24 hours and 5 minutes after arrival. He was transferred to Houston Behavioral Healthcare Hospital (HBHH).

157.    Seventeen minutes after Plaintiff was physically removed from the hospital, attending emergency physician Dr. Cedrick Lubin completed his delayed ED Provider Note at 20:15. Dr. Lubin's final documented medical clinical impression was: "No diagnosis found."

158.    On August 28, 2024, examining physician Dr. Eileen K. Starbranch at HBHH certified that he was "likely to cause serious harm to others." Her justification: "poor sleep. Says his identity has been stolen" and "Agitation. Pacing."

159.    Throughout the entirety of his detention — across two facilities and eleven days — no clinician at either institution ever documented suicidal ideation, homicidal ideation, or hallucinations. At HBHH, dozens of subsequent daily progress notes, nursing assessments, and clinical evaluations uniformly continued to document the same denials throughout the ten-day stay. Medical records demonstrate a consistent absence of SI/HI or hallucinations, repeated denials by the patient, and no charted finding of imminent harm matching the statutory standard.

## U. The 176-Day Retroactive Records Scan

160.    Texas Health and Safety Code § 573.002(a) establishes a strict statutory prerequisite for involuntary psychiatric confinement: a facility must "immediately include" the Emergency Detention Order in the patient's clinical record upon admission. Furthermore, § 573.022(a)(2) prohibits admitting a patient unless it possesses the "written application for emergency detention." When a facility lacks the statutorily mandated instrument, § 576.023 commands that the patient "shall be released."

**161.** According to the Epic EHR audit trails, the Emergency Detention Order did not exist in Plaintiff's active clinical chart at any point during his involuntary hospitalization. The absence of the Emergency Detention Order from the active chart meant the statutory documentation requirement for involuntary admission was unmet.

**162.** While Harris Health possessed the physical paper EDO on August 27, 2024—the date it was transmitted to the Probate Court—physical possession did not satisfy § 573.002(a)'s command to immediately include the EDO in the clinical record used by treating staff. Clinicians documented and relied exclusively through the Epic EHR during admission and treatment.

**163.** Because treating clinicians rely on the EHR as the operative legal record, the EDO's absence prevented staff from verifying the legal authority for Plaintiff's confinement. Consequently, the subsequent clinical and administrative actions proceeded without the statutorily required documentation:

**(a)** 19:53: Arrival; intake begins; property and clothing seized (see ¶51); no EDO executed yet.

**(b)** 20:00-20:01: Suicide precautions and 1:1 supervision ordered; pre-EDO.

**(c)** 20:03: EDO executed on paper; never added to EHR during admission.

**(d)** 02:54: Clinical parameters for detention extinguish entirely, establishing an independent basis for mandatory release under § 576.023. The EDO's ongoing absence compounded this duty.

**(e)** 03:58 & 04:07: Forced injection administered and retroactive restraint ordered (see ¶¶115, 117); no EDO in EHR at any time.

**164.** Because no EDO existed in Epic to transmit, transfer documentation sent on August 27 lacked the statutory instrument. HBHH therefore received and detained Plaintiff for ten

additional days without the statutorily required Emergency Detention Order present in the electronic health exchange.

165.    Harris Health did not release Plaintiff. Instead, on February 18, 2025—176 days after Plaintiff's initial detention—Health Information Management executed a batch administrative upload, scanning a substitute Emergency Detention Order and the Patient's Bill of Rights into the Epic system for the very first time at 07:37 AM.

166.    The physical Patient's Bill of Rights records Plaintiff's refusal to sign at exactly 20:26, witnessed by RN Luke Dean. However, the exact Epic audit trail establishes that RN Dean did not access Plaintiff's chart until 22:01—one hour and thirty-five minutes later. The hospital's retroactive scan introduced a witness signature from a nurse who was not physically present.

167.    The evidentiary chain reveals two conflicting documents. The Court-filed EDO was received by the Probate Court on August 27, 2024 (Exhibit 2). The retro-scanned EDO was uploaded by HIM on February 18, 2025 (Exhibit 1).

168.    Both documents bear distinct, visibly different signatures that each appear to be in Officer Hernandez's handwriting (Exhibit 3). Upon information and belief, based on the audit trail and signature discrepancies, HPD provided a second, differing copy of the EDO for scanning on February 18, 2025.

169.    On September 3, 2025, Plaintiff submitted a formal records request to Harris Health seeking the complete EHR audit log and an Accounting of Disclosures under 45 C.F.R. § 164.528, explicitly requesting documentation of the disclosures to the Probate Court and the Precinct 1 Constable.

170.    On September 15, 2025, Harris Health Privacy Officer Catherine Walther, JD, CHC, CHRC, issued a formal written response denying the Accounting of Disclosures by

invoking the HIPAA Treatment, Payment, and Operations (TPO) exemption. The TPO exemption is textually inapplicable to third-party judicial and law enforcement disclosures, which are expressly enumerated as required accountable disclosures under § 164.528.

171.    Walther's September 15, 2025 response did not provide an Accounting of Disclosures for the Probate Court or Precinct 1 Constable disclosures Plaintiff had requested. The response cited the HIPAA Treatment, Payment, and Operations exemption as the basis for denying that portion of the request. Plaintiff alleges the records practices reflected in this response are further addressed in the municipal-liability allegations below.

## V. Conflicting Agency Designations and Denial of Public Records

172.    As established (¶¶5–9), Plaintiff filed four Texas Public Information Act (TPIA) requests for CAD data, 911 telephony records, body-worn camera footage, and preservation letter confirmations regarding the encounter. HPD denied access by invoking the § 552.108 "active investigation" criminal exemption, yet inconsistently cited the civil EDO number for one denial (Exhibit 7) and the unassigned cybercrimes case number for another (Exhibit 8), despite Plaintiff never being charged with a crime. HPD failed to respond entirely to the remaining requests, defaulting under the statute and actively withholding evidence including the only objective video record of the seizure (Exhibits 9, 10).

173.    The telephony data HPD withheld under these exemptions includes critical ANI (Automatic Number Identification), ALI (Automatic Location Identification), Call Detail Records, SIP headers, ESInet border traffic logs, RapidSOS telemetry, and related dispatcher narratives.

174.    The City currently maintains two official positions regarding the events of August 26, 2024. Through the Emergency Detention Order, it certified Plaintiff's crime report as a psychiatric delusion. Through formal Texas Public Information Act responses, it certified

the identical report as an "active, ongoing criminal investigation" to withhold public records under Tex. Gov't Code § 552.108. The operational record accumulated since that date establishes both the existence of these contradictory positions and the complete absence of any actual investigation by HPD.

## W. Consequential Harm

175.    On July 20, 2025, $74,370.88 in cryptocurrency (0.63415691 BTC) was stolen from an Exodus wallet residing on the cellular device belonging to Plaintiff's mother.

176.    Plaintiff subsequently extracted and analyzed diagnostic data from the family's mobile devices (Exhibit 13, Exhibit 14). Operating system tombstone crash logs from Plaintiff's mother's device contain records of a hardware encryption key compromise targeting the secure element on September 9, 2024, and related exploitation attempts on September 8, 2024. The diagnostic logs from Plaintiff's father's device contain records of a separate exploit on September 15, 2024. These dates occurred within days of Plaintiff's release, indicating the initial device compromises were established during or shortly after Plaintiff's eleven-day detention.

177.    For approximately one year, the personal devices belonging to Plaintiff's household —along with the device of a friend, Nikandro Pacheco—functioned as instruments of criminal surveillance.

178.    HPD declined to provide the law enforcement forensic assistance routinely afforded to non-disabled crime victims. The City withheld Plaintiff's surrendered devices from the Houston Forensic Science Center for examination (Exhibit 12) and refused to issue standard 18 U.S.C. § 2703(f) preservation letters to telecommunications carriers. The failure of law enforcement to secure the devices or issue preservation letters granted the intruders an unobstructed operational window. Unimpeded by law enforcement preservation or forensic

interdiction, the attackers established kernel-level persistence on the family's hardware. On July 20, 2025, the attackers successfully exfiltrated $74,370.88 in cryptocurrency from the compromised device belonging to Plaintiff's mother.

179.    Plaintiff holds a university degree in Physics and has professional experience developing software. During the course of this device investigation, Plaintiff identified an unrelated Remote Code Execution (RCE) vulnerability within Android's Radio Interface Layer that Google's own internal security teams had entirely missed. Google independently validated Plaintiff's discovery and issued a financial payout to Plaintiff through the official Android Vulnerability Reward Program in December 2025.

180.    Plaintiff has subsequently submitted the core diagnostic files related to this complaint—including the raw Android Bugreports and Samsung Sysdumps previously provided to HPD—to Google's Threat Assessment Group for technical assessment. Plaintiff will file the results of Google's analysis with the Court upon its completion.

181.    Plaintiff attributes the July 20, 2025 cryptocurrency theft, in part, to the absence of timely forensic examination and preservation activity following Incident No. 1198816-24. Plaintiff intends to pursue separate claims against the persons responsible for the underlying device compromises and theft. Plaintiff does not seek double recovery for the $74,370.88 loss.

## X. Actionable Evidence With Identifiable Suspects and No Investigation

182.    *HPD maintains Incident No. 1198816-24 as an investigation for Tampering with Electronic*, yet upon information and belief, has produced no investigative report, made no arrests, and taken no investigative action.

183.    The Houston Forensic Science Center ("HFSC") is an independent local government corporation that provides forensic services exclusively to HPD. HFSC's "Digital

and Multimedia" section accepts cell phones, laptops, tablets, and other digital devices for forensic examination.

