United States Courts
Southern District of Texas
FILED
AUG 25 2026
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ROBERT W. VAN KIRK, | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:26-cv-02517 |
| *v.* | § | |
| | § | Honorable George C. Hanks, Jr. |
| Officer Hernandez, et al., | § | |
| *Defendants.* | § | |

# VERIFIED SECOND AMENDED COMPLAINT FOR VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983 & ADA TITLE II)

**JURY TRIAL DEMANDED**

I, Robert W. Van Kirk, proceeding *pro se*, bring this civil rights action for damages and appropriate declaratory and equitable relief against Officer M. Hernandez, the City of Houston, Harris County Hospital District d/b/a Harris Health, Dr. Valeria M. Contreras, and Monique Jones, LMSW. Plaintiff alleges that Defendants, acting under color of state law, violated Plaintiff's rights under the Fourth and Fourteenth Amendments and Title II of the Americans with Disabilities Act.

## I. INTRODUCTION

**1.** On August 26, 2024, Plaintiff Robert W. Van Kirk voluntarily approached HPD Officer M. Hernandez to report an ongoing cyberattack in an already-open HPD Cybercrimes matter, with his mother present as an eyewitness. Plaintiff's mother remained in her vehicle within feet of the encounter, with her window down, and heard and observed the officer's questioning. When Hernandez later interviewed her separately, she told him she

had witnessed the spoofed-call events Plaintiff was reporting. Three days earlier, HPD had opened Incident No. 1198816-24, classified as "Tampering w/ Electronic," after officers documented Plaintiff's report of unauthorized remote-access software, compromised devices, and related electronic intrusions. Plaintiff had already surrendered multiple devices to HPD's Cybercrimes Division for forensic review. The specific August 26 report concerned a brand-new phone, purchased less than two hours earlier, receiving spoofed calls from the most recently dialed number, including callbacks displaying "911" after Plaintiff called 911.

**2.** During the August 26 encounter, Officer Hernandez located Plaintiff's open Cybercrimes case in HPD's own system. Hernandez turned to Plaintiff and asked: "Why didn't you tell me you had an open case with Cybercrimes?" After locating that case, he proceeded with an Emergency Detention Order (the "EDO"). Upon information and belief, Cybercrimes was never contacted by Hernandez or any participating member of HPD involved in Plaintiff's detention.

**3.** Plaintiff made no threats, committed no violent acts, possessed no weapon, and expressed no intent to harm himself or others. The EDO identifies no inability by Plaintiff to function independently. In response to Hernandez's direct questioning, Plaintiff disclosed diagnoses of ADHD and Depression and stated that he had taken caffeine supplements that day, as he had done daily for years in lieu of coffee. The EDO later claimed Plaintiff had not slept in days; Plaintiff does not recall making that statement.

**4.** The EDO identified no overt act, threat, attempt, weapon, violent conduct, suicidal ideation, homicidal ideation, or grave disability. Its stated basis was Plaintiff's statements: Hernandez wrote that his belief was "based on consumer's statement," then characterized Plaintiff's report as "mental capacity deterioration." The form listed no witness, although

Plaintiff's mother had remained within feet of the questioning and was separately interviewed by Hernandez. The form identified the content of Plaintiff's speech and disclosed diagnoses; it did not identify independently observed conduct or behavior showing an imminent risk of serious harm.

**5.** Afterward, the City took the following public-records positions. For Houston Emergency Center telephony and network data generated while Plaintiff was calling 911 and receiving spoofed callbacks displaying "911," HPD invoked the Texas Public Information Act exemption for an "active, ongoing criminal investigation." HPD also denied CAD data for the Emergency Detention Order under the same criminal-investigation exemption while citing the civil EDO incident number. Separately, HPD failed to produce body-worn camera footage within the statutory deadline. Plaintiff was never arrested for, charged with, or convicted of any crime arising from the encounter; he was the reporting victim. The investigation HPD invokes has no assigned detective, no investigative report, and no documented forensic submission. When Plaintiff later surrendered the device from which $74,370.88 in Bitcoin was stolen, HPD accepted it on March 16, 2026, then called him back within 48 hours, demanding that he retrieve it because HPD was "not taking phones as evidence" (Ex. 12). Plaintiff pleads these later events as context concerning notice, preservation, evidence handling, and the credibility of the City's stated records positions, not as an independent TPIA claim.

**6.** HPD's official position: Plaintiff's statements reporting a cybercrime were cited as justification for an emergency detention; the HEC telephony data Plaintiff requested, captured while Plaintiff was calling 911 to report receiving inbound spoofed callbacks, was withheld under the exemption for an "active, ongoing investigation," citing Plaintiff's

Cybercrimes case number; and the CAD records for the same encounter were withheld under the same exemption, citing the incident number of the Emergency Detention Order.

**7.** As recently as March 2026, the Cybercrimes case had not been assigned to a detective. Upon information and belief, no investigative report has been generated, no evidence has been submitted for forensic evaluation, and no suspects have been identified in Incident No. 1198816-24.

**8.** The City provides police reporting, digital-evidence retention, and forensic referral as municipal services. Plaintiff alleges below that, after his disclosed ADHD and Depression diagnoses were recorded in the EDO, the surrendered devices remained outside forensic review, the later theft device was not retained, and the same Cybercrimes matter was used to withhold records while no detective was assigned to investigate it.

## II. JURISDICTION AND VENUE

**9.** This civil action is brought under 42 U.S.C. § 1983 for violations of Plaintiff's constitutional rights, and under 42 U.S.C. § 12132 for violations of the Americans with Disabilities Act.

**10.** This Court has subject matter jurisdiction over these federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).

**11.** Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b) because the Defendants are located within this District, and the events giving rise to the claims occurred in Houston, Harris County, Texas.

**12.** Plaintiff was not arrested for, charged with, or convicted of any crime arising from the August 26, 2024 encounter. No criminal proceedings are pending against him. He is the victim and reporting party in HPD Incident No. 1198816-24.

## III. PARTIES

**13.** Plaintiff Robert W. Van Kirk is a resident of Houston, Harris County, Texas.

**14.** Officer M. Hernandez (Badge No. 8324) is, and was at all relevant times, a police officer employed by the Houston Police Department, acting under color of state law. He is sued in his individual capacity.

**15.** The City of Houston is a municipality organized under the laws of the State of Texas. It operates the Houston Police Department and is legally responsible for its officers' training, its widespread departmental customs, and its compliance with the Americans with Disabilities Act.

**16.** Defendant Harris County Hospital District ("Harris Health") is a governmental entity organized under Texas Health & Safety Code § 281.001 et seq., operating Ben Taub Hospital at 1504 Taub Loop, Houston, Texas 77030. Harris Health is a political subdivision acting under color of state law and is subject to suit under 42 U.S.C. § 1983.

**17.** Defendant Valeria M. Contreras, M.D., acted as the attending psychiatrist involved in Plaintiff's treatment at Ben Taub during the events alleged below. Plaintiff does not allege that Contreras was a Harris Health employee. Plaintiff alleges that, while treating a person held in Harris Health's involuntary-custody system, Contreras personally exercised authority over the medication and physical-restraint decisions carried out through Harris Health's clinical systems and staff, and personally executed the F25 certificate used in the commitment process. Plaintiff sues Contreras in her individual capacity for those personal acts and alleges that, in performing those acts within the governmental involuntary-custody and commitment process, she acted under color of state law.

**18.** Defendant Monique Jones, LMSW, acted as a social worker at Ben Taub during the events alleged below. She is sued in her individual capacity for her alleged creation and sworn execution of commitment instruments used to obtain or maintain judicial custody. Plaintiff alleges that Jones acted under color of state law.

## IV. STATEMENT OF FACTS

### A. The Underlying Cybercrimes Case: Board Meeting Surveillance, Unauthorized Remote Access Software, and Spontaneous Device Activation Witnessed Under Penalty of Perjury

**19.** Plaintiff is a software developer with a degree in Physics. Plaintiff founded and operated Kaboomracks, a cryptocurrency mining and colocation services business that generated over $71 million in gross receipts. Upon information and belief, the combined entities generated over $200 million in cumulative revenue. During a contentious overnight board meeting on August 18–19, 2024, Plaintiff's former business partners diluted Plaintiff's ownership from approximately 39% to less than 4% through board actions, while the CFO simultaneously misrepresented the company's financial position to Plaintiff.

**20.** Recovered Telegram messages, which have been provided to HPD as evidence, show that in late July 2024, Plaintiff had questioned a board member and shareholder about an anomalous approximately $1,500 TeamViewer enterprise purchase on his company credit card; he dismissed the inquiry.

**21.** During that same board meeting, the audio recording and transcript of which have been provided to HPD as evidence, the CFO stated:

> "I can see you all the time when you get distracted. You have a mirror behind you. We can see when you're not paying attention and your screen is going crazy."

This was followed immediately by a second board member:

> "We can see your screen in the reflection of the mirror behind you, *too*. All the porn you're looking at."

Because Google Meet's background-obscuring feature was enabled, the screen was not physically visible in the mirror. Within hours of the meeting's conclusion, Plaintiff discovered that his laptop's webcam indicator light remained on. In light of the above comments, Plaintiff found this highly suspicious, and upon investigation, he found commercially licensed enterprise TeamViewer software that had been installed on his personal laptop and his father's desktop PC without his knowledge or consent.

**22.** On August 22, 2024, Plaintiff's Samsung Galaxy S22 Ultra spontaneously powered itself on from a fully shut-down state and then refused to shut down, demanding a PIN — an event directly witnessed by Plaintiff's mother and a friend. Both witnesses provided sworn statements to HPD under penalty of perjury corroborating this anomaly.

**23.** On August 23, 2024, HPD officers responded to Plaintiff's home and documented his coherent account of the corporate board meeting, severe ownership dilution, and the subsequent discovery of unauthorized enterprise remote-access software on his devices. Finding the account credible, officers generated Incident No. 1198816-24 ("Tampering w/ Electronic") (Ex. 4). Plaintiff then surrendered the compromised computers and phones to HPD's Cybercrimes Division at downtown headquarters, where they were secured in an evidence locker. Consequently, when Plaintiff encountered Officer Hernandez three days later, HPD's own Records Management System (the "RMS") already contained an objective, documented context for Plaintiff's reports—an active investigation of a technology shareholder suffering targeted electronic intrusions following an adversarial corporate action.

## B. The Attack Escalates to a Brand-New Device Within Two Hours of Purchase — Witnessed by Plaintiff's Mother Through Vehicle Bluetooth Display

**24.** On August 26, 2024, Plaintiff purchased a brand-new Samsung Galaxy S24 from a Verizon store with a newly opened Verizon account and a new phone number, deliberately avoiding linking any prior accounts. Plaintiff made several ordinary calls during the drive home without issue. Plaintiff's mother was driving; the phone was connected to her vehicle's speakers and navigation display, allowing her to hear the calls and see the caller ID. The device then began receiving bursts of three MMS messages, each containing a broken image, followed by spoofed inbound calls. Each call disconnected immediately when Plaintiff answered — no voice, no hold tone, no carrier message.

**25.** Each spoofed callback displayed the exact number Plaintiff had most recently dialed. The calls paused while Plaintiff was connected to a legitimate call and resumed within seconds after he hung up. When the calls stopped, they left no trace in the device's call history. The device was brand-new, the Verizon account was newly opened, the number was new, no prior accounts had been linked, and the phone had existed on the carrier's network for less than two hours.

**26.** The pattern began only as Plaintiff neared his home. Based on this timing, the repeated use of Plaintiff's most recently dialed numbers, and the absence of call-history entries, Plaintiff felt unsafe to return home without first seeking law enforcement assistance.

**27.** Plaintiff's mother pulled off the road, and Plaintiff called 911 to report the attack. After the 911 call ended, the same pattern repeated: the phone rang with an incoming call displaying "911" as the caller ID. When Plaintiff answered, the line disconnected immediately, with no human voice on the other end.

## C. The Encounter with Officer Hernandez: A Crime Victim Voluntarily Approaches Police and the Officer Abandons the Criminal Inquiry to Interrogate the Victim's Psychiatric History

**28.** Observing HPD Officer M. Hernandez stationed at a nearby intersection, Plaintiff walked across the street on foot to voluntarily report the active attack. Plaintiff's mother followed in her vehicle and was later interviewed by Hernandez on the scene.

**29.** During the field interview, Plaintiff reported the events described above (¶¶26–27), in addition to the same cybercrimes Plaintiff had reported to HPD three days earlier (¶24). Plaintiff maintained a cooperative demeanor, explaining his technical hypotheses for the attack and offering to show Officer Hernandez the device. When Plaintiff utilized cybersecurity terminology unfamiliar to the officer, Plaintiff clarified the definitions, such as defining a "zero-day exploit" as "a vulnerability without a patch." Plaintiff was a citizen in the middle of an existing criminal case seeking police assistance with an ongoing crime. At no point was Plaintiff violent, threatening, or expressing any intent to harm himself or others.