184.    HFSC eliminated its historic Digital and Multimedia Evidence backlog by early 2024. See Houston Forensic Science Center, Board Meeting Minutes at 1 (March 8, 2024) ("Both the latent print (LP) and digital multimedia evidence (DME) sections cleared their historic backlogs"). Upon information and belief, no item of digital evidence from Incident No. 1198816-24 has been submitted to HFSC for forensic examination.

185.    The physical evidence contains directly actionable leads HPD has refused to pursue. Forensic analysis of Plaintiff's father's PC (Exhibit 13) revealed TeamViewer remote-access software illicitly bound to an unauthorized enterprise console, with attackers actively overwriting log files — a recognized anti-forensics technique. A configuration file (Exhibit 14) survived the scrubbing and contains a unique TeamViewer Session ID timestamped August 14, 2024 — twelve days before Officer Hernandez dismissed Plaintiff's crime report as a psychiatric delusion. A routine administrative subpoena to TeamViewer GmbH for that Session ID would positively identify the perpetrator's originating IP address and account credentials, including the credit card used to purchase the enterprise license. HPD possesses this Session ID and upon information and belief, has not issued the subpoena.

186.    In direct contradiction to this institutional inaction, HPD Cyber Crimes Detective J. Chaney emailed Plaintiff on August 22, 2025 (Exhibit 11)—more than six months ago— claiming he had issued urgent preservation requests for TeamViewer data logs on Case No. 1198816-24. Yet HPD has not responded to formal public information requests seeking the transmission records of those very preservation letters (Exhibit 10), in violation of statutory deadlines. HPD's Cyber Crimes Division claims to have issued preservation requests; HPD's Open Records division has not responded to a TPIA request seeking confirmation that

those preservation letters were actually transmitted. Telecommunications carriers routinely purge records on rolling retention schedules. Each day without confirmed preservation letters increases the probability that the telephony records documenting the events on August 26, 2024—records that may independently corroborate Plaintiff's account—have been permanently destroyed. When Plaintiff separately attempted to file a federal telecommunications crime report directly with Detective Chaney, Chaney responded by instructing Plaintiff to take the matter to the "local police station" rather than accepting or forwarding the report within HPD's own investigative chain (Exhibit 24).

## Y. Impact on Future Law Enforcement Interactions

**187.** As a direct consequence of Officer Hernandez's fabricated Emergency Detention Order, Plaintiff's involuntary psychiatric commitment was formalized into a permanent public record in Harris County Probate Court (Cause No. 360232).

**188.** Although the court dismissed the application on September 9, 2024, and no formal commitment order was entered, the Probate Court record remains publicly associated with Plaintiff. Plaintiff works in technology-related fields where cybersecurity, financial-sector, and federal-clearance roles may require disclosure or review of court-ordered mental health proceedings, including disclosures requested on Standard Form 86.

**189.** Officer Hernandez's Emergency Detention Order generated HPD Incident No. 1198816-24 (Exhibit 4), an internal cybercrimes ticket classifying the offense as "Tampering w/ Electronic." This incident card is the administrative record that underlies the HPD Records Management System entry associated with Plaintiff's identity profile. The RMS entry reflects a facially legitimate psychiatric event based on Hernandez's Emergency Detention Order, but it omits subsequent developments that undermine that document. Specifically, the RMS does not note that the Harris County Probate Court dismissed the

application on September 9, 2024, or that Plaintiff's subsequent medical records contradicted the behavioral predicates Hernandez swore to. The City maintains this uncorrected flag while simultaneously invoking the § 552.108 "active investigation" exemption to withhold public records of the encounter that generated it—classifying the underlying cybercrimes report as the subject of a criminal inquiry while relying on that same report as grounds for the psychiatric detention.

190.    Plaintiff's August 26, 2024 report of a cybercrime generated a response involving HPD patrol personnel, dispatch or CIRT-related personnel, Harris Health triage nurses, registered nurses, social workers, attending physicians, Harris County Probate Court filings, interfacility transfer records, and later Health Information Management activity. The records described above reflect psychiatric detention, confiscation of Plaintiff's personal phones during intake, failed attempts to call 811, 911, and Plaintiff's father from the unit telephone, administration of emergency medication over Plaintiff's stated refusal, physical-restraint documentation, an eleven-day hospitalization, sworn Probate Court submissions, and the February 18, 2025 EHR scan of EDO-related documents. At least twenty-five Harris Health personnel, along with multiple HPD officers and related dispatch or CIRT personnel, appear in the records associated with this encounter.

191.    Identifying the perpetrators responsible for the TeamViewer remote intrusion—whose discovery and subsequent criminal harassment catalyzed this entire series of events—requires a single administrative subpoena. Upon Plaintiff's best knowledge and belief, in nineteen months, the City has issued zero.

## V. MUNICIPAL CUSTOM AND CONSTRUCTIVE NOTICE

192.    To establish municipal liability under 42 U.S.C. § 1983, a plaintiff must demonstrate that a persistent, widespread municipal policy or custom was the moving force behind the constitutional deprivation, and that the municipality's final policymakers acted with deliberate indifference to the known or obvious consequences of that custom. Between 2009 and August 2024, a high volume of sustained federal civil rights complaints, severe internal operational failures (such as the 268,920 suspended-cases incident), regulatory audits, and overturned convictions placed the Houston City Council, successive Chiefs of Police, and the Harris Health Board of Trustees on actual and constructive notice of specific mechanisms of structural failure.

### A. The City of Houston / Houston Police Department (HPD)

193.    At all relevant times, the Houston City Council and successive Chiefs of Police—acting as the final policymakers regarding HPD's investigative procedures, inter-divisional coordination, and disciplinary oversight—possessed actual and constructive notice of three distinct, widespread institutional customs that systematically deprive citizens of their constitutional rights, yet exhibited deliberate indifference by refusing to remediate them.

#### 1. Custom 1: Institutional Siloing, ADA Credibility Filtering, and the Binary "Default to Detention"

194.    **The Custom:** The City of Houston maintains a siloed dispatch architecture wherein law enforcement encounters involving disabled citizens frequently default into psychiatric detentions. HPD's Crisis Intervention Response Team (CIRT) operates without an interoperable framework for citizens reporting highly complex crimes (such as zero-day

targeted cyberattacks) who also possess a voluntarily disclosed, widely managed clinical diagnosis (such as ADHD). Without integration between standard patrol and CIRT, HPD has established a widespread custom of substituting a citizen's speech (the crime report itself) and disclosed disability as a proxy for clinical deterioration, executing EDOs based on disclosed diagnoses rather than an independently observed threat.

**195.    The Structural Defect (Uncredentialed Officers and Blind Authorization):** This custom is executed and compounded by patrol officers who are fundamentally unqualified to make clinical determinations. Pursuant to records produced by the Texas Commission on Law Enforcement (TCOLE) (GovQA R002296-042226), Officer Hernandez lacks current, state-mandated Crisis Intervention Team (CIT) and Mental Health Officer (MHO) credentials. His TCOLE Personal Status Report shows his last genuine CIT-related training (Course #3843) was completed on October 18, 2010—nearly fourteen years before he detained Plaintiff on August 26, 2024. After 2010, his record contains no entry for TCOLE Course #1850 (the 40-hour CIT curriculum) or any equivalent MHO designation. In lieu of statutory compliance, HPD substitutes its proprietary 8-hour Course #2048, "Recognition and Handling of Abnormal People," a department-specific course that carries no TCOLE certification and lacks the legal framework content mandated by Texas Health and Safety Code §§ 573.001–573.002. TCOLE audits of HPD in 2018 and 2023, relying on a mathematically invisible 0.5% sampling rate (reviewing just 20 to 30 files out of a force of over 5,300), systematically failed to detect this training void. The result is a closed system of unverified authorization: an uncredentialed patrol officer relies on a remote CIRT operator who has never evaluated the subject, and the CIRT operator relies unquestioningly on the untrained patrol officer's characterization.

196. **Notice of Foreseeable Harm from Siloing:** The City of Houston was placed on explicit actual notice that this identical institutional siloing and lack of coordinated clinical support leads directly to constitutional violations. The architectural deficiency was sufficiently documented that in January 2024, Houston Mayor John Whitmire publicly acknowledged the crisis, instructing department heads that no city agency could "be allowed to run in silos" and lamenting that law enforcement agencies historically operated in disjointed "silos" rather than sharing vital intelligence. Furthermore, on June 25, 2020, and February 17, 2022, the Houston City Council's Public Safety and Homeland Security Committee received formal briefings regarding the severe structural limitations of the Mental Health Division. Houston's own operational data confirms that in a single year (2019), standard patrol officers were forced to handle 86.4% (over 35,000) of HPD's 40,525 mental health calls without any on-scene CIRT support, resulting in precisely 13,010 involuntary detentions executed department-wide by HPD patrol officers alone. The City was explicitly informed by its own experts that CIRT teams operate as "secondary units" functionally isolated from the primary calls-for-service loop. The contractual terms of this architecture remain under active evidentiary pursuit: on April 17, 2026, Plaintiff requested from HHSC all MOUs and interagency agreements between the Harris Center and HPD governing CIRT operations (pending prepayment); on April 26, 2026, Plaintiff requested from the Department of Justice Office of Justice Programs all Byrne JAG compliance audits and pattern-or-practice complaints regarding HPD's CIRT program. Upon information and belief, the responsive documents will confirm that no operative agreement required cross-referencing an open HPD investigation before authorizing an Emergency Detention Order.