**30.** Officer Hernandez abruptly stopped inquiring about the perpetrators and did not document a crime report. Instead, he questioned Plaintiff about his private medical history, sleep, safety, medication adherence, and any OTC supplement usage.

**31.** Plaintiff answered truthfully. When asked if he felt unsafe, Plaintiff answered "yes." Plaintiff acknowledged missing a daily medication dose. Plaintiff acknowledged poor sleep, citing the all-night corporate board meeting six days prior and the discovery that his family's devices were under surveillance. When asked about supplements, Plaintiff stated he had taken caffeine supplements, which he had used instead of morning coffee for years.

**32.** When Hernandez began asking about psychiatric diagnoses, Plaintiff's mother, within sight and hearing of the exchange, looked at Plaintiff and gestured for him not to

answer. Plaintiff answered anyway. Believing that routine, widely managed diagnoses could not legally justify a deprivation of liberty, Plaintiff truthfully disclosed his diagnoses of ADHD and Depression. Officer Hernandez immediately cited these disclosed diagnoses as the primary basis for psychiatric detention.

**33.** HPD routinely investigates reports of property crimes, telecommunications fraud, and cybercrimes from non-disabled complainants without subjecting the victims to an interrogation regarding their private medical history, sleep habits, or psychiatric diagnoses. Instead of proceeding with the investigation of the reported cybercrime, Officer Hernandez shifted his inquiry to Plaintiff's private medical history. Non-disabled complainants reporting similar property or telecommunications crimes are not routinely subjected to psychiatric questioning prior to filing a police report.

## D. Plaintiff Invokes Complete Refusal of Consent Prior to Hernandez Discovering the Active Investigation

**34.** During the encounter, Officer Hernandez made unclear statements regarding Plaintiff's medical care. Plaintiff pointedly asked whether Hernandez meant an emergency psychiatric detention. After Hernandez confirmed, Plaintiff explicitly and unambiguously refused voluntary transport, stated that he did not consent to any such seizure, and verbally commanded the officer to "cease and desist." It was only after Plaintiff explicitly verbalized his refusal to be transported that Hernandez initiated the Emergency Detention Order process.

**35.** Drawing on his business background, this refusal was a calculated, deliberate invocation of Plaintiff's legal and constitutional rights to be free from unreasonable seizure.

**36.** Following Plaintiff's explicit refusal of consent, Officer Hernandez ordered Plaintiff to stand by a wall. Plaintiff complied with this order without argument as Hernandez initiated the emergency detention process.

**37.** While the encounter was underway, and after Hernandez had begun the detention process, Hernandez turned to Plaintiff and asked: "Why didn't you tell me you had an open case with Cybercrimes?" Hernandez had located Incident No. 1198816-24 in HPD's system, confirming that Plaintiff's prior cybercrime report was an active HPD investigation.

**38.** Officer Hernandez did not contact the Cybercrimes Division. He proceeded with the detention.

**39.** Plaintiff voluntarily approached Officer Hernandez in a public setting to report a crime. Plaintiff possessed no weapons, made no threats, and complied with Hernandez's instructions. Before executing the Emergency Detention Order, Hernandez questioned Plaintiff about psychiatric diagnoses, interviewed Plaintiff's mother, waited for additional officers to arrive, and searched HPD's RMS, where he confirmed the active Cybercrimes case. The detention occurred after those steps were completed.

---

## E. The Affidavit: The Omission of Exculpatory Evidence and the Total Absence of Any Documented Threat, Act of Violence, or Indication of Self-Harm

---

**40.** Despite Plaintiff's unequivocal objection, the presence of a corroborating witness, and the confirmed existence of an active cybercrimes case, Officer Hernandez proceeded to draft a sworn EDO (Exhibits 1–2). The relevant portions of the Notification of Emergency Detention form are reproduced below verbatim:

**Item 2.** I have reason to believe and do believe that the above-named person evidences a substantial risk of serious harm to himself/herself or others based upon the following: **"THE CONSUMER BELIEFS HE IS UNDER CYBER ATTACK, SOMEOME HAS TOLEN HIS IDENTITY, SOMEONE HAS HACKED HIS PHONE, CONSUMER HAS NOT SLEPT IN DAYS, CONSUMER CALLED 911 AND BELIEFS THAT 911 CALL TAKER IS NOT REAL, CONSUMER BELIEFS HE IS BEING WIRED TAPPED FOR A CIVIL SITUATION, CONSUMER STATED THAT HE IS DIOGNOSED WITH DEPRESSION, ANXIETY, AND ADHD AND DID NOT TAKE HIS MEDICATION TODAY."**

**Item 3.** I have reason to believe and do believe that the above risk of harm is imminent unless the above-named person is immediately restrained.

**Item 4.** My beliefs are based upon the following recent behavior, overt acts, attempts, statements, or threats observed by me or reliably reported to me:

**"BASED ON THE CONSUMER'S STATEMENT, IT IS MY BELIEF THAT HE IS PARANOID DO TO HIS STATEMENTS AND SHOWING SIGNS OF MENTALL CAPACITY DETERIORATION."**

**"NO CHARGES"**

**Item 5.** The names, addresses, and relationship to the above-named person of those persons who reported or observed recent behavior, acts, attempts, statements, or threats of the above-named person are (if applicable): **"None"**

**Item 6.** Was the person restrained in any way? — Checked: **"Yes"**

**41.** The quoted text constitutes the entirety of the factual narrative Officer Hernandez submitted to execute the EDO, which resulted in an eleven-day involuntary psychiatric confinement. However, the document omitted four material facts known to Hernandez at the scene:

**42. A. The Omitted Witness:** The EDO omitted Plaintiff's mother. Item 5 required Hernandez to identify persons who "reported or observed recent behavior, acts, attempts, statements, or threats." Hernandez's stated basis for detention was "based on consumer's statement." Plaintiff's mother observed Plaintiff's statements and behavior during the encounter, including the diagnosis questioning and Plaintiff's refusal of consent. Hernandez

then interviewed her separately on scene, where she corroborated the spoofed-call events Plaintiff was reporting. Item 5 states: "None."

**43. B. The Active Police Investigation:** Officer Hernandez personally confirmed the existence of an active HPD cybercrimes investigation — Incident No. 1198816-24 — while on the scene with Plaintiff (¶38). He confronted Plaintiff about it: "Why didn't you tell me you had an open case with Cybercrimes?" He then drafted the sworn EDO. The EDO contains no reference to Incident No. 1198816-24. It does not mention the existence of any active HPD investigation. It does not acknowledge that the crimes Plaintiff described to Hernandez at the scene — the same crimes Hernandez characterized as evidence of "MENTAL CAPACITY DETERIORATION" — were the exact same crimes that HPD's own Cybercrimes Division had opened an active case on three days earlier.

**44. C. The Federal Telecommunications Crime:** The EDO does not describe the specific crime Plaintiff was reporting. Plaintiff was reporting the impersonation of 911 Emergency Services — a federal crime under 47 U.S.C. § 227(e) (the Truth in Caller ID Act) occurring within 1.5 miles of William P. Hobby Airport. The EDO instead characterizes this report as: "CONSUMER BELIEFS HE IS UNDER CYBER ATTACK" and "BELIEFS THAT 911 CALL TAKER IS NOT REAL." The sworn instrument omitted the specific details of the reported telecommunications fraud — including the spoofed callbacks and the physical presence of a corroborating witness — and instead documented Plaintiff's statements as a belief that the "911 CALL TAKER IS NOT REAL."

**45. D. The Harm Predicate:** The EDO omitted any threatening conduct, violent behavior, indication of self-harm, severe emotional distress, or inability to function independently. Item 4 required "recent behavior, overt acts, attempts, statements, or threats observed by me." Hernandez supplied only the conclusion that Plaintiff showed "mental

capacity deterioration," and identified no specific behavior, act, threat, or observable sign supporting that conclusion. His stated basis remained Plaintiff's speech: "based on consumer's statement." Hernandez repeated the same deterioration narrative during the Ben Taub intake handoff, telling Triage RN Rodriguez that Plaintiff was "getting worse." In the same intake sequence, Rodriguez documented Plaintiff as "ambulatory with steady gait," "In No Acute Distress (NAD)," and with "respirations unlabored". At 20:00, RN Aneja scored Plaintiff BARS 4 — quiet and awake — with "ability to follow commands: Yes" and "compliant." The EDO's deterioration conclusion was contradicted by the first clinical observations recorded after transport.

**46.** The sworn affidavit states: "CONSUMER CALLED 911 AND BELIEFS THAT 911 CALL TAKER IS NOT REAL." The document omits Plaintiff's report of successive inbound calls displaying "911" that disconnected upon answering. The EDO also states that Plaintiff "BELIEFS HE IS BEING WIRED TAPPED FOR A CIVIL SITUATION." It does not identify the documented civil/business context already reflected in HPD Incident No. 1198816-24: the board dispute, ownership dilution, unauthorized enterprise remote-access software, and compromised devices.

**47.** The EDO Hernandez later wrote states that Plaintiff "HAS NOT SLEPT IN DAYS". Although Plaintiff recalls acknowledging poor sleep, Plaintiff does not recall stating that he had not slept in days.

**48.** Texas Health and Safety Code § 573.001 mandates that a warrantless apprehension requires a belief of a substantial risk of serious harm and "not sufficient time to obtain a warrant." The sworn EDO invokes this emergency standard by asserting that Plaintiff "did not take his medication today" as its final clinical data point.

**49.** Hernandez had no knowledge of Plaintiff's psychiatric history which was only known by his psychiatrist. Hernandez did not know Plaintiff's specific medication, its dosage, its half-life, or whether a single missed dose carries any clinical significance.

**50.** Upon information and belief, HPD's Crisis Intervention Response Team ("CIRT") was involved in the encounter and authorized or recommended the detention. Upon information and belief, both Hernandez and CIRT were aware of Incident No. 1198816-24 before the EDO was executed. Neither Hernandez nor CIRT contacted HPD's Cybercrimes Division before the detention proceeded. On April 27, 2026, Plaintiff submitted an expedited HIPAA Right of Access request to the Harris Center for Mental Health and IDD seeking CIRT tele-triage call notes, dispatch logs, and any CSPMP query audit records referencing Plaintiff on August 26, 2024. The Harris Center requested an authorization release form, which Plaintiff completed and returned on April 28, 2026. As of the date of this filing, record production remains pending within the Harris Center's HIPAA 30-day window. Plaintiff pleads the request and pending records as evidence to identify what information and clinical basis, if any, CIRT communicated to Officer Hernandez; he does not ask the Court to treat unproduced records as established facts.

**51.** Officer Hernandez placed Plaintiff in handcuffs for transport. Plaintiff had made no threats, committed no act of violence, and offered no physical resistance. Plaintiff had not made any statements or committed any acts indicating self-harm. The EDO itself does not allege any threatening conduct.

## F. Suicide Watch Began Before Any Psychiatric Evaluation and Before the EDO Was Executed

**52.** Upon arrival at the Psychiatric Emergency Center at Ben Taub Hospital, the admitting physician reviewed the physical paper copy of the sworn EDO and specifically

remarked to the officers on the absence of any documented threat to self or others on its face.

**53.** The hospital's own admission record documents Plaintiff's arrival at 19:53 and the EDO execution at 20:03. Before the EDO was executed, and before any psychiatric evaluation appears in the record, staff searched Plaintiff, required him to change into green scrubs, *confiscated his personal property (cell phones, wallet, etc.)*, initiated suicide precautions, and placed him under continuous 1:1 supervision.

**54.** **19:53 – Triage Intake and Officer Handoff:** Triage RN Natividad Rodriguez opened the intake record at 19:53 and signed it at 19:58 (Exhibit 5). During that five-minute interval, Rodriguez verified Plaintiff's name, date of birth, and allergies and completed standardized Epic intake checklists, including Travel Screening, Pre-Arrival Notification, and Prehospital Treatment. These were administrative intake steps, not psychiatric evaluations. The narrative entered during the same officer-handoff interval begins: *HPD officer Hernandez 8324 states "patient is getting worse." Patient HX of depression, ADHD. Patient states took caffeine pills. States is willing to go to a locked unit.*

**55.** Rodriguez's note opens a quotation for Hernandez's statement but does not close it, leaving the attribution of some phrases ambiguous on the face of the record. Plaintiff did not tell Hernandez or Rodriguez that he was willing to go to a locked unit; he had already refused psychiatric detention in the field. To the extent Defendants contend otherwise, body-worn camera footage and intake records will resolve the attribution and wording.

**56.** **20:00 – Suicide Precautions Initiated:** RN Balbir Singh Aneja initiated the "Safety and Intervention Checklist for Suicide Risk," applying maximum-restriction suicide precautions as a blanket administrative default. Plaintiff was subjected to arm's-length observation at all times and supervised daily hygiene, including toileting.