197. **Notice from the SL Code Failures:** The use of an Emergency Detention Order to administratively dispose of a complex crime report without investigation is a direct

manifestation of HPD's documented culture of investigative avoidance. In February 2024, the City disclosed that approximately 268,920 incident reports—including over 4,000 sexual assault cases—had been improperly classified under an internal status code, "Suspended – Lack of Personnel" (SL), between 2016 and 2024. The Independent Review Committee Report (August 2024) concluded that HPD's investigative divisions operated in "near complete autonomy," each creating its own case management procedures without centralized oversight. The Report explicitly identified HPD's Records Management System (RMS) as "antiquated" and "inadequate," structurally preventing the flow of case data between divisions. Crucially, the committee documented that leadership had at least seven recorded opportunities to question this practice, and found that 8,818 reports were administratively mischaracterized as noncriminal despite the facts meeting the elements of a penal offense.

**198.    Deliberate Indifference to Internal Policies:** The City's deliberate indifference is further evidenced by its structural failure to enforce its own written mandates. *HPD General Order 500-12* (January 28, 2021) mandates: "Officers shall thoroughly investigate all reported crimes... regardless of any history of or reported mental illness," and prohibits unverified, conclusory detention justifications: "Officers should avoid using only generic or vague statements... Such statements do not adequately detail the justification for the apprehension." *HPD General Order 200-19* explicitly binds all HPD employees to federal ADA standards. HPD's official training curriculum, *Responding to the Mentally Ill* (Revised May 2018), provides officers with a sample EDO form explicitly labeled "Insufficient Information" to warn against the exact vague, behavior-less justification Hernandez utilized. Despite possessing these written standards, the final policymakers structured CIRT to operate remotely and isolated standard patrol from the Cybercrimes

database, which predictably permitted the ADA Credibility Filtering custom to override written policy in the field.

199.    **Prior Specific Instance (The *Wilkerson* Pipeline):** The City possessed direct, constructive notice that this siloed § 573 transport pipeline routinely routes citizens reporting crimes into psychiatric lockup rather than criminal investigation. In *Wilkerson v. Arrington*, Cause No. 2015-66027 (Harris Cnty. 295th JDC, filed Nov. 3, 2015), a Black activist who presented at Ben Taub's emergency room distributing flyers about criminal networks targeting Houston residents was subjected to an identical unconstitutional process. Classifying the content of her speech as "delusional," clinical staff and HPD utilized the § 573 process to chemically restrain and detain her for thirteen days, relying on EDO affidavits that were subsequently contradicted by objective phone-search evidence. The 2015 filing of the *Wilkerson* complaint placed the City on constructive notice that the pipeline functionally converted crime reporters into psychiatric detainees. Nine years later, the unremediated architecture processed Plaintiff through the exact same mechanism.

200.    **Moving Force Causation:** Plaintiff's Emergency Detention Order operated through the same administrative sequence. Officer Hernandez entered a classification — "Mental Capacity Deterioration" — on a one-page state form. Crucially, there were no independent on-scene indicators of imminent harm, violence, or functional incapacity to provide an alternative, lawful basis for the seizure. No supervisor verified whether the classification was supported by the statutory predicate of "specific recent behavior, overt acts, attempts, or threats" required by Texas Health and Safety Code § 573.002. The City's deliberate maintenance of an information silo between Patrol and Cybercrimes was the direct moving force behind the constitutional deprivation: the custom structurally blinded Officer Hernandez to the active Cybercrimes case (No. 1198816-24) in HPD's Records

Management System. Had the custom not existed, a simple cross-reference would have objectively verified Plaintiff's report and collapsed the false premise that his statements were psychiatric delusions. Instead, the EDO's "Witnesses" field was marked "None" despite the physical presence of Plaintiff's mother, and the resulting administrative disposition — psychiatric detention — closed the encounter without criminal investigation, in the exact same manner the SL code closed 264,000 cases without criminal investigation.

## 2. Custom 2: Systemic Falsification of Sworn Instruments

201.    **The Custom:** The City of Houston maintains a widespread custom of permitting officers to execute sworn detention instruments—including criminal warrants and civil Emergency Detention Orders—containing material omissions and unsupported factual assertions. Under this custom, HPD supervisors routinely allow officers to submit EDOs under penalty of perjury without requiring corroborating evidence, verifying physical narratives, or rejecting demonstrably false police reports. This practice structurally bypasses the Fourth Amendment's probable cause requirement, allowing officers to effectuate seizures based entirely on unverified narratives knowing they will never face an internal factual audit.

202.    **Actual and Constructive Notice of Systemic Probable Cause Failures:** The City has been confronted with overwhelming, statistically quantified evidence of this perjury custom: *(a)* **City Council Notice:** On June 25, 2020, the Houston City Council's Public Safety Committee was directly briefed on a report revealing a 70% increase in cases dismissed for lack of probable cause. HPD was explicitly identified on the record as the "number 1 offender," accounting for over 2,000 dismissed cases due to deficient factual predicates. *(b)* **The Harding Street Raid and Goines Scandal:** The Gerald Goines scandal resulted in 162 convictions requiring post-conviction relief due to fabricated sworn affidavits (*Jeffery v. City*

*of Houston*, 4:23-CV-00069, S.D. Tex.). In parallel state litigation, *Prophet v. City of Houston* (Cause No. 2020-42472), the City was explicitly sued for its systemic failure to adequately audit and supervise the sworn affidavits of its officers—the precise supervisory failure that allowed Officer Hernandez to execute an EDO without factual audit. *(c)* **99.08% Search Warrant Fabrication Rate:** In *Nicholas v. City of Houston*, No. 4:21-cv-00272 (S.D. Tex. 2021), the City was confronted with quantitative data revealing that HPD officers obtained over a hundred search warrants by falsely swearing to the presence of firearms—yet in 99.08% of those cases, no firearm was ever recovered. *See also Ybarra v. City of Houston*, No. 4:24-cv-00584 (S.D. Tex. 2024) (confronting a systemic fifteen-year-long practice of officers falsifying charges and lying in sworn affidavits). *(d)* **The Brady List:** The sheer scale of the Harris County District Attorney's *Brady* list, which contained 1,593 compromised officers by 2019, placed final policymakers on direct notice that relying on un-audited HPD sworn instruments violates constitutional rights.

**203.    Uniform Application Across Patrol Operations:** The institutional failure that permits an HPD officer to swear a false oath applies uniformly across all patrol operations. The exact same supervisory apparatus that ratified Goines's fabricated search warrants across 26 years operated without modification on Officer Hernandez's Emergency Detention Order. The execution of a false narrative to seize a citizen operates mechanically the same whether the instrument is a criminal affidavit or a civil EDO. The Fifth Circuit has explicitly recognized "a due process right not to have police deliberately fabricate evidence and use it to frame and bring false charges against them." *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015). That liberty interest applies with equal force to psychiatric detentions. The City received notice of this specific variant of oath-fabrication directly during the June 25, 2020 PSHS Committee briefing, placing the City on notice that its structural tolerance for

unverified sworn instruments constituted a department-wide pattern across all oath-based probable cause determinations, including the approximately 12,000 EDOs executed annually.

**204.** **Post-Incident Pattern Evidence Demonstrates an Ongoing Custom:** The City of Houston maintains a closed-system *de facto* policy where administrative convenience is prioritized over investigative integrity. This policy is evidenced by a statistically significant pattern of 'numerosity' involving prior lawsuits and formal grievances filed within the last five years. These are factually identical examples of HPD officers systematically falsifying sworn instruments and manufacturing evidence to bypass constitutional protections. The following cases highlight this continuing systemic devaluation of sworn instruments: *Archangel v. City of Houston* (S.D. Tex. Sept. 13, 2024); *Doe v. Houston* (S.D. Tex. Jan. 31, 2025); and *Abbt v. City of Houston* (S.D. Tex. Dec. 19, 2025). Furthermore, discovery in recent litigation statistically confirms this entrenched tolerance for perjury: in *Ramos v. Erwin* (S.D. Tex. Dec. 17, 2025), a motion to compel revealed that the personnel files of active HPD officers contained confirmed disciplinary infractions for "being untruthful in an incident report" without the officers being terminated.

**205.** **Moving Force Causation:** Because HPD supervisors categorically fail to audit factual predicates, Officer Hernandez knew he could safely execute a sworn EDO that affirmatively misrepresented the presence of witnesses ("None") despite Plaintiff's mother standing feet away, and deliberately omitted the active HPD cybercrimes case he personally verified on scene. This custom of tolerating perjury directly empowered the fabrication that stripped Plaintiff of his liberty.

### 3. Custom 3: Post-Incident Ratification, Failure to Discipline, and Evidence Refusal

206.    **The Custom:** To protect officers who execute unlawful seizures and fabricated affidavits, the City of Houston maintains a pervasive practice of post-incident ratification. This operates through a predictable administrative pipeline: (a) a systemic refusal to meaningfully investigate or discipline officer misconduct, resulting in a systemic failure to enforce disciplinary standards; and (b) the routine misuse of public records exemptions, including the Texas Public Information Act (TPIA) and Texas Local Government Code § 143.089(g), to actively block victims' access to exculpatory evidence, body-worn camera footage, and dispatch logs.