**57.** **20:01 – Physician Confinement Order:** Dr. Stephen A. Harding placed an electronic physician's order for "Nursing - Continuous 1:1 Supervision"—a maximum-restriction confinement order.

**58.** **20:03 – EDO Executed.** Two minutes after Dr. Harding ordered constant physician supervision, three minutes after RN Aneja initiated the severe suicide protocol, and ten minutes after RN Rodriguez confiscated and inventoried Plaintiff's personal property, Officer Hernandez executed the sworn paper EDO.

**59.** **20:11 – Formal Admission:** Plaintiff was formally admitted and roomed in BT POD F 18. The hospital's admission record confirms Means of Arrival: "Police." The formal admission occurred eight minutes after the EDO was executed and nineteen minutes after staff had already seized Plaintiff's property and initiated maximum-restriction confinement.

**60.** Harris Health presented Plaintiff with a four-page Patient Bill of Rights at intake. In its general section titled "Basic Rights for All Patients," the form states that a patient has the right to appropriate treatment in the least restrictive setting available (Exhibit 6). The form separately contains an "Emergency Detention – Special Rights" section stating that a person brought to the hospital against his will may be held only if a doctor believes the person has a mental illness, is an imminent danger to self or others, and emergency detention is the least restrictive means of restraint. By 20:01, before the EDO was executed and before any psychiatric evaluation appears in the record, staff had searched Plaintiff, required green scrubs, confiscated his property, initiated suicide precautions, and ordered continuous 1:1 supervision.

**61.** As quoted in ¶55, the 19:53 triage note recorded the officer handoff notation: "States is willing to go to a locked unit." The sworn Emergency Detention Order, executed

by Officer Hernandez at 20:03, contains no mention of Plaintiff being "willing to go to a locked unit."

**62.** At 02:45, RN Hamblin charted a symptom narrative: *"Per report pt has been taking caffeine pills to stay up d/t paranoia".* Given that Plaintiff arrived via police transport, this "report" is an attribution to Officer Hernandez.

**63.** At the 20:00 intake evaluation, RN Aneja charted: "Per the patient he has been taking caffeine pills because he did not feel safe to go to sleep."

**64.** The sworn Emergency Detention Order contains no mention of Plaintiff taking caffeine pills at night to avoid going to sleep.

**65.** Plaintiff had already refused psychiatric detention in the field by telling Hernandez to "cease and desist." At intake, Plaintiff read and understood the Patient Bill of Rights, including its emergency-detention section. Plaintiff refused to sign the acknowledgment because he understood that possessing the rights did not depend on signing the form and did not want to sign a medical or legal acknowledgment without first speaking with counsel. The physical form bears the notation "Patient Refused to Sign" alongside a staff-witness signature timestamped at 20:26.

**66.** *The physical form presents a witness signature certifying that rights were explained at 20:20. The form identifies the witness signature as RN Luke Dean's.* The checked acknowledgment and Plaintiff's refusal to sign record the institution's assertion that the form was explained and Plaintiff's deliberate refusal to execute that acknowledgment; they do not establish that Plaintiff waived, misunderstood, or relinquished the rights stated in the form.

**67.** The Epic audit trail establishes that RN Dean first accessed Plaintiff's chart at 22:01 —one hour and thirty-five minutes after 20:26. Plaintiff does not recall a second staff

member being present when the document was initially presented and does not recall the form being presented again at a later time.

**68.** At 21:15, RN Aneja formally charted an attorney demand in her clinical note: "Wants to call his lawyer" (Exhibit 18).

**69.** In the same chart entry, Aneja documented that Plaintiff was actively reviewing the Patient Bill of Rights. Under the section titled "Emergency Detention – Special Rights for People Brought to the Hospital Against Their Will," the document states: "You have the right to call a lawyer. The people talking to you must help you call a lawyer if you ask." It further states: *"In no case may your right to contact or be contacted by an attorney... be limited."*

**70.** After reading the form, Plaintiff repeatedly told staff—including successive staff members who approached him—that he wanted to speak with his attorney. Plaintiff made these requests for assistance contacting counsel, not merely as a request to possess a telephone. Staff recorded at least one such request in the clinical record but did not facilitate contact with counsel. The same emergency-detention section also states that a person brought to the hospital against his will has the right to be told where he is; the four-page form does not state the name of the hospital or its address, and none of the intake paperwork presented to Plaintiff identified the facility as Ben Taub Hospital or provided its physical location.

**71.** Staff had already confiscated Plaintiff's three personal cell phones upon intake, removing his ordinary means of contacting counsel. The production record later documents a general wall-phone opportunity, but does not document staff-facilitated contact with Plaintiff's attorney.

**72.** The triage notes preserved Plaintiff's own explanation: *"Pt states he shouldn't be here; he had called the police b/c he states he identity was stolen; being hacked"*. In the formal intake record, staff recorded objective markers including "Oriented X4," "Attentive," "Cooperative," and "Within Functional Limits," while simultaneously checking the "Delusions" label.

## G. "I'm Confused Why No One Has Called Cyber Security Yet"

**73.** Deprived of his personal cell phones and denied access to legal counsel, Plaintiff repeatedly asked staff to contact the Houston Police Department's Cybercrimes Division to verify his active case. At 03:34 AM on August 27, LMSW Monique Jones entered the following behavioral health assessment into the clinical record (Exhibit 22):

> "SW arrived at bedside patient states, 'I'm confused why no one has called cyber security yet' Patient reports that he is being hacked on all of his electronic devices to have his identity stolen. Patient states that he was working with some business partners and they were working with some investors that may have an interest in taking his identity. Patient has rapid speech with constant roaming eyes throughout the entire assessment. Patient appears to be paranoid, SW will complete an affidavit for acute involuntary hospitalization."

**74.** LMSW Monique Jones did not contact the Houston Police Department. She did not attempt to verify the reported identity theft or business dispute. Based on the assessment quoted above (¶75), Jones executed the sworn probate affidavit used to support Plaintiff's continued involuntary detention. Plaintiff pleads these facts as part of the alleged detention-document and operational-record workflow, not as a standalone claim for a police investigation.

## H. Clinical Chronology of Null Results

**75.** The following clinical assessments were documented in Plaintiff's electronic health record between intake and the forced injection:

| Time | Clinician | Assessment | Finding | Record |
|---|---|---|---|---|
| 19:53 (Aug 26) | RN Natividad Rodriguez | Triage Exam | "In NAD" (no acute distress); "ambulatory with steady gait"; "respirations unlabored" | |
| 20:00 | RN Jasmine Aneja | BARS / Psych Eval | "BARS 4" (quiet and awake); "ability to follow commands: Yes"; "compliant" | |
| 20:03 | Officer Hernandez | EDO executed | No suicidal or homicidal threat, act, or ideation alleged on its face | EDO (Exhibits 1–2) |
| 21:35 | Dr. Cedrick Lubin | Physician evaluation | "No SI/HI" | |
| 23:14 | Dr. Joy M. Mackey | Physician evaluation | "No SI/HI" | |
| 23:15 | DO Chinelo Obinero | Physician evaluation | "No SI/HI" | |
| 01:41–01:42 (Aug 27) | Dr. Mackey | Medical clearance — CMP | Normal values ($K^+$ 4.3, Glucose 90, Anion Gap 10, $CO_2$ 27, Temp 97.9°F); illicit substances: "No"; "Labs reassuring will medically clear" | (Exhibit 23) |
| 02:37 | RN Hamblin | Nursing Intake | Objective Checkboxes: "Oriented X4", "Cooperative", "Attentive", "Within Functional Limits" | |
| 02:45 | RN Jessica L. Hamblin | Charge RN evaluation | "No SI/HI" | |

| Time | Clinician | Assessment | Finding | Record |
|---|---|---|---|---|
| 02:54 | RN Hamblin | C-SSRS (scored instrument) | "No Risk" | |
| 02:54 | RN Hamblin | Homicide Screening | "No" | |

**76.** Texas Health & Safety Code § 576.023 provides that a facility shall release a person apprehended under an EDO if an examining physician determines the person does not meet the criteria for involuntary detention. Between 19:53 and 02:54, the chart recorded no suicidal ideation, no homicidal ideation, no intoxication, no abnormal orientation, no inability to follow commands, and no scored suicide risk.

**77.** The homicide findings were separately documented at three points: RN Rodriguez recorded "No HI" at triage; Dr. Lubin recorded "No HI" at physician sign-out; and RN Hamblin completed the homicide screening at 02:54 AM, documenting Plaintiff's denials: "Do you feel like hurting others?: No. Did you feel like hurting others within last 7 days?: No".

**78.** At 02:20 AM, RN Aneja documented Plaintiff's statement: "He wants to leave". Thirty-four minutes later, the C-SSRS returned "No Risk" and the homicide screening returned "No." Plaintiff remained detained.

**79.** At 03:30 AM, several hours after Aneja documented Plaintiff's request to call his lawyer, the production medical record states that Plaintiff was allowed to make a phone call by turning on the ward telephone. The same record states that Plaintiff attempted to call 811, 911, and his father; an embedded assessment in the same production record bears a 03:48 AM timestamp and repeats that account. Plaintiff remained without his personal phones and had received no verification from HPD Cybercrimes. Staff in the locked psychiatric area wore paper identification tags without photographs or Harris Health ID

numbers. Names and departments appeared handwritten in marker. The tags identified the parent system, "Harris Health," not Ben Taub Hospital. Plaintiff saw no interior signage identifying the specific facility or building he was in.

**80.** Plaintiff first attempted to use the wall phone to contact 811 and 911 to obtain outside assistance and verify the active HPD Cybercrimes matter about which he had repeatedly asked staff to inquire. Neither call connected.

**81.** Plaintiff then attempted to call his father because his personal phones had been confiscated and his father could provide or facilitate access to Plaintiff's attorney's contact information. The call rang and terminated before reaching voicemail or a carrier intercept.

**82.** The documented phone opportunity therefore did not provide Plaintiff a meaningful means to contact counsel or obtain outside verification. Plaintiff alleges that the phone's ring-timeout behavior, whether caused by institutional settings or another operational restriction, made the opportunity ineffective by terminating the attempted call before the recipient's voicemail or carrier system could answer. Texas Health & Safety Code § 771A.001 requires hospital multi-line telephone systems to allow direct 9-1-1 access without prefix or restriction.

**83.** Three calls were attempted: 811, 911, and Plaintiff's father. Two did not connect, and the call to Plaintiff's father terminated before voicemail or a carrier intercept. Harris Health's workflow treated the existence of a nominal phone opportunity as sufficient without ensuring an effective means of reaching counsel or an outside verifier.

**84.** After the calls failed, Plaintiff asked staff for basic identity and location verification. He asked staff to show that they possessed photo identification, not to surrender it for inspection; staff did not do so. He also asked staff to load a hospital website or otherwise verify that the facility was Ben Taub.

## I. Statutory Rights, the Simultaneous Minute, and Elopement

**85.** At 03:47:39 AM, Dr. Contreras placed a medication order for Haloperidol, Lorazepam, and Diphenhydramine—a combination colloquially known as a "B52."

**86.** At 03:47 AM, the automated dispensing cabinet logged the medication as available.

**87.** In this note, RN Aneja checked a behavior code for "Patient attempting to leave" (PTALEDOWC).

**88.** In the free-text narrative of the same entry, RN Aneja documented: "Patient is insisting on leaving" and "Although he is not aggressive. Emergent medications ordered. Patient did walk into his room but required physical hold to medicate him.".

**89.** At 18:19 (6:19 PM), the inter-facility transfer certification formally certified "No" in the checkbox for elopement attempts.

**90.** RN Hamblin charted at 03:30 AM that Plaintiff was "threatening to elope". Dr. Contreras used the same phrase in her Restraints Face-to-Face Provider Note at 04:13 AM: "threatening to elope despite being on police packet".

**91.** Neither RN Hamblin nor Dr. Contreras documented that Plaintiff physically attempted to leave the unit. Neither clinician recorded the specific words Plaintiff allegedly used to "threaten" elopement.

**92.** LMSW Jones later swore under oath to the Probate Court that Plaintiff was actively "attempting to elope from the locked unit" (B31 Affidavit).

## K. Objective Clinical Findings: Aggression

**93.** Regarding aggression, RN Aneja's 03:48 AM note scored Plaintiff at BARS 6. Under the standardized clinical rubric for the Behavioral Activity Rating Scale, a score of 6 is defined as: "Extremely or continuously active, not requiring restraint."

**94.** In the accompanying narrative, RN Aneja documented: "Although he is not aggressive."

**95.** At 03:58 AM, the official restraint monitoring log identified as the recorded condition associated with the physical restraint: "Refusing Emergent Psychoactive Medication."

**96.** No staff member documented any physical aggression prior to or during the initiation of the physical hold. No staff member filed a Safety Event Report regarding a kick.

**97.** Dr. Contreras later swore to the Probate Court that Plaintiff "kicked nurse" and was "aggressive due to severe paranoia" (F25 Certificate).