207.    **Constructive Notice:** Federal courts in the Southern District of Texas have repeatedly sustained *Monell* claims against the City based on this precise disciplinary vacuum and evidence refusal playbook: *(a) Pizana v. City of Houston* (S.D. Tex. 2020) demonstrated that between 2005 and 2018, HPD's Internal Affairs Division (IAD) did not classify a single intentional use of lethal force as unjustified. *(b) Allen v. Hays* (S.D. Tex. 2018) demonstrated a 400-to-0 discipline ratio, wherein across over 400 severe incidents since 2009, no HPD officer was disciplined by IAD. *(c) Howard v. City of Houston* (S.D. Tex. Feb. 16, 2022) documented 50 separate incidents of excessive force alongside actions by the Chief of Police to intentionally keep prior shootings internal. *(d) Ettinoffe v. City of Houston* (S.D. Tex. Aug. 13, 2021) documented 24 specific prior incidents spanning eight years wherein constitutional violations occurred under identical circumstances with no resulting discipline or retraining. *(e) Releford v. City of Houston* (S.D. Tex. Feb. 29, 2016) demonstrated 99 consecutive internal investigations resulting in zero findings against the involved officers.

**208.    Structural Impediments to Internal Investigation:** The City's failure to discipline Officer Hernandez is the foreseeable result of structural barriers integrated into the investigatory process. As documented in *Lane v. City of Houston* (S.D. Tex. 2023), HPD consistently grants officers a 48-hour window to review evidence before making statements, and permits unrecorded "walkthroughs" of incident scenes prior to formal interviews. Compounding this, the City enforces policies that prohibit officer discipline if six months have elapsed since an incident. *See Espinal v. City of Houston* (S.D. Tex. Apr. 10, 2022). Furthermore, this administrative structure enables officers to coordinate justifications following constitutional violations. *See McWashington v. Rodgers* (S.D. Tex. 2024).

**209.    Systemic "Evidence Refusal":** To maintain this Code of Silence, the City routinely suppresses objective video evidence and stonewalls victims' access to public records: In *Simms v. Rivers* (S.D. Tex. 2023), plaintiffs alleged that Chief Troy Finner explicitly ratified officers' unconstitutional conduct by *actively deleting body-worn camera footage* of an incident from public access. In *Moore v. City of Houston* (S.D. Tex. 2023), plaintiffs alleged the City ratified misconduct by "blocking victim's access to justice and to unedited video footage to cover up for officers." In *Ramos v. Erwin* (S.D. Tex. 2025), the City Legal Department aggressively intervened to quash civil subpoenas for HPD internal affairs records regarding "evidence fabrication," arguing they must be concealed under Tex. Loc. Gov't Code § 143.089(g).

**210.    The Moving Force Causation:** The ratification apparatus applies uniformly to psychiatric detention instruments. An administration that deletes body-camera footage to shield officers who commit homicide (*Simms*) and fabricates a suicide narrative to avoid civil liability (*Moore*) deploys the identical apparatus to ratify the psychiatric detention of a private citizen. Following Plaintiff's unlawful seizure, the City actively ratified Hernandez's

fabricated EDO by officially classifying Plaintiff's underlying cybercrimes report as an "active investigation" under Tex. Gov't Code § 552.108. This was done to obstruct Plaintiff's TPIA requests for CAD records, 911 audio, and BWC footage, while simultaneously confirming no detective had actually been assigned to the case. The City's deployment of conflicting agency designations—certifying the crime report as a psychiatric delusion to justify the EDO, while certifying it as an "active criminal investigation" to withhold public records—protects the officer's false narrative from objective contradiction while stripping Plaintiff of his constitutional rights.

211.    The three foregoing institutional customs—ADA Credibility Filtering, Systemic Falsification of Sworn Instruments, and Post-Incident Ratification—operated in concert as the moving force behind Plaintiff's unlawful detention. The City of Houston is therefore liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for the constitutional injuries described herein.

## B. Harris County Hospital District (Harris Health System)

212.    At all relevant times, the Harris Health Board of Trustees and the Medical Executive Committee acted as the final policymakers for the Harris County Hospital District. Harris Health is liable under *Monell* because these policymakers acted with deliberate indifference in maintaining unconstitutional clinical and documentation customs. Harris Health possessed actual and constructive notice of these failures through a decade of federal litigation, adverse Centers for Medicare & Medicaid Services (CMS) regulatory citations, and its own internal Board minutes, yet affirmatively chose to preserve the architecture that generated them.

## 1. Custom 1: Punitive Blanket Protocols and "Restraint-as-Coercion"

**213.**    **The Custom:** Harris Health maintains a widespread institutional custom of deploying maximum-restriction clinical protocols—specifically Continuous 1:1 Suicide Watch and physical/chemical restraints—without documenting imminent clinical danger. Harris Health utilizes emergent restraints to manage patient non-compliance and overcome a civil detainee's lawful refusal of medication under Texas Health & Safety Code § 576.025, rather than as a last resort for physical safety.

**214.**    **Notice from CMS Immediate Jeopardy and Board Ratification:** Federal regulators formally cited Ben Taub Hospital for this exact conduct. A September 2019 *CMS Immediate Jeopardy determination (Tags A 131, A 174, A 178)* found the facility systematically bypassed informed consent, deployed physical restraints punitively, and administered chemical injections prior to physician authorization. Rather than correct this, the Board of Trustees explicitly codified it: in an *October 27, 2022 packet,* the Board formally approved written credentialing standards authorizing the "Chemical restraint of agitated patient"—a policy that facially violates the federal constitutional floor requiring an *imminent physical threat* (BARS-7) under 42 CFR § 482.13(e)(1). An August 24, 2023 Board packet further documented severe "throughput issues in the emergency room," establishing the institutional motive for applying blanket maximum-restriction protocols to forcefully process detainees and manage overcrowding. Two federal FOIA requests to CMS remain pending. First, on April 27, 2026, Plaintiff requested aggregate Medicare claims data showing facility-level billing frequency for haloperidol (Haldol) and related antipsychotic chemical restraints across all comparable psychiatric inpatient facilities for calendar years 2014–2024 (Control No. FOIA-CMS-0427). Upon information and belief, that data will support Plaintiff's thesis that chemical restraint was applied at Ben Taub as a matter of

institutional custom rather than individualized clinical judgment. Second, on April 27, 2026, Plaintiff requested the surveyor worksheets, field notes, and Plans of Correction underlying the September 2019 Immediate Jeopardy determination (Control No. 042820267081; appeal acknowledged May 12, 2026, Control No. 042820267085). Upon information and belief, those records will confirm whether Ben Taub ever implemented enforceable corrections to its chemical restraint authorization protocols — or whether the Board's 2022 credentialing approval simply codified the surveyed deficiency.

**215. Constructive Notice from Prior Litigation:** The policymakers were explicitly warned of this punitive treatment model through prior federal litigation: *(a)* In *Mitchell v. Harris Health System*, No. 4:20-cv-00142 (S.D. Tex. 2020), an elderly detainee processed through the identical § 573 pipeline was punitively shackled to a hospital bed during a hypertensive emergency. *(b)* In *Slayton v. Harris County*, No. 4:22-cv-02572 (S.D. Tex. 2022), plaintiffs alleged a regular custom of ignoring medical needs and maladministering prescription medication as an administrative default. *(c)* In *McGregor v. Harris County*, No. 4:26-cv-00685 (S.D. Tex. 2026), a schizophrenic patient's psychiatric label was used as institutional cover to withhold care until he died of sepsis, demonstrating the exact inverse of Plaintiff's case: deploying psychiatric documentation as an institutional shield rather than a clinical tool.

**216. Moving Force Causation:** Pursuant to this custom, Harris Health applied a total deprivation of liberty to Plaintiff. He was placed on maximum-restriction suicide watch for over seven hours before any psychiatric diagnosis existed, even after a scored C-SSRS assessment certified him as "No Risk" and four independent clinicians documented "No SI/ HI." At 03:58 AM, staff administered a "B52" chemical restraint to overcome his explicit refusal of treatment, despite his concurrent BARS assessment logging him as "BARS 6" and

"not aggressive." This triple-injection was the direct, predictable application of the Board's unconstitutional written credentialing standard permitting chemical restraint for mere "agitation."

## 2. Custom 2: Systemic Restriction of Patient Communication and Record Verification

217.    **The Custom:** Harris Health isolates civil detainees from external verification. Operationally, Harris Health violates Texas Health & Safety Code § 573.002(a) by failing to scan foundational legal instruments (the EDO) into the active Epic Electronic Health Record (EHR) during the admission process. This practice deprives treating clinicians of the ability to review the legal and factual basis of the detention, causing them to rely exclusively on unsworn police hearsay. Concurrently, staff restrict external communication by confiscating communication devices, ignoring charted requests for legal counsel, operating ward telephones that block 9-1-1 access, and interacting with patients without wearing legally mandated photo identification.

218.    **Constructive Notice of Epic Manipulation and Anonymity:** Harris Health's policymakers have received repeated notice that their Epic architecture and staff protocols are utilized to obscure clinical decision-making and shield institutional liability: *(a) United States ex rel. Strawn v. Harris Health System* (No. 4:20-cv-00296) and *Vaughn v. Harris County Hospital District* (No. 4:17-cv-02749) alleged systemic, coordinated manipulation of the Epic EHR to execute multi-million dollar federal frauds, explicitly naming policymakers who took no corrective action. *(b) Rodgers v. Harris County Hospital District* (Cause No. 2023-63132) alleged supervisors directed nurses to retroactively modify clinical records to delete mandatory CDC infection data. *(c) Aguocha-Ohakweh v. Harris County* (No. 4:16-cv-903) and *Aguocha-Ohakweh v. Baylor* (No. 4:16-cv-01704) alleged an "admit and

withhold" strategy where Harris Health generated false records, including post-incident orders placed retroactively to mask clinical decisions and "credential laundering." *(d) Byrd v. Harris Health*, No. 4:24-cv-03128 (S.D. Tex. Aug. 2024), documented contemporaneously that Harris Health staff systematically "hide their names and refuse to present identification" to neutralize patient grievances at the point of contact.