---

## L. The Unverifiable Environment and the DSM-5-TR

---

**98.** At 03:48 AM, staff holding Plaintiff in the locked unit wore black-and-white paper printouts as identification. The printouts lacked a photograph. The printouts did not identify the hospital. They displayed incomplete names handwritten in marker.

**99.** Plaintiff possessed no means to verify that the individuals detaining him were licensed medical providers.

**100.** Plaintiff requested that staff produce valid photo identification. Staff did not do so. Plaintiff then requested that staff merely show him they were in possession of valid photo identification, without needing to hand it to him or let him read it. No staff member did so.

**101.** Plaintiff requested they load the hospital's website to verify the physical location was Ben Taub. Staff did not load the website.

**102.** Plaintiff attempted to dial 911; the facility's telephone blocked the call. Plaintiff attempted to dial his father; the call terminated abruptly without reaching an automated carrier intercept.

**103.** The DSM-5 defines a delusion as "fixed beliefs that are not amenable to change in light of conflicting evidence."

**104.** Staff charted Plaintiff's requests for verifiable facility documentation and staff photo identification as his psychiatric "Chief Complaint."

**105.** At 03:48 AM, RN Aneja checked the clinical protocol box for "Therapeutic communication" as an intervention. In the free-text narrative of the same entry, she recorded: "Unable to reason with the patient" and "Patient is not redirectable at this time." The clinical chart contains no record of any words staff spoke to Plaintiff, nor any words Plaintiff said in response.

**106.** Plaintiff walked away from the silent staff and returned to his room.

## M. The Forced Injection: 03:58 AM

**107.** Staff members Plaintiff could not identify followed him into his room.

**108.** An individual that Plaintiff could not verify as a licensed nurse approached holding a syringe filled with the B52 cocktail ordered at 03:47:39 AM.

**109.** At no point did any staff member identify the medication, explain its risks, or attempt to obtain consent.

**110.** Plaintiff explicitly stated he was unwilling to consent to psychotropic medication, stating he was "being killed and injected with poison and being kidnapped."

**111.** Staff charted Plaintiff's reaction to the silent, unexplained approach of unverified personnel holding a syringe as clinical paranoia.

**112.** At 03:58 AM, multiple unidentifiable Staff members forced Plaintiff onto a bed and initiated a physical hold.

**113.** No physician's order for physical restraint existed at the time of the hold.

**114.** Three staff members physically immobilized Plaintiff's extremities.

**115.** In resisting the restraint, Plaintiff's leg broke free momentarily, resulting in contact between the side of his leg and the thigh area of one of the staff members. The movement had to overcome the active resistance of the restraint grip and lacked any leverage.

**116.** With his body pinned to the bed, the nurse injected the syringe into Plaintiff's left lateral thigh, injecting the B52 cocktail.

**117.** Dr. Contreras's initial 04:13 AM note confirms this timeline, describing the physical contact as occurring during "medication administration."

**118.** 42 CFR § 482.13(e) requires a physician's order before the application of physical restraint. At 04:07 AM, nine minutes after the physical hold began, Dr. Contreras entered the authorizing "Personal Restraint" order retroactively.

**119.** Because Lorazepam is clinically known to cause anterograde amnesia, Plaintiff has no independent recollection of the subsequent events. The remaining factual record relies entirely on the charting entered by the personnel who applied the physical and chemical restraints.

## N. The Subsequent Clinical Diagnosis and Post-Restraint Documentation

**120.** At 04:13 AM, federal regulations required RN Hamblin to conduct a post-restraint debriefing—a face-to-face evaluation requiring the patient's active, conscious participation. RN Hamblin checked the compliance box: "Debriefing occurred."

**121.** At that exact minute, the clinical flowsheet recorded a positive CAM-ICU Feature 3 assessment: "Altered Level of Consciousness." By 04:30 AM, thirty-two minutes after the injection, the clinical reassessment documented Plaintiff as "lying in bed with both eyes closed" with "respirations even and unlabored" — pharmacologically incapacitated and incapable of the face-to-face participation the debriefing protocol requires. Harris Health certified a successful, interactive patient debriefing while concurrently documenting in the

clinical flowsheet that Plaintiff was experiencing an altered level of consciousness due to the administered chemical restraint.

**122.** Medical records indicate the administration of the chemical restraint occurred prior to the documentation of any psychiatric diagnosis.

**123.** At 03:58 AM, no psychiatric diagnosis existed anywhere in Plaintiff's medical record. The B52 was injected.

**124.** At 01:41 AM — more than two hours earlier — Dr. Mackey had documented: "Labs reassuring will medically clear". At 01:42 AM, she completed the formal medical stability checklist, marking illicit substances: "No" (¶75).

**125.** At 04:19 AM — twenty-two minutes after the injection — Dr. Contreras authored Plaintiff's first psychiatric evaluation. She entered: "Unspecified psychotic d/o, R/O [Rule Out] Stimulant induced."

**126.** By that evening, when Dr. Contreras submitted her sworn F25 Certificate to the Probate Court, the "R/O" qualifier had been removed. "Kicked nurse who was administering emergency medication" — her own 04:13 AM language — had become: Item 9: "kicked nurse." Item 10: "aggressive due to severe paranoia, kicked a nurse." Item 11: "active psychosis leading to aggressive behavior."

**127.** Not one of the four people physically present during the injection — RN Aneja, R. Bendy PT, Jose Rios RN, or A. Adelowo RN — documented any act of kicking, striking, or physical aggression.

**128.** At 04:19 AM, Dr. Contreras assigned Plaintiff a Global Assessment of Functioning (GAF) score of 25—a severe clinical metric denoting an "inability to function in almost all areas."

**129.** At triage, staff recorded Plaintiff as "ambulatory" and in "no acute distress" (¶45). The attending physician documented him as "oriented to person, place, and time" (¶72). Sitter logs recorded him "Talking with peers" and "Talking with staff" continuously throughout the night (¶153).

**130.** A GAF of 25 requires profound, observable impairment. The clinical flowsheet instead documents a coherent, oriented, and cooperative patient whose only observed functional impairment was the pharmacological effect of the recently administered chemical restraint.

---

## O. "Folie à Deux"

---

**131.** Plaintiff had repeatedly asked staff to call the Department of Cybercrimes at the HPD to verify his status as a victim in an active cybercrimes investigation. LMSW Jones documented his explicit request: "I'm confused why no one has called cyber security yet." He provided her the context: a dispute involving "business partners" who had "an interest in taking his identity." He attempted to call authorities himself; the ward telephone blocked the call. HPD Cybercrimes Case No. 1198816-24 had been open since August 26. Plaintiff alleges that the failure to make that verification call is relevant to the detention-document and operational-record workflow, not as a claim for a particular investigative outcome.

**132.** Plaintiff's mother called Dr. Contreras the following morning. In her addendum (Exhibit 21), Contreras documented the call: Plaintiff's mother "had been notified by police." She confirmed that Plaintiff "has been stressed out recently because of an issue that started at his job," that "he was kicked off the board of the company," and that "since [then] pt and his parents have been dealing with a cyber attack." She confirmed that "she and her husband have also had issues with their phones and internet at their home and they got new phones just recently because of this." She provided new phone numbers.

**133.** The mother's account independently verified the exact business and cybercrime context Plaintiff had provided to Jones. The documentation contains ellipses throughout, indicating Contreras summarized or truncated the mother's account.

**134.** Despite receiving independent factual corroboration from a secondary witness, Dr. Contreras did not adjust the psychiatric diagnosis or verify the police report. Instead, fifteen minutes later, Contreras reduced the entire call to a single flowsheet entry: "mom bringing CPAP, ?folie à deux" (Exhibit 19). She entered "?folie à deux" into the clinical chart, suggesting applying the psychiatric classification for a "shared delusion" to the corroborating witness.

---

## P. Sworn Probate Court Submissions: Material Fabrications and Omissions

---

**135.** On August 27, 2024, Defendants submitted an Application for Temporary Mental Health Services (B29), an Affidavit of Applicant (B31) sworn by Monique Jones, LMSW (Exhibit 15), and a Certificate of Medical Examination (F25) sworn by Dr. Valeria Contreras (Exhibit 16) to the Harris County Probate Court (Cause No. 360232).

**136.** Texas Health & Safety Code § 574.011 requires such certificates to contain "specific factual descriptions of the patient's recent overt behavior" demonstrating a likelihood of serious harm.

---

## Q. The B31 Affidavit (Monique Jones, LMSW)

---

**137.** In the B31 Affidavit, LMSW Jones swore under penalty of perjury to the following narrative:

> Obs. 1. That on or about the 27th day of August, 2024. I saw the proposed patient do the following: **"Patient was brought in by police for emergency psychiatric treatment by police. Patient appears to be delusional and believes that he is being cyber hacked for his identity. Patient appears to be paranoid with rapid speech and constant wandering eyes. Patient attempted to elope from the psychiatric unit."**
>
> Obs. 2. That on or about the 27 day of August, 2024. I heard the proposed patient say as follows: **"Patient stated during this writer's assessment, 'Someone is using my electronic devices to steal my identity and you are not doing anything.' 'This is not a real hospital this has been put together, by the people trying to take my identity.'"**
>
> Obs. 3. That I have had the opportunity to watch the proposed patient recently, and I have seen him/her act as follows: **"Patient was witnessed to be a danger to himself, attempting to elope from the locked unit. Patient believes that persons on the other end of the phone are impersonating 911 operators and his parents."**

**138.** In her 03:34 AM internal assessment (¶73) (Exhibit 22), LMSW Jones explicitly recorded Plaintiff's request to contact "cyber security" (HPD Cybercrimes) regarding his compromised devices and business dispute. LMSW Jones transcribed Plaintiff's report of cyber-intrusion and corporate disputes.

**139.** She made no attempt to independently verify these reports. Neither LMSW Jones nor any member of the Harris Health clinical staff made a single phone call to the Houston Police Department. LMSW Jones cited these reports to the Probate Court as evidence that Plaintiff "appears to be delusional." Concurrently, HPD opened Incident No. 1198816-24 as an investigation into those exact reports.

**140.** Jones simultaneously swore Plaintiff "attempted to elope." Every contemporaneous clinical and operational record generated by her own facility contradicts this sworn assertion:

- Every attending physician who evaluated Plaintiff documented only a verbal desire to leave the hospital, never a physical attempt to elope.

- The facility's own contemporaneous inter-facility transfer certification (Exhibit 20), authored at 18:19 (6:19 PM), formally certified "No" in the checkbox for elopement attempts.
- The sole clinical basis for physical elopement in the entire chart was a behavior code checkbox (PTALEDOWC) selected by RN Aneja at 03:48 AM—a checkbox that was immediately refuted by her own simultaneous free-text narrative, which documented only a verbalization: *"Patient is insisting on leaving."*

**141.** In her sworn affidavit (Exhibit 15), LMSW Jones certified under penalty of perjury that Plaintiff believed "persons on the other end of the phone are impersonating 911 operators and his parents."

**142.** The electronic health record contains no prior documentation of this delusion. The nursing staff observing the phone call documented only that Plaintiff's outgoing calls were failing to connect, and that Plaintiff was accurately reporting the routing failure.

**143.** The 03:48 AM clinical assessment (Exhibit 17) objectively establishes that the calls did not connect: *"Patient was allowed to make a phone call... attempted to call 811, then 911 and then his father and says it doesn't go to voicemail."*

**144.** Thus, while LMSW Jones swore to the Probate Court that Plaintiff was hallucinating impersonators, the clinical record at 03:48 AM objectively establishes only that Plaintiff attempted to dial 911 and his father, and accurately reported that the calls did not connect.

---

## R. The F25 Certificate of Medical Examination (Dr. Valeria Contreras)

---

**145.** Concurrently, Dr. Contreras certified the following narrative to the Probate Court on the F25 Certificate (Exhibit 16):

> **Item 7.** The treatment, if any, given by me or administered at my direction to Patient is as follows: **"Hospitalization, Antipsychotic medication"**
>
> **Item 8.** My diagnosis of the physical and mental condition of Patient based upon reasonable medical probability is — Psychiatric or Substance Use Diagnosis: **"Unspecified psychotic disorder"** — Personality Disorder and Intellectual Diagnosis: **"Deferred"** — Medical Diagnosis: **"None"**
>
> **Item 9.** Furthermore, the detailed factual basis of such opinion is as follows: **"He is extremely paranoid, believes hospital staff has kidnapped him, required emergency medication, kicked nurse."**
>
> **Item 10.** I am of the opinion that the Patient presents a substantial risk of serious harm to self or others if not immediately restrained; the detailed basis for such is as follows: **"He is aggressive due to severe paranoia, kicked a nurse and believes hospital has kidnapped him."**
>
> **Item 11.** Emergency detention is the least restrictive means; the facts forming the basis for my opinion as to Patient's imminent risk of harm unless immediately restrained are: **"He exhibits poor insight and judgment due to active psychosis leading to aggressive behavior."**

**146.** Dr. Contreras swore Plaintiff "kicked a nurse" (Exhibit 16). As established (¶117), the incidental contact occurred exclusively as a physical reflex while three staff members were forcibly pinning Plaintiff to a bed over his refusal, and a leg temporarily broke free from their grasp.