219.    **Moving Force Causation:** Because the original EDO was not scanned into Plaintiff's active chart, clinicians relied entirely on Officer Hernandez's triage narrative. When Plaintiff identified objective infrastructure failures—a ward phone that blocked 911 (violating Tex. Health & Safety Code § 771A.001) and staff lacking mandatory photo badges (violating § 241.009)—staff documented his accurate observations as "paranoia" and "delusions." This documentation of distress directly supplied the clinical predicate for the forced chemical restraint. On April 27, 2026, Plaintiff filed a FOIA request with the FCC Enforcement Bureau seeking Kari's Law and RAY BAUM'S Act MLTS compliance filings, enforcement citations, and any consumer complaints against Harris Health System regarding the inability to dial 911 directly from the Ben Taub ward phone. As of the date of this filing, no response has been received. Upon information and belief, those records will confirm that the ward phone's 911 block was a known, documented infrastructure failure — not a delusion — and that Plaintiff's accurate observation was contemporaneously weaponized as psychiatric evidence against him.

### 3. Custom 3: Sworn Probate Court Fabrications and Retroactive Alteration

220.    **The Custom:** Harris Health maintains a coordinated custom wherein clinical staff at Ben Taub Hospital submit unsupported behavioral assertions in sworn EDO affidavits submitted to the Harris County Probate Court to sustain unlawful confinements. Concurrently, Harris Health maintains a practice of retroactive record modification,

utilizing its Health Information Management (HIM) department to scan substitute legal documents into closed charts months after discharge, creating an inaccurate appearance of contemporaneous statutory compliance.

221. **Constructive Notice of Affidavit Fabrication and Spoliation:** Harris Health possessed direct constructive notice of this exact pipeline from certified state-court records and federal litigation: *(a) Wilkerson v. Arrington*, Cause No. 2015-66027 (Harris Cnty. 295th JDC, filed Nov. 3, 2015). The identical Harris Health/Ben Taub clinical staff pool was sued for executing EDO affidavits containing demonstrably false behavioral descriptions ("screaming she was Jesus") to bypass clinical reality, sedating a non-violent political activist and detaining her for 13 days. The case demonstrated Harris Health's systemic use of the Texas Medical Liability Act (Chapter 74 expert-report requirement) as a procedural trap to extinguish constitutional claims before merits adjudication. *(b) Gatlin v. Harris County Hospital District*, Cause No. 2013-56180 (Harris Cnty. 113th JDC), similarly demonstrated that the mandatory judicial probable cause hearing for psychiatric detention "never happened," yet claims against the Ben Taub staff were predictably extinguished by the Chapter 74 barrier. *(c) Borchgrevink v. Harris County*, No. 4:23-cv-03198 (S.D. Tex. 2023), alleged Harris Health's Chief Medical Officer ratified dangerous practices and that the facility engaged in "textbook spoliation" by intentionally destroying video surveillance to cover up misconduct. *(d) Mitchell v. Harris Health System* (No. 4:20-cv-00142) alleged that the facility deliberately shredded clinical records pertaining to a § 573 detention and denied the patient access to counsel.

222. **Moving Force Causation:** Operating under this uncorrected institutional blueprint, LMSW Jones and Dr. Contreras acted as complaining witnesses to the Probate Court against Plaintiff. They swore under penalty of perjury to overt acts of violence and

escape attempts ("kicked a nurse," "attempted to elope") that their own hospital's concurrent clinical flowsheets, transfer certificates, and sitter logs affirmatively denied. To conceal the fact that Plaintiff had been detained for eleven days without the statutorily mandated EDO on file, Harris Health's HIM department executed a batch administrative upload 176 days after Plaintiff's discharge. They retroactively inserted a substitute EDO—bearing an irreconcilable signature—into the closed Epic system. The Board of Trustees openly acknowledged profound Epic EHR structural flaws necessitating a "Back to Foundation" rebuild in 2025, confirming the architecture that enabled this retroactive manipulation was known and deliberately unremediated during Plaintiff's detention.

## VI. CAUSES OF ACTION

223. *Clarification Regarding References to State Law.* Throughout this Complaint, Plaintiff cites provisions of Texas state law — including the Texas Health & Safety Code (§§ 573.001, 573.002, 573.023, 576.006, 576.025), the Texas Government Code (§ 552.108), and related regulatory standards. These citations serve exclusively as factual predicates establishing the constitutional floor against which Defendants' conduct is measured, as elements of state-created liberty interests enforceable under the Fourteenth Amendment, or as evidence of the applicable standard of care for purposes of demonstrating deliberate indifference. Plaintiff does not assert any independent state-law cause of action arising from these statutes. All claims are brought under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

224. *Clarification Regarding Medical Malpractice.* No claim in this Complaint sounds in medical malpractice or health care liability under Texas Civil Practice & Remedies Code Chapter 74. Plaintiff challenges the constitutional adequacy of institutional customs and

policies, the fabrication of sworn judicial instruments, and the deliberate indifference of municipal policymakers — not the exercise of professional medical judgment. The expert report requirement of § 74.351 does not apply to federal civil rights claims brought under § 1983. *See Esteves v. Brock, 106 F.3d 674, 677 (5th Cir. 1997).*

---

**Count I: Fourth Amendment — Unreasonable Seizure (42 U.S.C. § 1983)**

---

**(Unreasonable Seizure, Franks Violation, and Failure to Intervene — against Officers Hernandez and John Doe 1–N)**

225.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 47, and 155 through 191.

226.    Officer Hernandez executed a sworn EDO that affirmatively misrepresented the presence of witnesses and omitted four critical facts known to him at the time of execution:

**(a) The Witness Falsity Matrix:** The sworn EDO explicitly certified under Item 5 that there were "None" for witnesses who reported or observed Plaintiff's behavior. This was an affirmative fabrication. Plaintiff's mother, Carolyn Van Kirk, was physically present on the scene and was directly interviewed by Officer Hernandez on his body-worn camera. Upon information and belief, the body-worn camera footage captures her explicitly corroborating the spoofed-call attack and failing to describe Plaintiff as violent, threatening, or a danger to himself or others. By swearing "None," Officer Hernandez deliberately concealed this material, exculpatory witness statement from the magistrate to manufacture a false psychiatric emergency. **(b)** The EDO omitted Plaintiff's active, verified HPD cybercrimes case (No. 1198816-24), which Hernandez personally confirmed on the scene. **(c)** The affidavit fails to identify a single objective behavior, physical action, or overt act. Instead, Officer Hernandez relied exclusively on his own subjective interpretation of Plaintiff's speech (the crime report itself) to apply conclusory psychiatric labels ("paranoia" and

"delusions"). Substituting a citizen's statements for the statutory requirement of "specific recent behavior, overt acts, attempts, or threats" bypasses the objective evidence standard required for an involuntary seizure. **(d)** The EDO deliberately reframed Plaintiff's citizen-initiated crime report—concerning actively spoofed incoming calls on a newly purchased phone with a corroborating witness—into the spontaneous exhibition of delusional beliefs, omitting the fact that Plaintiff had voluntarily approached the officer to report a specific, witnessed telecommunications crime.

227.    Because Hernandez personally confirmed the active cybercrimes case, personally interviewed Plaintiff's mother on scene, and personally observed the absence of any threats, weapons, self-harm, or acute distress, his omission of these exculpatory facts from the sworn instrument transcends negligence and constitutes a reckless disregard for the truth. This reckless disregard pierces the independent intermediary doctrine under the taint exception: Hernandez's fabricated EDO was submitted to and relied upon by the Harris County Probate Court Magistrate to authorize the continued confinement, and his false oral narratives directly tainted the clinical intake process at Ben Taub, as subsequent nursing evaluations incorporated these subjective labels "per report" rather than through independent observation. These omissions and fabrications were "clearly critical" to a finding of probable cause; had they been truthfully included, the sworn instrument would have failed to articulate the statutory predicate for detention.

228.    The sworn EDO does not satisfy any statutory predicate for involuntary detention. The EDO form's Item 4 required documentation of "recent behavior, overt acts, attempts, statements, or threats observed by me." Hernandez documented no behavior, no overt act, and no threat — his sole factual predicate is attributed to "based on consumer's statement." The statutory standard under § 573.001(b)(2) requires both "severe emotional distress" and

"deterioration in the person's mental condition to the extent that the person cannot remain at liberty." The EDO documents neither element. Harris Health's contemporaneous intake record documented Plaintiff as "In No Acute Distress (NAD)," "ambulatory with steady gait," oriented in all four spheres, BARS 4 (quiet and awake), with "ability to follow commands: Yes" and "compliant." Fifth Circuit precedent unequivocally holds that mental illness alone cannot justify a seizure; there must be an independent showing that the individual poses a "substantial risk of serious harm." *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012). At the time of the seizure, it was clearly established law in the Fifth Circuit that detaining an individual for a psychiatric evaluation without objective, articulable facts demonstrating an imminent physical threat of serious harm to self or others violates the Fourth Amendment. Because the EDO documented zero threats, zero violent acts, and zero inability to care for oneself, no reasonable officer could find arguable probable cause of imminent harm. Officer Hernandez is not entitled to qualified immunity because every reasonable officer would have known that substituting a non-threatening, voluntarily disclosed disability or protected speech for the mandatory statutory predicate of imminent physical danger is constitutionally impermissible. When the *Franks v. Delaware*, 438 U.S. 154 (1978), corrective is applied — excising the fabricated statements and inserting the omitted truths — the remaining facts fail to establish any "substantial risk of serious harm." Plaintiff has transmitted tombstone forensic artifacts from three compromised family devices to Google's Threat Analysis Group ("TAG") for technical assessment; as of the date of this filing, that review remains pending. Upon information and belief, Google's assessment will confirm that the device behaviors documented in August 2024 are consistent with known threat actor TTPs — not delusion.