**147.** Neither RN Aneja (the designated restraint observer), nor the three nursing staff members who executed the physical hold, ever documented that a kick occurred or that any staff member was injured. Dr. Contreras swore to an act of physical aggression that the involved staff members themselves did not record. Upon information and belief, no Safety Event Report was filed.

**148.** In the F25 Certificate submitted to the Probate Court (Exhibit 16), Dr. Contreras certified under penalty of perjury that Plaintiff was "aggressive due to severe paranoia" and exhibited "active psychosis leading to aggressive behavior."

**149.** At the exact moment Dr. Contreras claims this aggression occurred—and exactly 21 seconds after she ordered the chemical restraint—RN Aneja (the designated CIT nurse observing the event) formally scored Plaintiff at BARS 6 ("not requiring restraint") (Exhibit 17). In the accompanying free-text narrative, RN Aneja explicitly charted: "Although he is not aggressive," and "Patient did walk into his room."

**150.** Plaintiff was not aggressive. Plaintiff voluntarily walked into his room.

**151.** Furthermore, 28 separate sitter notes made in the seven hours prior to the emergency medication order (21:00 to 03:45 AM) uniformly logged "No" behavioral change, continuously documenting Plaintiff peacefully "Sitting," "Talking with peers," and "Talking with staff" in the open unit.

**152.** At 04:19 AM, Dr. Contreras recorded Plaintiff's diagnosis in the internal clinical chart as: "Unspecified psychotic d/o, R/O [Rule Out] Stimulant induced" (¶127) (Exhibit 21).

**153.** On the F25 Certificate submitted to the Probate Court under penalty of perjury (Exhibit 16), Dr. Contreras certified Plaintiff's diagnosis as: "Unspecified psychotic disorder."

---

## S. Omitted Exculpatory Clinical Data

---

**154.** Defendants submitted the police intake narrative and the PTALEDOWC code to the magistrate. Defendants did not submit the concurrent "No Risk" C-SSRS finding, the normal metabolic labs, or the nursing note documenting Plaintiff as "not aggressive."

---

## T. Transfer to HBHH

---

**155.** Plaintiff's initial arrival at Ben Taub triage was logged at 19:53 on August 26, 2024. His formal transfer out of the facility to Houston Behavioral Healthcare Hospital was

logged at 19:58 exactly one day later — approximately 24 hours after arrival. He was transferred to Houston Behavioral Healthcare Hospital (HBHH).

**156.** Seventeen minutes after Plaintiff was physically removed from the hospital, attending emergency physician Dr. Cedrick Lubin completed his delayed ED Provider Note at 20:15. Dr. Lubin's final documented medical clinical impression was: "No diagnosis found."

**157.** On August 28, 2024, examining physician Dr. Eileen K. Starbranch at HBHH certified that he was "likely to cause serious harm to others." Her justification: "poor sleep. Says his identity has been stolen" and "Agitation. Pacing."

**158.** Throughout the entirety of his detention — across two facilities and eleven days — no clinician at either institution ever documented suicidal ideation, homicidal ideation, or hallucinations. At HBHH, dozens of subsequent daily progress notes, nursing assessments, and clinical evaluations uniformly continued to document the same denials throughout the ten-day stay. Medical records demonstrate a consistent absence of SI/HI or hallucinations, repeated denials by the patient, and no charted finding of imminent harm matching the statutory standard.

## U. The 176-Day Retroactive Records Scan

**159.** Texas Health and Safety Code § 573.002(a) establishes a strict statutory prerequisite for involuntary psychiatric confinement: a facility must "immediately include" the Emergency Detention Order in the patient's clinical record upon admission. Furthermore, § 573.022(a)(2) prohibits admitting a patient unless it possesses the "written application for emergency detention." When a facility lacks the statutorily mandated instrument, § 576.023 commands that the patient "shall be released."

**160.** According to the Epic EHR audit trails reviewed, the Emergency Detention Order does not appear in Plaintiff's active clinical chart for the period of his involuntary hospitalization. The absence of the Emergency Detention Order from the active chart, as reflected in the records reviewed, meant the statutory documentation requirement for involuntary admission was not shown in that operational record.

**161.** While Harris Health possessed the physical paper EDO on August 27, 2024—the date it was transmitted to the Probate Court—physical possession did not satisfy § 573.002(a)'s command to immediately include the EDO in the clinical record used by treating staff. Clinicians documented and relied exclusively through the Epic EHR during admission and treatment.

**162.** Because treating clinicians rely on the EHR as the operative legal record, the EDO's absence prevented staff from verifying the legal authority for Plaintiff's confinement. Consequently, the subsequent clinical and administrative actions proceeded without the statutorily required documentation:

**(a)** **19:53:** Arrival; intake begins; property and clothing seized (see ¶55); no EDO executed yet.

**(b)** **20:00-20:01:** Suicide precautions and 1:1 supervision ordered; pre-EDO.

**(c)** **20:03:** EDO executed on paper; never added to EHR during admission.

**(d)** **02:54:** Clinical parameters for detention extinguish entirely, establishing an independent basis for mandatory release under § 576.023. The EDO's ongoing absence compounded this duty.

**(e)** **03:58 & 04:07:** Forced injection administered and retroactive restraint ordered (see ¶116 and ¶115); no EDO in EHR at any time.

**163.** Because the EDO does not appear in the Epic records reviewed during admission, the electronic transfer records reviewed do not show that the statutory instrument was transmitted electronically. HBHH thereafter received and detained Plaintiff for approximately ten additional days; Plaintiff alleges that the records reviewed do not show the statutorily required Emergency Detention Order in the electronic health exchange.

**164.** Harris Health did not release Plaintiff. Instead, on February 18, 2025—176 days after Plaintiff's initial detention—Health Information Management executed a batch administrative upload, scanning an EDO copy and the Patient's Bill of Rights into the Epic system at 07:37 AM; the audit trail reviewed identifies this as the first appearance of those documents in the active Epic record.

**165.** The physical Patient's Bill of Rights records Plaintiff's refusal to sign at exactly 20:26, witnessed by RN Luke Dean. However, the exact Epic audit trail establishes that RN Dean did not access Plaintiff's chart until 22:01—one hour and thirty-five minutes later. The later scan therefore presents a timing discrepancy: the form identifies the witness signature as RN Luke Dean's, while the Epic audit trail shows Dean's first chart access at 22:01.

**166.** The evidentiary chain reveals two conflicting documents. The Court-filed EDO was received by the Probate Court on August 27, 2024 (Exhibit 2). The retro-scanned EDO was uploaded by HIM on February 18, 2025 (Exhibit 1).

**167.** Both documents bear distinct, visibly different signatures that each appear to be in Officer Hernandez's handwriting (Exhibit 3). Upon information and belief, based on the audit trail and signature discrepancies, HPD provided a second, differing copy of the EDO for scanning on February 18, 2025.

**168.** On September 3, 2025, Plaintiff submitted a formal records request to Harris Health seeking the complete EHR audit log and an Accounting of Disclosures under 45

C.F.R. § 164.528, explicitly requesting documentation of the disclosures to the Probate Court and the Precinct 1 Constable.

**169.** On September 15, 2025, Harris Health Privacy Officer Catherine Walther, JD, CHC, CHRC, issued a formal written response denying the Accounting of Disclosures by invoking the HIPAA Treatment, Payment, and Operations (TPO) exemption. The TPO exemption is textually inapplicable to third-party judicial and law enforcement disclosures, which are expressly enumerated as required accountable disclosures under § 164.528.

**170.** Walther's September 15, 2025 response did not provide an Accounting of Disclosures for the Probate Court or Precinct 1 Constable disclosures Plaintiff had requested. The response cited the HIPAA Treatment, Payment, and Operations exemption as the basis for denying that portion of the request. Plaintiff pleads this response only as context concerning record provenance, notice, and the detention-document workflow alleged in Count V.

---

## V. Conflicting Agency Designations and Denial of Public Records

---

**171.** As established (¶¶5–8), Plaintiff filed four Texas Public Information Act (TPIA) requests for CAD data, 911 telephony records, body-worn camera footage, and preservation letter confirmations regarding the encounter. HPD denied access by invoking the § 552.108 "active investigation" criminal exemption, yet inconsistently cited the civil EDO number for one denial (Exhibit 7) and the unassigned cybercrimes case number for another (Exhibit 8), despite Plaintiff never being charged with a crime. HPD failed to respond entirely to the remaining requests, defaulting under the statute and withholding evidence including the objective video record of the seizure (Exhibits 9, 10). Plaintiff pleads these responses as evidence concerning notice, preservation, record provenance, and the ability to test the allegations in Counts I–II, not as an independent TPIA cause of action.

**172.** The telephony data HPD withheld under these exemptions reportedly includes ANI (Automatic Number Identification), ALI (Automatic Location Identification), Call Detail Records, SIP headers, ESInet border traffic logs, RapidSOS telemetry, and related dispatcher narratives. Plaintiff identifies these categories to explain the preservation and evidentiary significance of the requested records, not to plead a separate records-access claim.

**173.** The City has taken materially different positions regarding the events of August 26, 2024. Through the Emergency Detention Order, the report was characterized as evidence of psychiatric deterioration. Through formal Texas Public Information Act responses, the same underlying matter was treated as an "active, ongoing criminal investigation" for purposes of withholding records under Tex. Gov't Code § 552.108. Plaintiff alleges that this discrepancy is relevant to notice, credibility, preservation, and record provenance. Plaintiff does not ask the Court to decide a standalone claim based on HPD's investigative performance.

---

**W. Consequential Harm**

---

**174.** On July 20, 2025, $74,370.88 in cryptocurrency (0.63415691 BTC) was stolen from an Exodus wallet residing on the cellular device belonging to Plaintiff's mother.

**175.** Plaintiff subsequently extracted and analyzed diagnostic data from the family's mobile devices (Exhibit 13, Exhibit 14). The surviving operating-system artifacts document unusual and security-relevant crashes and failures on Plaintiff's mother's and father's devices during the period following Plaintiff's release. Plaintiff alleges that these artifacts warrant qualified forensic examination; their mechanism, attribution, and relationship to the reported MMS and telephony events remain subject to further evidence.

**176.** Plaintiff alleges that the devices exhibited abnormal behavior consistent with possible unauthorized interference and that the precise mechanism remains unresolved. These facts are pleaded as context for the reasonableness of Plaintiff's reports and for the

need to preserve and evaluate evidence, not as a claim seeking recovery of the cryptocurrency loss.

**177.** HPD declined to provide the law-enforcement forensic assistance Plaintiff requested for the surrendered devices and did not document a forensic submission to the Houston Forensic Science Center. Plaintiff alleges that the absence of timely documented forensic preservation impaired later efforts to determine what occurred. The July 20, 2025 cryptocurrency theft is a related event and is not sought as damages in this action.

**178.** Plaintiff holds a university degree in Physics and has professional experience developing software. During the course of this device investigation, Plaintiff identified an unrelated Remote Code Execution (RCE) vulnerability within Android's Radio Interface Layer that Google's own internal security teams had entirely missed. Google independently validated Plaintiff's discovery and issued a financial payout to Plaintiff through the official Android Vulnerability Reward Program in December 2025.

---

## X. Evidence Preservation and Investigative Notice

---

**179.** *HPD maintains Incident No. 1198816-24 as an investigation for Tampering with Electronic*, yet upon information and belief, has produced no investigative report, made no arrests, or documented further investigative action. Plaintiff pleads this alleged inaction as context for notice, preservation, the reasonableness of his report, and the Count II service-denial theory—not as a freestanding constitutional right to investigation.

**180.** The Houston Forensic Science Center ("HFSC") is an independent local government corporation that provides forensic services to HPD. HFSC's "Digital and Multimedia" section accepts cell phones, laptops, tablets, and other digital devices for forensic examination. Plaintiff identifies this capability to explain the preservation and forensic-review significance of the devices he offered to HPD.

**181.** HFSC eliminated its historic Digital and Multimedia Evidence backlog by early 2024. See Houston Forensic Science Center, Board Meeting Minutes at 1 (March 8, 2024) ("Both the latent print (LP) and digital multimedia evidence (DME) sections cleared their historic backlogs"). Upon information and belief, no item of digital evidence from Incident No. 1198816-24 has been submitted to HFSC for forensic examination. Plaintiff pleads this alleged absence of documented submission as preservation and notice context, not as a claim requiring HPD to obtain a particular forensic result.