229.    Multiple additional officers ("Officers John Doe 1–N") were present on the scene. Because Officer Hernandez audibly confirmed the active HPD case number on his police radio in the immediate physical presence of the John Doe officers, and because the John Doe officers were physically present when Plaintiff's mother corroborated the crime report on body-worn camera, it is reasonably inferred that they possessed actual knowledge of the exculpatory evidence. Based on the recollection of Plaintiff's mother, upon information and belief, at least one John Doe officer explicitly expressed disagreement with or questioned the necessity of the detention on the scene. Despite this actual knowledge, and despite possessing an EDO that facially failed to articulate any imminent threat or act of harm to self or others, they failed to intervene to prevent the involuntary psychiatric transport. Each officer had a minimum of several minutes between hearing the exculpatory evidence and Plaintiff's physical transport to intervene and halt the unlawful seizure, but chose not to.

## Count II: First Amendment — Retaliatory Seizure (42 U.S.C. § 1983)

**(Retaliation for Protected Speech — against Officer Hernandez)**

230.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 47.

231.    Plaintiff engaged in core protected speech by verbally and formally commanding Officer Hernandez to "cease and desist" from the unlawful detention and expressly refusing consent to psychiatric hospitalization. The First Amendment strictly protects a citizen's right to verbally oppose or challenge police action without thereby risking arrest or retaliation. *City of Houston v. Hill*, 482 U.S. 451, 462–63 (1987). A citizen who has not been placed under arrest retains the absolute right to decline further interaction and withdraw consent. Plaintiff's verbal cease-and-desist demand placed Officer Hernandez on unambiguous, recorded notice that Plaintiff considered the seizure unlawful and was

invoking his constitutional right to refuse. The EDO itself confirms that the sole predicate for detention was Plaintiff's speech: the instrument attributes its basis to "consumer's statement," documents no observed behavior, no physical act, no threat, no severe emotional distress, no functional incapacity, and no imminent risk of harm.

**232.** The retaliatory motive is evidenced by Officer Hernandez's immediate post-refusal conduct. Following Plaintiff's explicit invocation of his rights, the clinical intake record reflects a narrative attributed to Officer Hernandez stating that Plaintiff was "willing to go to a locked unit" — a statement directly contradicting Plaintiff's verbal refusal and his transport in handcuffs in the back of a police cruiser pursuant to an involuntary hold. This altered narrative subsequently compromised the downstream clinical record: at 20:00, RN Aneja incorporated the statement, charting, "Per the patient he has been taking caffeine pills because he did not feel safe to go to sleep." At 02:45, RN Hamblin preserved the source attribution, charting: "Per report pt has been taking caffeine pills to stay up d/t paranoia." This documented narrative discrepancy — in which a recorded statement of voluntary consent directly contradicts the simultaneously documented facts of involuntary transport — constitutes an adverse action that would chill a person of ordinary firmness from exercising the same rights in the future.

**233.** The retaliatory deployment of an EDO constitutes a more severe retaliatory act than a retaliatory arrest because it bypasses every procedural protection the criminal justice system affords: no *Miranda* warning, no right to remain silent, no right to counsel at the point of seizure, no probable cause hearing before a magistrate, and no bail. Officer Hernandez used the psychiatric system to accomplish a deprivation of liberty unconstrained by the Fourth, Fifth, and Sixth Amendments. Therefore, an Emergency Detention Order categorically qualifies as an actionable "adverse action" under the First Amendment. An 11-day

involuntary confinement in a locked psychiatric ward, the forced injection of chemical restraints, the loss of Second Amendment rights, and the generation of a permanent SF-86 federal disclosure record is categorically more chilling to a person of ordinary firmness than a standard misdemeanor arrest (which the Fifth Circuit has consistently recognized as actionable). No rational person of ordinary firmness would risk verbally refusing police if they knew that such refusal would trigger this level of punitive civil commitment.

234.    These actions would deter a person of ordinary firmness from exercising the same protected speech in the future. The seizure lacked probable cause, as demonstrated by the fabrications and material omissions detailed in Count I. *Nieves v. Bartlett*, 587 U.S. 391 (2019). The objective evidence that the seizure was motivated by protected speech — as required by *Gonzalez v. Trevino*, 602 U.S. 653 (2024) — is the fabrication chain itself: Hernandez's post-refusal conduct of overwriting Plaintiff's express invocation of rights with a fabricated consent narrative, omitting four material exculpatory facts from the EDO, and recharacterizing a voluntary crime report as a spontaneous psychiatric exhibition.

## Count III: Americans with Disabilities Act, Title II (42 U.S.C. § 12132)

**(Discriminatory Denial of Police Services — against the City of Houston)**

235.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 47, and 155 through 191.

236.    Plaintiff is a qualified individual with a disability (ADHD and Depression). The City of Houston, through HPD, provides public-safety services, including the receipt and investigation of crime reports, to the public. Police investigation is a "service, program, or activity" of a public entity within the meaning of 42 U.S.C. § 12132.

237.    Plaintiff voluntarily approached Officer Hernandez in a public parking lot to initiate a crime report — no exigency existed, no tactical response was required, no arrest was

underway, and no threat to human safety was present. The scene was inherently secure at all times: a cooperative citizen speaking to a uniformed officer with a corroborating witness present. *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000). The City of Houston, through Officer Hernandez, denied Plaintiff the same police investigative services that the City provides to non-disabled citizens, and did so because of his disclosed disability status.

238.    Officer Hernandez's first substantive act upon encountering Plaintiff was to solicit Plaintiff's mental health diagnoses. This solicitation was not prompted by any observable behavior suggesting a psychiatric emergency. Having obtained the disclosure that Plaintiff had been diagnosed with ADHD and Depression, Hernandez used those diagnoses as a cognitive shortcut to categorically discredit Plaintiff's crime report. He did not investigate the report's factual basis: he did not verify the HPD Cybercrimes case (No. 1198816-24), interview the corroborating witness on scene, or examine any evidence Plaintiff had assembled. Instead, he treated the disability diagnoses as a substitute for the fact-finding that any non-disabled citizen filing the identical crime report would have received. The ADA prohibits public entities from making decisions based on stereotypes, generalizations, or assumptions about individuals with disabilities.

239.    But for Plaintiff's disclosure of his ADHD and Depression diagnoses, Officer Hernandez would have processed the crime report through standard HPD investigative channels. Non-disabled citizens who report complex, stressful cybercrimes and admit to temporary sleep deprivation are routinely processed by HPD Cybercrimes as victims without being subjected to warrantless seizures for psychiatric evaluation. It was the specific introduction of the "ADHD/Depression" label that caused Officer Hernandez to deviate from standard investigative practice. The disability disclosure was the but-for cause of the denial of police services. 42 U.S.C. § 12132.

**240.**    By soliciting Plaintiff's disability status, using that status to reflexively discredit a factually corroborated crime report without any independent investigation, and substituting the disability diagnosis for the statutory exigency standard that an EDO requires — all in a fully secured, non-exigent setting where the City's obligation to provide non-discriminatory police services was at its apex — the City of Houston denied Plaintiff the benefit of police investigative services "by reason of" his disability, in violation of Title II of the ADA, 42 U.S.C. § 12132. This denial of services constitutes intentional discrimination because the City of Houston, through its officers and policymakers, acted with deliberate indifference to Plaintiff's rights under the ADA, entitling Plaintiff to compensatory damages.

## Count IV: Municipal Liability (Monell) (42 U.S.C. § 1983)

**(Failure to Train and Ratification — against the City of Houston)**

**241.**    Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 47, and 192 through 211.

**242.**    HPD General Order 500-12, "Response to Mental Health Incidents" (Jan. 28, 2021) (Exhibit 25), governs every HPD officer's response to persons with mental illness. GO 500-12 expressly mandates that an Emergency Detention Order may be executed only when the officer has "reason to believe and does believe" that the person has a mental illness AND there exists a "substantial risk of serious harm" demonstrated by "the person's specific recent behavior, overt acts, attempts, or threats" (GO 500-12 §1(c)). The General Order further requires that officers "articulate in the narrative" the specific factual basis for this belief and warns that officers "should avoid using only generic or vague statements" (GO 500-12 §6). GO 500-12 §3 commands: "Officers shall thoroughly investigate all reported crimes, including crimes of family violence, regardless of any history of or reported mental illness." Officer Hernandez violated all three mandates.

243.    The General Order was issued and signed by the HPD Chief of Police, who possesses final policymaking authority for officer training, field procedures, and the use of Emergency Detention Orders. *Bennett v. City of Slidell*, 735 F.2d 861 (5th Cir. 1984) (en banc).