**182.** Plaintiff alleges that the physical and digital evidence contains investigative leads relevant to the reported electronic intrusions. Forensic analysis of Plaintiff's father's PC (Exhibit 13) identified TeamViewer remote-access software associated with an unauthorized enterprise console, and a surviving configuration file (Exhibit 14) contains a unique TeamViewer Session ID timestamped August 14, 2024. Plaintiff alleges that the Session ID could support a preservation request or subpoena to TeamViewer GmbH. He pleads HPD's alleged failure to document pursuit of that lead as context concerning notice, preservation, and the reasonableness of its response, not as a claim for a particular investigative step or result.

**183.** HPD Cyber Crimes Detective J. Chaney emailed Plaintiff on August 22, 2025 (Exhibit 11), stating that he had issued urgent preservation requests for TeamViewer data logs on Case No. 1198816-24. HPD has not responded to formal public-information requests seeking transmission records for those preservation letters (Exhibit 10). Plaintiff alleges that the unresolved preservation status is relevant because carrier and platform records may independently corroborate the reported events and may be subject to retention limits. When Plaintiff separately attempted to file a federal telecommunications crime report directly with Detective Chaney, Chaney responded by instructing Plaintiff to take the

matter to the "local police station" rather than accepting or forwarding the report within HPD's own investigative chain. Plaintiff pleads these facts as notice and preservation context, not as an independent claim requiring HPD to investigate or prosecute.

## Y. Records-Related and Professional Consequences

**184.** As a consequence of the Emergency Detention Order and subsequent commitment process alleged in Counts I and IV, records concerning Plaintiff's involuntary psychiatric detention were created and maintained in Harris County Probate Court (Cause No. 360232). Plaintiff alleges that the existence, content, and dissemination of those records are relevant to the record-related injury and relief pleaded below.

**185.** Although the court dismissed the application on September 9, 2024, and no formal commitment order was entered, Plaintiff alleges that the Probate Court record remains associated with his name in official records. Plaintiff works in technology-related fields where cybersecurity, financial-sector, and federal-clearance roles may require disclosure or review of mental-health proceedings, including disclosures requested on Standard Form 86. Plaintiff pleads this as potential reputational and professional harm only to the extent it is proven and legally attributable to a named defendant.

**186.** Officer Hernandez's Emergency Detention Order generated HPD Incident No. 1198816-24 (Exhibit 4), an internal record associated with the reported electronic offense. Plaintiff alleges that the corresponding Records Management System entry does not reflect the September 9, 2024 dismissal of the Probate Court application or later records that Plaintiff contends undermine the EDO's behavioral predicates. Plaintiff further alleges that the City's records responses treated the underlying matter as an active investigation while the EDO treated Plaintiff's report as evidence of psychiatric deterioration. These allegations are

pleaded as context for the records-related injury, notice, and relief within the claims stated here.

**187.** Plaintiff's August 26, 2024 report generated records involving HPD patrol and dispatch or CIRT-related personnel, Harris Health staff, Harris County Probate Court filings, interfacility transfer records, and later Health Information Management activity. Those records are pleaded to show the sequence of the detention, medical restraint, commitment-document process, communications restrictions, and later record-handling events relevant to Counts I–V. Plaintiff does not rely on the number of personnel involved as an independent claim or as proof that every participant is liable.

**188.** Plaintiff alleges that the TeamViewer Session ID and related device evidence provided HPD with preservation and investigative leads relevant to the reported electronic intrusions. The absence of a documented response to those leads is pleaded as context concerning notice, preservation, and the reasonableness of the City's response, not as a claim requiring HPD to issue a particular subpoena or identify a perpetrator.

## V. MUNICIPAL CUSTOM AND CONSTRUCTIVE NOTICE

### V. City/HPD Context Relevant to Counts I–II

**189.** Plaintiff does not assert a separate City Monell claim in this Complaint. The following City/HPD facts are pleaded only as context relevant to Count I's initial-seizure analysis and Count II's disability-based police-service claim.

**190.** Plaintiff alleges that HPD's patrol, Cybercrimes, records, and crisis-response functions operated through separate channels during the encounter. The CIRT consultations, the absence of documented technical review, the existing Cybercrimes case,

and the reported failure to complete ordinary report-processing steps are relevant to what information was available to Hernandez and whether disability-related assumptions displaced ordinary police-service handling.

**191.** Plaintiff further relies on HPD policies and training materials concerning receipt of crime reports, mental-health encounters, ADA compliance, and the requirement that EDO narratives identify specific factual grounds. These materials are pleaded as context for the reasonableness of the initial seizure and the alleged unequal provision of police services, not as an independent claim for failure to investigate or for a particular investigative result.

**192.** Plaintiff's later public-records responses, preservation communications, and body-camera dispute are pleaded as evidence concerning notice, preservation, record provenance, and the ability to test the allegations in Counts I–II. Plaintiff does not assert an independent TPIA claim, ratification claim, discipline claim, evidence-refusal claim, or municipal damages claim under § 1983 against the City.

## B. Harris County Hospital District (Harris Health System)

**193.** At all relevant times, Plaintiff alleges that the Harris Health Board of Trustees and Medical Executive Committee were the final policymakers for the Harris County Hospital District with respect to the institutional clinical and record-management workflows challenged in this Count. Plaintiff alleges that those policymakers possessed actual or constructive notice of recurring risks identified in CMS materials, Board materials, and prior litigation, yet maintained the challenged workflows without effective correction. Count V concerns two related but distinct institutional workflows: (1) the emergency-medication and restraint workflow; and (2) the detention-document and operational-record workflow.

### 1. Custom 1: Punitive Blanket Protocols and "Restraint-as-Coercion"

**194. Emergency-medication and restraint workflow.** Plaintiff alleges that Harris Health maintained an institutional workflow under which maximum-restriction precautions and emergency medication or physical restraint could be initiated in a civil-detention setting based on refusal, agitation, or difficulty redirecting a patient without requiring contemporaneous documentation of the specific immediate physical-safety facts supporting the intervention. Plaintiff alleges that the workflow treated refusal of psychoactive medication as an operational problem to be overcome rather than requiring individualized documentation of why medication and physical restraint were immediately necessary for physical safety. The challenged conduct is alleged as an institutional workflow and not merely as disagreement with a physician's diagnosis or treatment judgment. Harris Health's Patient Rights and Responsibilities policy, as admitted in the pleadings, states that restraint or seclusion may not be imposed for coercion, discipline, convenience, or retaliation, may be imposed only to ensure immediate physical safety, and must stop at the earliest possible time. Plaintiff alleges that the challenged workflow operated inconsistently with those stated limits.

**195. Notice from CMS Immediate Jeopardy and Board Ratification:** Federal regulators formally cited Ben Taub Hospital for this exact conduct. A September 2019 *CMS Immediate Jeopardy determination (Tags A 131, A 174, A 178)* found the facility systematically bypassed informed consent, deployed physical restraints punitively, and administered chemical injections prior to physician authorization. Rather than correct this, the Board of Trustees explicitly codified it: in an *October 27, 2022 packet*, the Board formally approved written credentialing standards authorizing the "Chemical restraint of agitated patient"—a policy that facially violates the federal constitutional floor requiring an

*imminent physical threat* (BARS-7) under 42 CFR § 482.13(e)(1). An August 24, 2023 Board packet further documented severe "throughput issues in the emergency room," establishing the institutional motive for applying blanket maximum-restriction protocols to forcefully process detainees and manage overcrowding. Two federal FOIA requests to CMS remain pending. First, on April 27, 2026, Plaintiff requested aggregate Medicare claims data showing facility-level billing frequency for haloperidol (Haldol) and related antipsychotic chemical restraints across all comparable psychiatric inpatient facilities for calendar years 2014–2024 (Control No. FOIA-CMS-0427). Upon information and belief, that data will support Plaintiff's thesis that chemical restraint was applied at Ben Taub as a matter of institutional custom rather than individualized clinical judgment. Second, on April 27, 2026, Plaintiff requested the surveyor worksheets, field notes, and Plans of Correction underlying the September 2019 Immediate Jeopardy determination (Control No. 042820267081; appeal acknowledged May 12, 2026, Control No. 042820267085). Upon information and belief, those records will confirm whether Ben Taub ever implemented enforceable corrections to its chemical restraint authorization protocols — or whether the Board's 2022 credentialing approval simply codified the surveyed deficiency.

**196. Constructive Notice from Prior Litigation:** The policymakers were explicitly warned of this punitive treatment model through prior federal litigation: *(a)* In *Mitchell v. Harris Health System*, No. 4:20-cv-00142 (S.D. Tex. 2020), an elderly detainee processed through the identical § 573 pipeline was punitively shackled to a hospital bed during a hypertensive emergency. *(b)* In *Slayton v. Harris County*, No. 4:22-cv-02572 (S.D. Tex. 2022), plaintiffs alleged a regular custom of ignoring medical needs and maladministering prescription medication as an administrative default. *(c)* In *McGregor v. Harris County*, No. 4:26-cv-00685 (S.D. Tex. 2026), a schizophrenic patient's psychiatric label was used as

institutional cover to withhold care until he died of sepsis, demonstrating the exact inverse of Plaintiff's case: deploying psychiatric documentation as an institutional shield rather than a clinical tool.

**197. Moving Force Causation:** Pursuant to this custom, Harris Health applied a total deprivation of liberty to Plaintiff. He was placed on maximum-restriction suicide watch for over seven hours before any psychiatric diagnosis existed, even after a scored C-SSRS assessment certified him as "No Risk" and four independent clinicians documented "No SI/ HI." At 03:58 AM, staff administered a "B52" chemical restraint to overcome his explicit refusal of treatment, despite his concurrent BARS assessment logging him as "BARS 6" and "not aggressive." This triple-injection was the direct, predictable application of the Board's unconstitutional written credentialing standard permitting chemical restraint for mere "agitation."

### 2. Custom 2: Systemic Restriction of Patient Communication and Record Verification

**198. Detention-document and operational-record workflow.** Plaintiff alleges that Harris Health maintained an institutional workflow that separated the legal and factual basis for emergency detention from the active clinical record used by treating personnel. Plaintiff alleges that the EDO was not available in the active Epic record during the relevant admission and treatment sequence, causing clinical personnel to rely on the police narrative without independently reviewing the instrument's stated factual basis. Plaintiff further alleges that the same workflow restricted the external verification needed to test that narrative by confiscating communication devices, failing to facilitate a charted request for counsel, and maintaining ward-phone and identification practices that prevented meaningful verification of the facility, staff identity, and reported events.

**199. Constructive Notice of Epic Manipulation and Anonymity:** Harris Health's policymakers have received repeated notice that their Epic architecture and staff protocols are utilized to obscure clinical decision-making and shield institutional liability: *(a) United States ex rel. Strawn v. Harris Health System* (No. 4:20-cv-00296) and *Vaughn v. Harris County Hospital District* (No. 4:17-cv-02749) alleged systemic, coordinated manipulation of the Epic EHR to execute multi-million dollar federal frauds, explicitly naming policymakers who took no corrective action. *(b) Rodgers v. Harris County Hospital District* (Cause No. 2023-63132) alleged supervisors directed nurses to retroactively modify clinical records to delete mandatory CDC infection data. *(c) Aguocha-Ohakweh v. Harris County* (No. 4:16-cv-903) and *Aguocha-Ohakweh v. Baylor* (No. 4:16-cv-01704) alleged an "admit and withhold" strategy where Harris Health generated false records, including post-incident orders placed retroactively to mask clinical decisions and "credential laundering." *(d) Byrd v. Harris Health*, No. 4:24-cv-03128 (S.D. Tex. Aug. 2024), documented contemporaneously that Harris Health staff systematically "hide their names and refuse to present identification" to neutralize patient grievances at the point of contact.

**200. Moving Force Causation:** Because the original EDO was not scanned into Plaintiff's active chart, clinicians relied entirely on Officer Hernandez's triage narrative. When Plaintiff identified objective infrastructure failures—a ward phone that blocked 911 (violating Tex. Health & Safety Code § 771A.001) and staff lacking mandatory photo badges (violating § 241.009)—staff documented his accurate observations as "paranoia" and "delusions." This documentation of distress directly supplied the clinical predicate for the forced chemical restraint. On April 27, 2026, Plaintiff filed a FOIA request with the FCC Enforcement Bureau seeking Kari's Law and RAY BAUM'S Act MLTS compliance filings, enforcement citations, and any consumer complaints against Harris Health System

regarding the inability to dial 911 directly from the Ben Taub ward phone. As of the date of this filing, no response has been received. Upon information and belief, those records will confirm that the ward phone's 911 block was a known, documented infrastructure failure — not a delusion — and that Plaintiff's accurate observation was contemporaneously weaponized as psychiatric evidence against him.