244.    The City of Houston is liable under the *City of Canton v. Harris*, 489 U.S. 378 (1989), failure-to-train doctrine. While Officer Hernandez completed CIT Course #3843 in 2010 and Course #2048, these courses contain a categorical, constitutional void: the City provides *no training whatsoever* instructing officers that a voluntarily disclosed ADA-protected diagnosis cannot, standing alone, supply the statutory predicate of imminent harm for a civil seizure. GO 500-12 itself does not mention the ADA or disability discrimination. Because GO 500-12 §3 commands investigation "regardless of" mental illness, it is a highly predictable consequence that, absent specific training to the contrary, officers will default to treating disclosed diagnoses as a license to bypass both the investigative mandate and the statutory Emergency Detention Order exigency standard. This total absence of training on the intersection of the ADA and civil commitment falls strictly within the "single-incident" exception under *Canton*.

245.    Under *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012), a warrantless mental health detention constitutes a Fourth Amendment seizure requiring probable cause. Texas Health & Safety Code § 573.002 reinforces this constitutional floor by requiring "specific and detailed information" in the EDO. Hernandez's EDO contains none of the required particularity. When the *Franks* corrective is applied, the remaining facts fail to establish any "substantial risk of serious harm." The City's total failure to train its officers on the distinction between a managed mental health diagnosis and the statutory predicate for involuntary seizure was the moving force behind this deprivation.

**246.** In the alternative, the City of Houston is liable under a pervasive custom of structural blindness and deliberate indifference—most publicly evidenced by the "Suspended - Lack of Personnel" (SL) scandal. This structural blindness incentivizes officers to utilize administrative and civil mechanisms to fraudulently misclassify and dispose of unusual, complex, or unwanted crime reports, knowing no internal oversight will verify the legality of the disposition. Instead of using an SL code, Officer Hernandez utilized the psychiatric detention process (EDO) as the exact same type of administrative evasion tactic: taking a complex situation that should be treated criminally and misclassifying it as a non-criminal mental health event to dispose of it without investigation. This specific custom of weaponizing civil psychiatric detentions to dispose of unusual or unwanted citizen reports was previously documented in prior incident *Wilkerson v. Arrington*.

**247.** The Chief of Police, as final policymaker, possessed actual or constructive notice of both the ADA training gap and the pervasive custom of administrative misclassification, yet consciously chose not to revise General Order 500-12. Furthermore, as detailed in ¶170, the Chief and IAD commanders maintained a well-documented custom of insulating officers from accountability by operating a structurally deficient internal affairs process. Their personal failure to intervene, correct the fabricated TPIA justifications, or discipline Officer Hernandez after receiving direct notice constitutes official ratification of his unconstitutional seizure under *Sonnier v. Rivers*, 43 F.4th 500 (5th Cir. 2022).

**248.** The constitutional deprivation suffered by Plaintiff is not the product of a singular "bad officer"; it is the predictable output of a department-wide structural failure. The City's conscious failure to train its officers on ADA obligations in non-crisis encounters, combined with the custom of misclassifying unusual crime reports to avoid investigative work,

constitutes deliberate indifference that was the direct moving force behind the unconstitutional seizure.

---

## Count V: Fourteenth Amendment Due Process — Unlawful Restraint and Violation of Bodily Integrity (42 U.S.C. § 1983)

---

**(Against Dr. Valeria M. Contreras, M.D., in her Individual Capacity)**

249.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 154. Plaintiff brings this claim exclusively as a federal constitutional deprivation under 42 U.S.C. § 1983 and expressly disclaims any state-law medical malpractice claim.

250.    Under *Youngberg v. Romeo*, 457 U.S. 307 (1982), civilly committed individuals retain a constitutionally protected liberty interest in freedom from unreasonable bodily restraints. Dr. Contreras ordered a forced "B-52" chemical restraint over Plaintiff's explicit refusal while her own nursing staff formally assessed Plaintiff at BARS 6 ("not requiring restraint") and documented that Plaintiff was "not aggressive." She placed this order 32 minutes before any psychiatric diagnosis existed in the medical record. Deploying an emergent chemical restraint to compel behavioral submission without clinical exigency or diagnostic basis constitutes a substantial departure from accepted professional judgment, violating Plaintiff's Fourteenth Amendment liberty interest.

251.    Furthermore, under *Vitek v. Jones*, 445 U.S. 480 (1980), state statutes create liberty interests protected by the Fourteenth Amendment's Due Process Clause. Texas Health & Safety Code § 576.025 guarantees the right to refuse psychoactive medication. Dr. Contreras authorized the physical override of Plaintiff's explicit, documented refusal without affording Plaintiff any procedural safeguards, hearing, or legal process, extinguishing Plaintiff's procedural and substantive due process rights.

---

## Count VI: Fourteenth Amendment Due Process — Fabrication of Evidence (42 U.S.C. § 1983)

---

(Against Dr. Valeria M. Contreras, M.D., and Monique Jones, LMSW, in their Individual Capacities)

252.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 154.

253.    The Fourteenth Amendment's Due Process Clause prohibits state actors from intentionally fabricating evidence and knowingly using it to initiate or maintain a judicial proceeding that results in a deprivation of liberty. *Castellano v. Fragozo*, 311 F.3d 689 (5th Cir. 2002) (en banc); *McDonough v. Smith*, 588 U.S. 109 (2019).

254.    In executing the Application for Temporary Mental Health Services (B29/B31) and the Certificate of Medical Examination for Emergency Detention (F25), Defendants Jones and Contreras did not act as mere testifying witnesses providing clinical evidence to the Probate Court. They acted as the complaining witnesses who affirmatively instituted and maintained the legal machinery of civil commitment. LMSW Jones, by signing the B29/B31 Application, served as the statutory applicant who initiated the judicial deprivation of Plaintiff's liberty. Dr. Contreras, by executing the F25 Certificate, provided the statutory prerequisite required to trigger the Probate Court's jurisdiction over Plaintiff's continued confinement. In these roles, Defendants swore to material factual assertions that affirmatively contradicted their own concurrent clinical documentation, including a physical escape attempt that the hospital's own discharge documentation denied, the incorporation of unverified police hearsay as direct clinical observations, the erasure of an uncertain diagnostic qualifier (Dr. Contreras removed the "R/O" qualifier before certifying it in the sworn instrument), and a context-stripped allegation of physical contact that occurred during a forced injection.

**255.** This fabricated evidence was material to the commitment proceeding and served as the direct, moving force behind the Probate Court's authorization of Plaintiff's continued involuntary commitment and transfer to Harris Behavioral Health, resulting in an unconstitutional deprivation of liberty for an additional ten days.

---

### Count VII: First and Fourteenth Amendments — Denial of Access to Counsel and State-Created Liberty Interest (42 U.S.C. § 1983)

---

**(Against Nurse Jasmine Balbir Singh Aneja, MSN, PMH-BC, RN, in her Individual Capacity)**

**256.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 154.

**257.** Under the Fourteenth Amendment and the framework established in *Vitek v. Jones*, 445 U.S. 480 (1980), Texas Health & Safety Code § 576.006(a)(3) vests civil detainees with a state-created liberty interest in unrestricted telephone access to legal counsel. Furthermore, the First Amendment guarantees the right to petition the government and access the courts.

**258.** Defendant Aneja deliberately deprived Plaintiff of these clearly established constitutional rights through two specific acts of commission and omission:

*(a)* **Elopement Code Falsification:** At 03:48 AM on August 27, 2024, RN Aneja selected the behavior-code checkbox PTALEDOWC (elopement attempt) in Plaintiff's clinical chart. In the simultaneous free-text narrative of that exact same entry, Aneja documented: *"Patient is insisting on leaving"* — a verbalization of a desire to leave, not a physical attempt to elope. Aneja selected a code that, on its face, contradicted her own concurrent clinical observation. She did not correct, retract, or amend the elopement code before or after it was transmitted. That uncorrected checkbox became the sole clinical support for the "attempted to elope" language in LMSW Jones's sworn B31 Affidavit submitted to the Harris County Probate

Court, which in turn constituted a direct moving force behind Plaintiff's continued involuntary commitment for an additional ten days.

*(b)* **Denial of Access to Counsel:** RN Aneja maintained a communication blackout, ignoring Plaintiff's explicitly charted request for an attorney, and pathologizing Plaintiff's empirically accurate reports of the failing ward telephone as "psychiatric delusions." Under Texas Health & Safety Code § 576.006(a)(3), Plaintiff possessed a state-created liberty interest in unrestricted telephone access to legal counsel. Aneja's deliberate indifference to this charted request severed Plaintiff's constitutionally guaranteed access to the courts, ensuring Plaintiff's emergency narrative could neither be verified nor challenged by counsel, thereby proximately causing the continuation of his forced confinement.

**259.** Defendant Aneja's conduct violated Plaintiff's clearly established First and Fourteenth Amendment rights.

---

**Count VIII: Municipal Liability (Monell) — Fourteenth Amendment: Unconstitutional Customs and Deliberate Indifference (42 U.S.C. § 1983)**

---

**(Against Harris County Hospital District d/b/a Harris Health)**

**260.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 154, and specifically Section V(B) (paragraphs 218 through 220). Harris Health is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because its final policymakers (the Board of Trustees and Medical Executive Committee) acted with deliberate indifference in maintaining the following interlocking, unconstitutional customs, each of which was a moving force behind the constitutional deprivations Plaintiff suffered:

*(a)* **Punitive Blanket Protocols and "Restraint-as-Coercion":** Under *Bell v. Wolfish*, 441 U.S. 520 (1979), conditions of confinement imposed on civil detainees constitute

unconstitutional punishment if not reasonably related to a legitimate non-punitive governmental objective. Under *Youngberg v. Romeo*, 457 U.S. 307 (1982), and *Washington v. Harper*, 494 U.S. 210 (1990), forced psychoactive medication requires a finding that the patient poses a likelihood of serious harm. Harris Health deploys maximum-restriction clinical protocols and forced chemical injections as automated, punitive administrative defaults at intake, divorced from individualized clinical judgment — resulting in Plaintiff's confinement on Continuous 1:1 Suicide Watch despite four clinicians certifying "No SI/ HI" and a scored C-SSRS of "No Risk," and the B-52 chemical restraint while Plaintiff was assessed at BARS 6 and documented as "not aggressive."