### 3. Custom 3: Sworn Probate Court Fabrications and Retroactive Alteration

**201. Commitment-document and record-provenance component.** Plaintiff alleges that the detention-document workflow also permitted unsupported behavioral descriptions to move from clinical notes into sworn commitment instruments without a documented reconciliation against contemporaneous clinical records. Plaintiff further alleges that Harris Health's HIM process later introduced EDO-related documents into the closed Epic record months after discharge, creating a document-provenance and timing discrepancy that obscured when the foundational detention document was available to treating personnel. Plaintiff alleges that these practices operated as institutional record and commitment-process mechanisms, not merely as isolated individual mistakes.

**202. Constructive Notice of Affidavit Fabrication and Spoliation:** Harris Health possessed direct constructive notice of this exact pipeline from certified state-court records and federal litigation: *(a) Wilkerson v. Arrington*, Cause No. 2015-66027 (Harris Cnty. 295th JDC, filed Nov. 3, 2015). The identical Harris Health/Ben Taub clinical staff pool was sued for executing EDO affidavits containing demonstrably false behavioral descriptions ("screaming she was Jesus") to bypass clinical reality, sedating a non-violent political activist and detaining her for 13 days. The case demonstrated Harris Health's systemic use of the Texas Medical Liability Act (Chapter 74 expert-report requirement) as a procedural trap to extinguish constitutional claims before merits adjudication. *(b) Gatlin v. Harris County*

*Hospital District*, Cause No. 2013-56180 (Harris Cnty. 113th JDC), similarly demonstrated that the mandatory judicial probable cause hearing for psychiatric detention "never happened," yet claims against the Ben Taub staff were predictably extinguished by the Chapter 74 barrier. *(c) Borchgrevink v. Harris County*, No. 4:23-cv-03198 (S.D. Tex. 2023), alleged Harris Health's Chief Medical Officer ratified dangerous practices and that the facility engaged in "textbook spoliation" by intentionally destroying video surveillance to cover up misconduct. *(d) Mitchell v. Harris Health System* (No. 4:20-cv-00142) alleged that the facility deliberately shredded clinical records pertaining to a § 573 detention and denied the patient access to counsel.

**203. Moving Force Causation:** Plaintiff alleges that the detention-document workflow was a moving force in the continued-custody process because the B29/B31 and F25 instruments incorporated behavioral descriptions that Plaintiff alleges were not reconciled with the contemporaneous clinical flowsheets, transfer documentation, and sitter records. Plaintiff further alleges that the later HIM upload created a timing and provenance discrepancy concerning the EDO. These allegations are offered to show how the institutional record and commitment-document workflow affected the information available to treating and custody decisionmakers; Plaintiff does not contend that the later upload itself caused the August–September 2024 confinement.

## VI. CAUSES OF ACTION

**204.** *Clarification Regarding References to State Law.* Throughout this Complaint, Plaintiff cites provisions of Texas state law — including the Texas Health & Safety Code (§§ 573.001, 573.002, 573.023, 576.006, 576.025), the Texas Government Code (§ 552.108), and related regulatory standards. These citations serve exclusively as factual predicates

establishing the constitutional floor against which Defendants' conduct is measured, as elements of state-created liberty interests enforceable under the Fourteenth Amendment, or as evidence of the applicable standard of care for purposes of demonstrating deliberate indifference. Plaintiff does not assert any independent state-law cause of action arising from these statutes. All claims are brought under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132.

**205.** *Clarification Regarding Medical Malpractice.* No claim in this Complaint sounds in medical malpractice or health care liability under Texas Civil Practice & Remedies Code Chapter 74. Plaintiff challenges the constitutional adequacy of institutional customs and policies, the fabrication of sworn judicial instruments, and the deliberate indifference of municipal policymakers — not the exercise of professional medical judgment. The expert report requirement of § 74.351 does not apply to federal civil rights claims brought under § 1983. *See Esteves v. Brock, 106 F.3d 674, 677 (5th Cir. 1997).*

---

**Count I: Fourth Amendment — Unreasonable Initial Seizure (42 U.S.C. § 1983)**

---

**(Against Officer M. Hernandez in His Individual Capacity)**

**206.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 51. This Count concerns the initial field seizure, handcuffing, and transport initiated by Hernandez; it does not seek to impose on Hernandez responsibility for independent hospital, Probate Court, or later records decisions.

**207.** Officer Hernandez executed a sworn EDO that affirmatively misrepresented the presence of witnesses and omitted four critical facts known to him at the time of execution:

**(a) The Witness Falsity Matrix:** The sworn EDO explicitly certified under Item 5 that there were "None" for witnesses who reported or observed Plaintiff's behavior. This was an affirmative fabrication. Plaintiff's mother, Carolyn Van Kirk, was physically present on the

scene and was directly interviewed by Officer Hernandez on his body-worn camera. Upon information and belief, the body-worn camera footage captures her explicitly corroborating the spoofed-call attack and failing to describe Plaintiff as violent, threatening, or a danger to himself or others. By swearing "None," Officer Hernandez deliberately concealed this material, exculpatory witness statement from the magistrate to manufacture a false psychiatric emergency. **(b)** The EDO omitted Plaintiff's active, verified HPD cybercrimes case (No. 1198816-24), which Hernandez personally confirmed on the scene. **(c)** The affidavit fails to identify a single objective behavior, physical action, or overt act. Instead, Officer Hernandez relied exclusively on his own subjective interpretation of Plaintiff's speech (the crime report itself) to apply conclusory psychiatric labels ("paranoia" and "delusions"). Substituting a citizen's statements for the statutory requirement of "specific recent behavior, overt acts, attempts, or threats" bypasses the objective evidence standard required for an involuntary seizure. **(d)** The EDO deliberately reframed Plaintiff's citizen-initiated crime report—concerning actively spoofed incoming calls on a newly purchased phone with a corroborating witness—into the spontaneous exhibition of delusional beliefs, omitting the fact that Plaintiff had voluntarily approached the officer to report a specific, witnessed telecommunications crime.

**208.** Because Hernandez personally confirmed the active cybercrimes case, personally interviewed Plaintiff's mother on scene, and personally observed the absence of any threats, weapons, self-harm, or acute distress, his omission of these exculpatory facts from the sworn instrument transcends negligence and constitutes a reckless disregard for the truth. This reckless disregard bears on whether the Notification can supply probable cause for the initial seizure. Plaintiff does not seek through this Count to impose on Hernandez liability for independent hospital, Probate Court, or later records decisions. These omissions and

fabrications were "clearly critical" to a finding of probable cause; had they been truthfully included, the sworn instrument would have failed to articulate the statutory predicate for detention.

**209.** The sworn EDO does not identify facts sufficient to establish either statutory route alleged for involuntary detention. The EDO form's Item 4 required documentation of "recent behavior, overt acts, attempts, statements, or threats observed by me." Hernandez documented no behavior, overt act, or threat beyond Plaintiff's statements, and the form did not identify facts showing severe emotional distress together with deterioration to the extent Plaintiff could not remain at liberty. Harris Health's contemporaneous intake record documented Plaintiff as "In No Acute Distress (NAD)," "ambulatory with steady gait," oriented in all four spheres, BARS 4 (quiet and awake), with "ability to follow commands: Yes" and "compliant." *Cantrell v. City of Murphy*, 666 F.3d 911 (5th Cir. 2012), recognizes that mental illness alone does not establish the substantial-risk predicate for a warrantless mental-health seizure. Plaintiff alleges that, when the material omissions are corrected and the unsupported conclusions are disregarded, the remaining facts did not establish arguable probable cause under either statutory route. The device artifacts are pleaded as context for the reasonableness of Plaintiff's report, not as a substitute for the required detention facts.

**210.** The facts concerning Plaintiff's refusal, Hernandez's alleged post-refusal narrative, and the additional officers' presence remain incorporated as context for the initial seizure and for Count II below. Plaintiff does not presently assert a separate retaliation claim.

---

**Count II: Americans with Disabilities Act, Title II (42 U.S.C. § 12132)**

---

**(Discriminatory Denial or Unequal Provision of Police Complaint-Taking Services — against the City of Houston)**

**211.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 18 through 51. This Count alleges direct disability discrimination in the provision of police complaint-taking and incident-processing services; it does not allege a failure-to-accommodate claim or a right to a particular investigative outcome.

**212.** Plaintiff is qualified to use HPD's public-facing service of receiving, documenting, assessing, and routing reports of suspected crime and associated information. He voluntarily approached an on-duty officer; supplied identifying and incident information; described a specific recent phone event; offered the device; cooperated with the officer's questions; had a corroborating witness; and had no weapon, threat, violence, or conduct preventing ordinary report intake. Plaintiff does not allege a right to a particular detective assignment, prosecution, forensic result, or successful investigation.

**213.** Hernandez treated Plaintiff as having a mental impairment after Plaintiff disclosed ADHD and depression. Hernandez recorded those diagnoses and associated medication/ sleep information in the Notification, characterized Plaintiff's report as paranoia and mental-capacity deterioration, and used the perceived impairment in the detention decision. Plaintiff alleges in the alternative that he is an individual with an actual disability and that Hernandez regarded him as having a mental impairment. This Count is based on direct discrimination, not a request for reasonable modification.

**214.** Plaintiff voluntarily approached Hernandez to report a crime. He was cooperative, unarmed, nonviolent, and compliant with instructions; he made no threat, self-harm statement, or statement of intent to harm another person. Hernandez had time to question Plaintiff, separately interview Plaintiff's mother, await additional officers, and search HPD's RMS, where he located the active Cybercrimes case. Plaintiff alleges that the challenged denial of ordinary report-processing services occurred after those safety-assessment

opportunities and in the absence of a threat to human life. *Hainze v. Richards*, 207 F.3d 795 (5th Cir. 2000).

**215.** After obtaining the disclosed diagnoses, Hernandez did not complete ordinary report-taking, documentation, evidence-intake, or referral/routing steps for the August 26 report. Although he located the existing HPD Cybercrimes case and interviewed Plaintiff's mother, Plaintiff alleges that he used the perceived impairment to recast the new report as psychiatric evidence rather than document and route it through ordinary police-service channels. The materially different service alleged is the replacement of complainant processing with psychiatric detention.

**216.** Plaintiff alleges that perceived mental impairment was a motivating and but-for cause of the materially different service. The alleged sequence is that Hernandez moved from questions about the crime report to psychiatric history; Plaintiff disclosed ADHD and depression; Hernandez recorded that information and used it with the report's content to characterize Plaintiff as paranoid and deteriorating; ordinary report processing stopped; and detention followed. Plaintiff alleges that this sequence supports intentional discrimination because Hernandez had notice of the likely denial of equal police-service access and nevertheless chose the materially different course.

**217.** Plaintiff seeks only relief available for the completed Title II violation, including any proven direct, nonduplicative compensatory loss and nominal relief in the alternative if available. Plaintiff does not seek emotional-distress damages, punitive damages, the cryptocurrency loss, or prospective declaratory or injunctive relief under this Count.

## Count III: Fourteenth Amendment Due Process — Unwanted Medication and Bodily Restraint (42 U.S.C. § 1983)

**(Against Dr. Valeria M. Contreras, M.D., in her Individual Capacity)**

**218.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 131. Plaintiff brings this claim exclusively as a federal constitutional deprivation under 42 U.S.C. § 1983 and expressly disclaims any state-law medical malpractice claim. This Count concerns the 03:47 medication order, the 03:58–03:59 physical hold and injection, and the 04:07 personal-restraint order; it does not seek damages for the later commitment process or downstream confinement.

**219.** Dr. Contreras personally entered the 03:47 order for intramuscular haloperidol, lorazepam, and diphenhydramine. Harris Health staff administered the ordered medications during the recorded physical hold at 03:58–03:59. Contreras later entered the 04:07 personal-restraint order. Plaintiff alleges that these were not private acts unrelated to custody: they were treatment and restraint decisions made while Plaintiff was held under Harris Health's involuntary-custody system, entered into or carried out through Harris Health's clinical operations, and implemented by Harris Health staff. Plaintiff further alleges that Contreras personally exercised the authority reflected in those orders while Plaintiff was in governmental custody. On that basis, Plaintiff alleges that Contreras acted under color of state law for purposes of this Count.

**220.** Under *Youngberg v. Romeo*, 457 U.S. 307 (1982), civilly committed individuals retain a constitutionally protected liberty interest in freedom from unreasonable bodily restraints. The contemporaneous nursing record attributed to RN Aneja states that Plaintiff was "not aggressive" and that he walked into his room before staff used a physical hold to administer the medication. The same record contains a behavior-code entry and a narrative stating that Plaintiff was "insisting on leaving," while other records use the phrase "threatening to elope." Plaintiff does not rely on any one isolated entry; he alleges that the records must be read together and that they do not document an intentional act of violence

or a specific physical attempt to escape before the hold began. Contreras later admitted that Plaintiff kicked a nurse but disputes the conditions in which the contact occurred. Plaintiff alleges that the later categorical description of the event as a "kick" and as aggression due to severe paranoia materially overstated what the contemporaneous records established. She entered the medication order before the first psychiatric diagnosis appears in the medical record. Plaintiff alleges that ordering the forced medication and bodily restraint on these facts was a substantial departure from accepted professional judgment and violated Plaintiff's Fourteenth Amendment liberty interest.