*(b)* **Systemic Restriction of Record Verification and External Communication:** Under *O'Connor v. Donaldson*, 422 U.S. 563 (1975), the State cannot constitutionally continue to confine an individual after the original justification for commitment has ceased to exist. Operating in tandem with HPD's structural practices, Harris Health maintains a systemic practice of omitting legal documentation during admission. By isolating the foundational Emergency Detention Order from the active Epic EHR in violation of Texas Health & Safety Code § 573.002(a), Harris Health causes clinicians to rely exclusively on police narratives rather than independently verifying the statutory predicate for detention. Concurrently, Harris Health restricts external patient communication — confiscating devices, ignoring charted requests for counsel, operating telephones that block 911 access, and pathologizing empirically accurate observations as psychiatric symptoms — ensuring the patient's account cannot be independently verified against the police classification.

*(c)* **Fabrication of Sworn Instruments and Retroactive Record Alteration:** Under *McDonough v. Smith*, 588 U.S. 109 (2019), the Due Process Clause prohibits fabricating or retroactively altering evidence in judicial proceedings. Harris Health maintains a custom of

submitting fabricated behavioral predicates to the Probate Court, then utilizing its HIM department to retroactively upload substitute documents into closed EHRs to manufacture the illusion of compliance. The EIRS safety event reporting system the Board was told ensures accountability was systematically bypassed — no reports filed for the B52 physical hold, the alleged staff assault, the 911 non-connection, or the attorney-access denial.

261.    Harris Health's policymakers possessed actual notice of these precise customs through the 2019 *CMS Immediate Jeopardy determination* (Tags A 131, A 174, A 178), extensive prior federal litigation (e.g., *Wilkerson v. Arrington, Mitchell v. Harris Health System, Borchgrevink v. Harris County*), and its own Board minutes, yet deliberately refused to correct them. Harris Health's own Board of Trustees confirmed the Epic EHR architecture that enabled these customs required a "Back to Foundation" rebuild in 2025, confirming these deficiencies were known and deliberately unremediated during Plaintiff's detention.

---

**Count IX: Inter-Agency Conspiracy to Deprive Civil Rights (42 U.S.C. § 1983)**

---

**(Against the City of Houston, Officer Hernandez, and Harris Health)**

262.    Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 220.

263.    The intracorporate conspiracy doctrine does not apply to this claim because the City of Houston and Harris Health are two distinct political subdivisions of the State of Texas — the City is a home-rule municipality, and Harris Health is an independent hospital district created under Article IX of the Texas Constitution — each governed by separate policymakers, separate budgets, and separate legal counsel. Their agreement to pursue a common unconstitutional objective therefore constitutes a cognizable conspiracy under § 1983.

264.    The City of Houston and Harris Health acted in concert to retroactively insert a legal predicate for Plaintiff's confinement. Because Harris Health failed to scan the EDO during admission, Plaintiff was held for eleven days without a detention instrument in the EHR. To retroactively address this omission, these entities executed the following overt acts: **(a)** HPD (via Officer Hernandez) furnished a substitute EDO bearing a signature visibly irreconcilable with the Probate Court-filed version, 176 days after Plaintiff's discharge. **(b)** Harris Health's HIM department executed a batch administrative upload, inserting this newly executed instrument into Plaintiff's closed Epic chart. **(c)** Harris Health's Privacy Officer invoked HIPAA exemptions to block Plaintiff's Accounting of Disclosures, concealing the substitute document's chain of custody. **(d)** HPD simultaneously refused to produce the body-worn camera footage and CAD data under the guise of an "active investigation" (TPIA § 552.108), ensuring neither the fabricated consent narrative nor the exculpatory scene evidence could be independently verified.

265.    This concerted action manufactured a retroactive legal justification for the deprivation of liberty. The concerted action is directly attributable to each defendant municipality through its established unconstitutional customs: the City of Houston through its deficient disciplinary process and record-keeping customs (Count IV), and Harris Health through its retroactive record alteration customs (Count VIII).

266.    The agreement between these two distinct political subdivisions, and the specific overt acts taken in furtherance thereof, constitute a conspiracy to deprive Plaintiff of his constitutional rights under the First, Fourth, and Fourteenth Amendments in violation of 42 U.S.C. § 1983.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, and award the following relief:

**(a)** Compensatory damages against all Defendants, jointly and severally, for the loss of eleven days of freedom, the denial of access to counsel, the unconstitutional deprivation of bodily integrity and the physical trauma of the forced chemical injection and physical restraint, and the resulting severe emotional and psychological trauma;

**(b)** Reputational and professional damages for the harm to Plaintiff's background-check record and cybersecurity employment prospects (including mandatory SF-86 federal clearance disclosures), caused by the City's maintenance of a permanent RMS flag presenting this unconstitutional seizure as a legitimate psychiatric commitment;

**(c)** Compensatory damages for medical and counseling expenses resulting directly from the unconstitutional confinement;

**(d)** Consequential and special economic damages proximately caused by Plaintiff's unconstitutional incapacitation and the City's discriminatory denial of ADA police services, including the theft of $74,370.88 in cryptocurrency. Officer Hernandez engaged in an affirmative, unconstitutional seizure that physically incapacitated Plaintiff—the only cybersecurity professional capable of defending his family's network—during an active, verified cyberattack. This eleven-day incapacitation provided criminal perpetrators an unobstructed operational window to establish kernel-level persistence on Plaintiff's hardware. Furthermore, the City's ratification of the discriminatory "delusion" label caused HPD to discriminatorily withhold Plaintiff's devices from the Houston Forensic Science Center (HFSC) and refuse to issue standard preservation letters. But for this Fourth

Amendment seizure and ADA violation, the zero-day exploits would have been identified, the network secured, and the theft prevented;

**(e)** Punitive damages against Officer Hernandez individually for his knowing fabrication of a sworn affidavit, deliberate omission of exculpatory evidence, and retaliatory manufacture of false consent;

**(f)** Punitive damages against Dr. Contreras individually for ordering forced medication over an explicit refusal absent an emergency, entering a retroactive restraint order, and knowingly certifying physical violence to the Probate Court that her own clinical staff documented never occurred;

**(g)** Punitive damages against LMSW Jones individually for manufacturing a sworn B31 Affidavit that fused police hearsay into a fabricated in-hospital delusion, and swearing to an elopement attempt that the hospital formally certified never occurred;

**(h)** Compensatory damages against RN Aneja individually for the proximate harm caused by her two specific acts: (1) her failure to correct the PTALEDOWC elopement behavior code that she herself simultaneously refuted in free-text, which was then incorporated into the sworn judicial affidavit sustaining Plaintiff's continued confinement; and (2) her deliberate indifference to Plaintiff's charted request for an attorney, which deprived Plaintiff of any opportunity to mount a timely legal challenge to his detention. Plaintiff does not seek punitive damages against RN Aneja at this time. Plaintiff's claim against her is limited to compensatory relief for the identifiable, foreseeable consequences of these documented acts.

**(i) Declaratory Relief** pursuant to 28 U.S.C. § 2201, declaring that: (1) Defendants violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments and Title II of the ADA; (2) the August 26, 2024 Emergency Detention Order was an unlawful seizure devoid of factual or clinical basis; and (3) Plaintiff may present this declaration as binding federal

adjudication to legally invalidate the original psychiatric detention record in subsequent security clearance proceedings;

**(j) Injunctive Relief,** requiring the Court to enter a narrowly tailored injunction directing the City of Houston and Harris Health to:

**1.** Permanently expunge, seal, or correct the fabricated EDO and resulting psychiatric commitment flags from their respective databases (RMS and Epic);

**2.** Issue mandatory correction notices to downstream state or federal agencies and health information exchanges (e.g., Epic Care Everywhere, Texas DPS, NICS); and

**3.** Cease the transmission of the fabricated records to third parties;

**(k)** Post-judgment and Pre-judgment interest as allowed by federal common law;

**(l)** Costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 if counsel is retained; and

**(m)** Such other relief as this Court deems just and proper.

**Reservation of Rights:** The full scope of Defendants' unconstitutional customs, the identities of all responsible final policymakers, and the extent of their deliberate indifference are matters exclusively within Defendants' possession and control. Plaintiff reserves the right to supplement these allegations following discovery, and respectfully prays for leave to amend this Complaint should discovery reveal additional evidence supporting his claims.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: May 14, 2026

*Robert W. Van Kirk*

**ROBERT W. VAN KIRK**
*Plaintiff, Pro Se*
7366 Brace St., Houston, TX 77061
(832) 428-2882
robertwaynevankirk@gmail.com

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing factual allegations are true and correct to the best of my personal knowledge, information, and belief.

Executed on this 14th day of May, 2026.

*Robert W. Van Kirk*

**ROBERT W. VAN KIRK**
*Plaintiff, Pro Se*
7366 Brace St., Houston, TX 77061
(832) 428-2882
robertwaynevankirk@gmail.com