**221.** Under *Vitek v. Jones,* 445 U.S. 480 (1982), state statutes create liberty interests protected by the Fourteenth Amendment. Texas Health & Safety Code § 576.025 guarantees the right to refuse psychoactive medication. Plaintiff alleges that Contreras authorized the physical override of his explicit, documented refusal without a qualifying emergency or adequate procedural safeguard. Plaintiff does not rely on the absence of all physical contact; he alleges that the documented contact occurred during a staff-initiated physical hold, that its circumstances did not establish intentional aggression or an immediate serious safety threat, and that the later description of the event as a "kick" materially overstated its clinical and legal significance. Plaintiff seeks in this Count damages for the direct bodily invasion, physical hold, immediate medication effects, and associated dignitary harm; he does not seek Count III damages for later commitment-process or downstream-custody injury.

---

**Count IV: Fourth Amendment Continued Seizure Through Commitment Process (42 U.S.C. § 1983)**

---

**(Against Dr. Valeria M. Contreras, M.D., and Monique Jones, LMSW, in Their Individual Capacities)**

**222.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 108 through 159.

**223.** The Fourth Amendment governs a continued seizure alleged to have been caused by a knowingly false or materially misleading pre-hearing commitment instrument. Plaintiff challenges the non-testimonial acts of creating, executing, notarizing, and submitting the B29/B31 Application and F25 Certificate; Plaintiff does not premise this Count on testimony at a later hearing.

**224.** In executing the Application for Temporary Mental Health Services (B29/B31) and the Certificate of Medical Examination for Emergency Detention (F25), Defendants Jones and Contreras acted as the complaining witnesses who affirmatively instituted and maintained the legal machinery of civil commitment. LMSW Jones, by signing the B29/B31 Application, served as the statutory applicant who initiated the judicial deprivation of Plaintiff's liberty. Dr. Contreras, by executing the F25 Certificate, provided the statutory prerequisite required to trigger the Probate Court's jurisdiction over Plaintiff's continued confinement. In these roles, Defendants swore to material factual assertions that affirmatively contradicted their own concurrent clinical documentation, including a physical escape attempt that the hospital's own discharge documentation denied, the incorporation of unverified police hearsay as direct clinical observations, the erasure of an uncertain diagnostic qualifier (Dr. Contreras removed the "R/O" qualifier before certifying it in the sworn instrument), and a context-stripped allegation of physical contact that occurred during a forced injection.

**225.** Plaintiff alleges that the B29/B31 and F25 were submitted as the factual commitment-process instruments used to obtain the August 27 Order of Protective Custody. The sequence alleged is: Jones's B29/B31 Application and Contreras's F25

Certificate were submitted to the Probate Court; the Court issued the August 27 Order of Protective Custody; that Order authorized continued protective custody at Ben Taub; and the same-day transfer authority directed Plaintiff's transport to HBHH while continuing detention under that custody process. Plaintiff alleges that the challenged instruments were material to that custody sequence and that, without the materially misleading factual assertions identified above, the continued-custody process would not have proceeded in the same manner. The resulting custody after the initial field seizure is the specific continued-seizure injury alleged in this Count.

**226.** This Count seeks damages only for the continued-custody period proximately caused by the challenged commitment process. Plaintiff does not premise liability on either Defendant's later hearing testimony and does not automatically attribute every later day of confinement to the B29/B31 or F25. The alleged basis for liability is the material role of the instruments in initiating or maintaining the custody process before later independent decisions. To the extent a later custody decision independently supplied a lawful basis for confinement, Plaintiff does not attribute that independent decision to these Defendants; Plaintiff seeks relief only for custody that the materially misleading instruments caused or materially continued.

## Count V: Municipal Liability (Monell) — Harris Health (42 U.S.C. § 1983)

**(Against Harris County Hospital District d/b/a Harris Health)**

**227.** Plaintiff incorporates by reference the factual allegations contained in paragraphs 48 through 171, and specifically Section V(B) (paragraphs 211 through 222). Harris Health is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because its final policymakers—the Board of Trustees and Medical Executive Committee—acted with deliberate indifference in maintaining the two institutional workflows alleged below.

Plaintiff alleges that each workflow was a moving force behind a distinct stage of the constitutional deprivations Plaintiff suffered.

## A. Emergency-Medication and Restraint Workflow

**228. Policy or Custom.** Under *Bell v. Wolfish*, 441 U.S. 520 (1979), conditions of confinement imposed on civil detainees constitute unconstitutional punishment if not reasonably related to a legitimate non-punitive governmental objective. Under *Youngberg v. Romeo*, 457 U.S. 307 (1982), and *Washington v. Harper*, 494 U.S. 210 (1990), forced psychoactive medication requires a finding that the patient poses a likelihood of serious harm. Harris Health maintains a widespread institutional custom of deploying maximum-restriction clinical protocols—specifically Continuous 1:1 Suicide Watch and physical or chemical restraints—without documenting imminent clinical danger. It uses emergent restraints to manage patient non-compliance and overcome a civil detainee's refusal of medication rather than as a last resort for physical safety.

**229. Notice and Deliberate Indifference.** Harris Health's policymakers possessed actual notice of this workflow through the 2019 *CMS Immediate Jeopardy determination* (Tags A 131, A 174, A 178), the CMS findings and Board materials alleged in ¶¶196–197, and the prior litigation identified there. Those materials placed policymakers on notice of informed-consent, emergency-medication, restraint, and post-restraint-assessment failures. Plaintiff alleges that the Board of Trustees and Medical Executive Committee nevertheless maintained the workflow without effective correction.

**230. Moving Force.** Plaintiff alleges that this workflow was the moving force behind his Continuous 1:1 Suicide Watch, physical hold, and B-52 injection. Staff placed Plaintiff on maximum restriction before a psychiatric diagnosis had been entered; the record later showed a scored C-SSRS of "No Risk," multiple "No SI/HI" findings, BARS 6, and a

contemporaneous "not aggressive" entry. The workflow allegedly supplied the institutional mechanism through which medication refusal, agitation, and the cited behavioral entries were treated as grounds for physical and chemical restraint.

## B. Detention-Document and Operational-Record Workflow

**231. Policy or Custom.** Under *O'Connor v. Donaldson*, 422 U.S. 563 (1975), the State cannot constitutionally continue to confine an individual after the original justification for commitment has ceased to exist. Operating in tandem with HPD's structural practices, Harris Health maintains a systemic practice of omitting foundational legal documentation during admission and operational treatment. By isolating the Notification of Emergency Detention from the active Epic EHR in violation of Texas Health & Safety Code § 573.002(a), Harris Health causes clinicians to rely on police narratives rather than independently verifying the statutory predicate for detention. The same workflow includes restrictions on external verification: confiscating devices, ignoring charted requests for counsel, operating telephones that block 911 access, and pathologizing observations of those operational failures as psychiatric symptoms.

**232. Notice and Deliberate Indifference.** Harris Health's policymakers possessed actual notice of record-integrity and document-workflow concerns through the CMS findings, prior litigation, Board materials, and the record-related allegations in ¶¶202–204. Harris Health's Board of Trustees later confirmed that the Epic EHR architecture required a "Back to Foundation" rebuild in 2025. Plaintiff alleges that the same known architecture and workflow were in operation during his detention and were not effectively corrected.

**233. Moving Force.** Plaintiff alleges that this workflow was the moving force behind the continued use of the police narrative, the inability of clinicians and downstream decisionmakers to verify the Notification in the operational record, the transfer and

commitment-document process, and the later February 18, 2025 HIM scan event. The February event is pleaded as evidence of document provenance, institutional knowledge, and the alleged earlier workflow; it is not alleged to have caused the completed August–September 2024 confinement.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and award the following relief, allocated to the claims and defendants against whom each claim is pleaded:

**(a)** Compensatory damages against Officer Hernandez for injuries proximately caused by the alleged initial seizure, handcuffing, and transport, including any proven emotional or physical injury attributable to that conduct;

**(b)** Compensatory damages against the City of Houston for the limited service-related injury alleged in Count II. Plaintiff does not seek emotional-distress damages, punitive damages, cryptocurrency loss, or prospective declaratory or injunctive relief under Count II;

**(c)** Compensatory damages against Dr. Contreras for injuries proximately caused by the alleged immediate hold, forced medication, and physical restraint, excluding downstream commitment-process custody;

**(d)** Compensatory damages against Dr. Contreras and Monique Jones only to the extent the challenged commitment instruments proximately caused or continued custody, as alleged in Count IV, and not for later custody decisions or testimony-based liability that the complaint does not attribute to them;

**(e)** Compensatory damages against Harris County Hospital District d/b/a Harris Health for direct, nonduplicative injuries proximately caused by the two institutional workflows alleged in Count V, including injuries tied to the emergency-medication/restraint workflow and the detention-document/operational-record workflow;

**(f)** Reputational and professional damages, to the extent legally available and proven, for harm caused by City-controlled RMS records, including any resulting effect on cybersecurity employment prospects. Plaintiff does not seek mandatory correction of records controlled by nonparty agencies;

**(g)** Compensatory damages for medical and counseling expenses only to the extent they are proven to result from a particular defendant's conduct pleaded in Counts I through V. Plaintiff preserves the underlying cybercrime and cryptocurrency-loss facts as context and does not seek to recover the $74,370.88 cryptocurrency loss in this civil-rights action;

**(h)** Punitive damages against the individual defendants only, to the extent permitted by law and supported by proof of conduct that was malicious, reckless, or in callous disregard of Plaintiff's federally protected rights. Plaintiff does not seek punitive damages against the City or Harris Health;

**(i)** Nominal damages, in the alternative, for each proven constitutional violation under 42 U.S.C. § 1983 where compensatory damages are unavailable or not established;

**(j) Declaratory Relief** pursuant to 28 U.S.C. § 2201, limited to the specific claims pleaded and any live controversy supporting such relief, including a declaration concerning the alleged constitutional violations and the challenged records. Plaintiff does not seek a declaration binding nonparties, a declaration that the Emergency Detention Order was devoid of any factual or clinical basis, or a declaration that automatically invalidates records in subsequent security-clearance proceedings;

**(k) Injunctive or record-related relief,** if supported by a concrete ongoing injury, limited to records within the control of the responsible named defendant:

**1.** As to the City of Houston, narrowly tailored relief concerning specifically identified City-controlled RMS records alleged to be materially inaccurate, misleading, or incomplete;

**2.** As to Harris Health, narrowly tailored relief concerning specifically identified Harris Health Epic or HIM records alleged to be materially inaccurate, misleading, or incomplete; and

**3.** No order requiring correction notices to nonparty agencies or prohibiting transmission of records by persons or entities not before the Court;

**(l)** Post-judgment and Pre-judgment interest as allowed by federal common law;

**(m)** Costs of suit and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 if counsel is retained; and

**(n)** Such other relief as this Court deems just and proper.

**Reservation of Rights:** The full scope of Defendants' unconstitutional customs, the identities of all responsible final policymakers, and the extent of their deliberate indifference are matters exclusively within Defendants' possession and control. Plaintiff reserves the right to supplement these allegations following discovery, and respectfully prays for leave to amend this Complaint should discovery reveal additional evidence supporting his claims.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**SECOND AMENDED COMPLAINT**
**SIGNATURE PAGE**

Respectfully submitted,

Dated: August 25, 2026

Robert W. Van Kirk

ROBERT W. VAN KIRK
Plaintiff, Pro Se
7366 Brace St., Houston, TX 77061
(832) 428-2882
robertwarnervankirk@gmail.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**VERIFICATION UNDER 28 U.S.C. § 1746**
**SIGNATURE PAGE**

P□□□□an□ □o 28 U.S.C. § 1746, I declа□e □nde□ penal□□ of pe□j□□□ □ha□ □he fo□egoing fac□□al allega□ion□ a□e □□□e and co□□ec□ □o □he be□□ of m□ pe□□onal kno□ledge, info□ma□ion, and belief.

E□ec□□ed on A□g□□□ 25, 2026.

Robert W. Van Kirk

ROBERT W. VAN KIRK
Plain□iff, P□o Se
7366 B□ace S□., Ho□□□on, TX 77061
(832) 428-2882
□obe□□□a□ne□anki□k@gmail.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**CERTIFICATE OF SERVICE**
**SIGNATURE PAGE**

I ce□□if□ □ha□ on A□g□□□ 25, 2026, a □□□e and co□□ec□ co□□ of □hi□ Second Amended Com□lain□ □a□ □e□□ed b□ email on all co□n□el of □eco□d.

Robert W Van Kirk

ROBERT W. VAN KIRK
Plain□iff, P□o Se
7366 B□ace S□., Ho□□□□on, TX 77061
(832) 428-2882
□obe□□□a□ne□anki□k@gmail.com